Michael L. Schrag (SBN 185832)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
lpl@classlawgroup.com

Scott L. Silver (admitted *pro hac vice*)
Ryan A. Schwamm (admitted *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: 954-755-4799
Facsimile: 954-755-4684
ssilver@silverlaw.com
rschwamm@silverlaw.com

*Counsel for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Shela Camenisch and Dale Dean; Luna Baron; and Eva King, Individually and as Trustee of the Eva M. King Trust, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>Umpqua Bank,<br><br>　　　　Defendant. | Case No. 3:20-cv-5905-RS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT<br>AND DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1. For the last several decades, Ken Casey has offered investors safe, steady returns backed by Marin County commercial real estate. When Casey died suddenly in May, however, it quickly became apparent that his investment business was actually a long-running Ponzi scheme likely to cost investors more than $100 million.

2. There was nothing particularly clever or original about Casey's Ponzi scheme. It would have been obvious to anyone with access to Casey's financials. Casey was raising hundreds of millions of dollars from mostly local mom and pop investors, by promising returns that income from the properties couldn't cover. To make the promised interest payments and fund Casey's lavish lifestyle, the business was depositing money from new investors into company accounts and then using those funds to pay previous investors and for Casey's personal benefit.

3. Casey's Ponzi scheme was so obvious that within a month of his death, the scheme was publicly exposed, the SEC had opened an investigation, and the business had to suspend monthly payments to existing investors due to inadequate funds.

4. Someone did have a clear view of Casey's financials far earlier—Umpqua Bank, the financial institution where Casey maintained every account he used to operate his multi-decade Ponzi scheme. But rather than expose Casey's fraudulent business, Umpqua chose to profit from it.

5. Plaintiffs Shela Camenisch, Dale Dean, Luna Baron, and Eva King were among those investors who have lost their savings as a result of Casey's Ponzi scheme and Umpqua Bank's knowing participation in that scheme. Casey's investment companies are now in bankruptcy and will not be able to make full restitution. But on behalf of themselves and other investors like them, Plaintiffs seek to hold Umpqua liable for aiding and abetting Casey's Ponzi scheme and require it to make amends to the scheme's victims.

# PARTIES

6. Plaintiffs Shela Camenisch and Dale Dean are citizens and residents of Richmond, Virginia. They were previously long-time residents of the San Francisco Bay Area who learned about Ken Casey and his investment business from friends in the area.

7. Plaintiff Luna Baron is a citizen and resident of Santa Cruz, California.

8. Plaintiff Eva King is a citizen and resident of Walnut Creek, California. King is also the sole trustee of the Eva M. King Trust.

9. Defendant Umpqua Bank is community bank organized and chartered in Oregon, with its principal place of business in Portland, Oregon.

## JURISDICTION

10. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed class; and at least one class member is a citizen of a state different from Defendant.

11. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because Plaintiffs and Umpqua are citizens of different states and the matter in controversy exceeds $75,000.

## INTRADISTRICT ASSIGNMENT

12. Assignment to the San Francisco Division or Oakland Division is appropriate because the Ponzi scheme at issue in this litigation was devised and orchestrated in Marin County. Ken Casey was a resident of Marin County, Casey's companies were headquartered in Marin County, and almost all of the real property Casey and his companies offered as collateral is located in Marin County—including the real property used as collateral for Plaintiffs' investments. In addition, Umpqua Bank maintains branches in Marin County, from which it did business with Casey and aided and abetted his Ponzi scheme.

## FACTUAL ALLEGATIONS

A. **Ken Casey's Ponzi Scheme**

13. Ken Casey is a former accountant who, in 1997, was convicted of 21 counts of bank fraud, five counts of tax evasion, five counts of filing false income tax return, and one count of conspiracy to defraud the United States. He was sentenced to 18 months in prison and lost his license to practice public accountancy.

14. When Casey died on May 6, 2020, the executor of his estate learned that Casey's criminal activity did not stop in 1997. Casey also operated a decades-long Ponzi scheme through which he defrauded more than 1,000 victims—most of them Bay Area residents—out of hundreds of millions

-3-   FIRST AMENDED COMPLAINT
Case No. 3:20-cv-5905

of dollars.

15. Casey ran his Ponzi scheme through two related companies—Professional Financial Investors, Inc. (PFI) and Professional Investors Security Fund, Inc. (PISF). Casey founded PISF in 1983 and served as its sole shareholder, officer, and director until his death. He founded PFI in 1990 and served as its sole officer, director, and shareholder until 1998, when he relinquished his corporate positions and placed his shares in an irrevocable trust for his ex-wife, Charlene Albanese. Casey continued to exercise *de facto* control over PFI until his death.

16. Through PFI and PISF, Casey used investor money to personally enrich himself and to build a reputation as a prominent businessman, adventurer, and philanthropist. At the time of his death, PFI and PISF owned interests in about 70 real properties worth more than $550 million and Casey was reputed to be the largest commercial property owner in Marin County.

17. The victims of Casey's Ponzi scheme invested in PFI and PISF's real property through various mechanisms, including through loans secured by junior deeds of trust in the property, loans secured by PISF's interest in limited partnerships that owned the property, and by purchasing membership in LLCs that owned the property.

18. Investors were promised steady returns at above-market rates in exchange for their contributions and were told that those returns would be paid from the real property's rental income and capital appreciation.

19. In fact, existing investors were paid in large part through new investors' contributions— the hallmark of a Ponzi scheme. Casey's Ponzi scheme was so reliant on new investor money that it could not persist for even one month following his death.

20. After Casey passed, Ms. Albanese hired an attorney at a small Marin County law firm to help transition ownership of the business. At the very outset of the attorney's review of PFI and PISF's finances, it was apparent Casey's businesses lacked sufficient cash flow to meet their monthly obligations and had been unlawfully diverting new investors' money to pay previous investors.

21. Payments to investors were ceased and Ms. Albanese directed the companies to alert governmental authorities, including the Securities Exchange Commission, about Casey's criminal activity. Investors were informed of both developments on June 4, 2020.

22. Since then, PISF has been forced into involuntary bankruptcy by some of its investors and a managing director at one of the largest independent accounting and business consulting firms in the United States was hired to serve as the Chief Restructuring Officer for PFI—which then voluntarily commenced bankruptcy proceedings of its own.

23. After commissioning valuations from a real estate brokerage, the Chief Restructuring Officer reports that PFI and PISF's real estate holdings are worth approximately $555 million; the outstanding debt on those properties, including debt owed to commercial lenders and one group of investors, is believed to total more than $400 million; and PISF appears to owe more than $250 million to other investors.

24. In other words, even after all efforts are made to return as much value as possible to investors, Casey's Ponzi scheme is likely to cost investors $100 million or more.

**B.     Umpqua Bank Aided and Abetted Casey's Ponzi Scheme**

25. Casey's Ponzi scheme only succeeded for so long because Casey was able to limit access to PFI and PISF's financials. Among the select few who did have access was Defendant Umpqua Bank.

26. Umpqua is required by law to conduct extensive customer due diligence, especially for high-risk and high-net worth customers like Casey. These "know your customer" obligations are ongoing and required Umpqua to familiarize itself with Casey, the nature of PFI and PISF's operations, the source and legitimacy of their funds, and the purpose of their bank accounts and ongoing financial transactions.

27. Umpqua was also required to monitor PFI and PISF's accounts for "red flags" indicative of potential fraud—a particular risk for companies associated with Casey, who had pled guilty to multiple instances of financial fraud—and to report suspicious activity to governmental authorities.

28. In the course of performing its customer due diligence obligations, Umpqua learned that Casey was operating a Ponzi scheme, using deposits from new investors to pay existing investors, and using investor deposits to pay Casey's personal expenses.

29. Umpqua's knowledge of Casey's Ponzi scheme was an inevitable consequence of several factors that made the scheme obvious to someone in Umpqua's position:

a. All of PFI and PISF's bank accounts were Umpqua accounts, giving Umpqua a full view of the companies' financials.

b. Casey's companies were among Umpqua's largest clients in this region, having raised hundreds of millions of dollars from investors, making their activities highly visible to Umpqua.

c. Casey was a convicted felon who had pled guilty to numerous counts of financial fraud, which drew further scrutiny to his financial enterprise.

d. Casey kept close control over the management of PFI and PISF—a highly unusual arrangement for an investment company of that size, which would normally employ a comprehensive management structure with multiple executives.

e. Casey also kept close control over PFI and PISF's bank accounts—another highly unusual arrangement for such a large investment business, which would normally have many account signatories.

f. PFI and PISF did not use outside accounting firms to manage or audit its finances and never provided Umpqua with independent audit reports.

g. PFI and PISF did not provide Umpqua with copies of any SEC filings and had not registered its investment offerings with the SEC or filed for an exemption.

h. PFI and PISF were not filing the appropriate forms to perfect investors' security interests and were not providing Umpqua with copies of those forms.

i. PFI and PISF's investment offerings were secured by collateral with little to no value, as the existing encumbrances on PFI and PISF's real property holdings exceeded their value.

j. PFI and PISF's bank accounts showed that the companies required a regular influx of new investor money to meet the companies' monthly obligations.

k. PFI and PISF's bank accounts showed that money deposited from new investors were being commingled with other investors' funds, were being used to pay existing investors, and were being used to pay Casey's personal expenses.

l. Casey's Ponzi scheme was so obvious to someone with access to PFI and PISF's bank accounts, it was discovered almost immediately after his death. Payments to existing investors had to be suspended within a month and the companies were forced into bankruptcy.

30. Although Umpqua knew Casey was defrauding investors and using their contributions to pay previous investors, it chose to profit from—rather than expose—the illicit business.

31. Umpqua provided the banking assistance that Casey needed to successfully operate his Ponzi scheme. Among other things, Umpqua received investor funds into PFI and PISF's accounts and transferred those funds to help PFI and PISF meet its monthly obligations to existing investors.

32. This is not the first time that Umpqua has elected to profit from Ponzi schemes. Within the past ten years, Umpqua has twice agreed to pay restitution to victims of Oregon-based Ponzi schemes after it was accused of aiding and abetting the chief perpetrators of those schemes.

### PLAINTIFFS' EXPERIENCE

#### Shela Camenisch and Dale Dean

33. Plaintiffs Shela Camenisch and her husband, Dale Dean, are long-time Bay Area residents who recently moved to Richmond, Virginia, to be near their only grandchild.

34. Camenisch learned of Ken Casey and his investment business from a friend of a friend, who had invested with Casey for many years and had always received her monthly payments. Cognizant of the impact that COVID was having on the stock market, Camenisch and Dean found the prospect of a steady and predictable return appealing and decided to invest with Casey.

35. Between March 19, 2020, and April 3, 2020, Camenisch and Dean invested $297,450: Camenisch invested $145,600 through her self-directed IRA, Dean invested $51,850 through his self-directed IRA, and the couple jointly invested another $100,000.

36. The form of each investment was a straight note signed by Ken Casey as President of PISF. The notes contemplated monthly interest payments at the rate of 9% per year and pledged repayment of the full principal and all interest owing within 5 years.

37. Casey also executed a related security agreement as President of PISF, under which he pledged PISF's interests in certain limited partnerships as collateral. The limited partnerships are managed by PFI and own ten apartment buildings in San Rafael and Novato valued at more than $100 million.

#### Eva King

38. Plaintiff Eva King learned of Casey and his investment business from a friend, who had

invested with Casey for years and had always received her monthly payments. King wanted to place a small sum of money she inherited from her mother and her savings from years of working as a hairdresser in a safe investment.

39. Between September 16, 2019, and April 2, 2020, King invested $194,300: $75,000 through her personal trust (Eva M. King Trust) and $119,300 through her self-directed IRA.

40. The form of each investment was a straight note signed by Casey as president of PISF. The notes contemplated monthly interest payments at the rate of 9% per year and pledged repayment of the full principal and all interest owing within 5 years.

41. Casey also executed a related security agreement as President of PISF, under which he pledged PISF's interests in certain limited partnerships as collateral.

**Luna Baron**

42. Plaintiff Luna Baron also learned of Casey and his investment business from a friend. Baron wanted to place a sum of money she inherited from her mother as well as some insurance proceeds she received from losing her property in a fire in a safe investment.

43. Between January 16, 2013 and November 14, 2019, Baron invested $170,000: $70,000 in deeds of trust and $100,000 in limited liability companies (Professional Investors 44, LLC and Professional Investors 48, LLC).

44. The deeds of trust were supposed to be secured by buildings that Casey's companies owned in Marin County, and were renewable after five years. The LLC investments were supposed to give Baron membership interests in PFI companies that owned particular buildings, and were supposed to provide her with at least 6% interest per year (paid quarterly) as well as a return on her principal with additional gains from the buildings' appreciation in value once the buildings were sold.

45. Camenisch, Dean, Baron, and King did not know that they were investing in a Ponzi scheme. They did not know that their investments were being used—with Umpqua Bank's assistance—to make monthly payments to previous investors. They did not know that the collateral for their investments was worthless or nearly worthless. And they did not know that PISF did not have sufficient capital to pay its monthly obligations to them without an influx of money from new investors.

46. Casey withheld all of this information from Plaintiffs with an intent to defraud them—

just as he had withheld similar information from prior investors. Had Plaintiffs known any of this information, they never would have invested their savings with Casey or PISF.

47. As a result of Casey's fraud, Plaintiffs have lost a substantial portion of their investments. They received only some monthly payments before Casey died, his Ponzi scheme was quickly discovered, and monthly payments to investors were suspended. PFI and PISF are now in the midst of joint bankruptcy proceedings and do not have sufficient assets to fully repay Plaintiffs the principal amount of their investments.

## CLASS ACTION ALLEGATIONS

48. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue their claims on behalf of a class of similarly situated persons. The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for purposes of this complaint, Plaintiffs propose the following class definition:

> All persons who invested money with and/or loaned money to Kenneth J. Casey, Professional Financial Investors, Inc. and/or Professional Investors Security Fund, Inc.

49. Plaintiffs further propose that the following persons be excluded from any certified class: Defendant, its current or former officers, directors, legal representatives, employees; any and all parent companies, subsidiaries, affiliates, predecessors, successors, or assigns of Defendant, Professional Financial Investors, Inc., Professional Investors Security Fund, Inc., or Kenneth J. Casey; and all judicial officers and associated court staff assigned to this case and their immediate family members.

50. The proposed class meets the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

51. *Numerosity*: The class is sufficiently numerous such that individual joinders are impracticable. The Chief Restructuring Officer for PFI and PISF reports estimates the number of direct victims of Casey's Ponzi scheme at approximately 1,000, and the number of additionally affected investors who had their investments co-mingled with ill-gotten gains at approximately 500.

52. *Commonality:* Plaintiffs' and class members' claims against Umpqua present common

questions of law and fact, including:

    a. what Umpqua learned about Casey's Ponzi scheme and when it learned it?

    b. whether the information Umpqua knew about Casey's Ponzi scheme constitutes actual knowledge under the law of aiding and abetting?

    c. what transactions or other activities Umpqua performed for Casey and his companies?

    d. whether Umpqua's activities constitute substantial assistance under the law of aiding and abetting?

53. *Typicality:* Plaintiffs' claims against Umpqua Bank are typical of the class's claims. Plaintiffs and class members were all victims of Casey's Ponzi scheme, each has claims against Umpqua Bank for aiding and abetting that scheme, and each claim will depend on common proof that Umpqua Bank knew about Casey's Ponzi scheme and substantially assisted.

54. *Adequacy*: Plaintiffs are members of the class and will fairly and adequately protect its interests. Plaintiffs' interests are aligned with those of the class, as each seeks to recover from Umpqua Bank for aiding and abetting the Ponzi scheme that caused them financial harm.

55. *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. The major issues upon which Umpqua's liability depends—namely, whether Umpqua had actual knowledge of Casey's Ponzi scheme and substantially assisted—are each susceptible to generalized proof that would establish Umpqua's liability as to all class members through a single trial.

56. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims is likely to require intensive discovery of a $24 billion financial institution, review of large amounts of electronically stored information, and hiring of financial experts to explain and interpret the significance of both Casey's and Umpqua's records. These are matters that are best handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

# FIRST CAUSE OF ACTION
## Aiding and Abetting Fraud

57. Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and in so doing, incorporate all preceding allegations.

58. Plaintiffs and class members were each victimized by the Ponzi scheme orchestrated by Ken Casey. Casey solicited and accepted investments from Plaintiffs and class members with the intent to defraud them. Casey did not tell Plaintiffs or class members that their investments were being used—with Umpqua Bank's assistance—to make monthly payments to previous investors. Nor did Casey tell Plaintiffs or class members that his investment companies lacked sufficient capital to meet their obligations to investors unless they continued to solicit and receive money from new investors.

59. Defendant Umpqua Bank aided and abetted Casey's Ponzi scheme and is accordingly liable for the damage caused to Plaintiffs and class members. As previously alleged, Umpqua learned of Casey's Ponzi scheme in the course of performing its customer-due-diligence obligations and gave substantial assistance to the Ponzi scheme.

60. As a result of Umpqua's aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

# SECOND CAUSE OF ACTION
## Aiding and Abetting Breach of Fiduciary Duty

61. Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and in so doing, incorporate all preceding allegations.

62. Casey owed Plaintiffs and his other investors a fiduciary duty, which he breached by enlisting them in a Ponzi scheme whereby he used their investments to pay previous investors and to personally enrich himself.

63. Umpqua Bank knew the nature of Casey's business, including that he solicited and accepted investments and owed his investors a fiduciary duty to act with the utmost good faith and in the best interests of those investors.

64. Umpqua also knew that Casey was breaching his fiduciary duty. As previously alleged, Umpqua learned of Casey's Ponzi scheme in the course of performing its customer-due-diligence

obligations. Yet instead of exposing the Ponzi scheme, Umpqua substantially assisted Casey in operating the scheme and breaching his fiduciary duty to Plaintiffs and class members.

65. As a result of Umpqua's aiding and abetting of Casey's breach of his fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief on behalf themselves and all others similarly situated:

A. A determination this lawsuit may be maintained as a class action

B. An award of damages in an amount to be determined at trial

C. Pre-judgment interest and post-judgment interest, as provided by law

D. Attorneys' fees and expenses, including expert fees

E. Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: June 30, 2021

/s/ Michael Schrag
**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Linda P. Lam (SBN 301461)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:  510-350-9700
mls@classlawgroup.com
lpl@classlawgroup.com

**SILVER LAW GROUP**
Scott L. Silver (Fla Bar No. 095631)
Ryan A. Schwamm (Fla Bar No. 1019116)
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: 954-755-4799
ssilver@silverlaw.com
rschwamm@silverlaw.com

*Counsel for Plaintiffs and Proposed Class*