# GIBBS LAW GROUP
### L L P

July 30, 2021

**VIA ECF**

Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 – 17th Floor
450 Golden Gate Avenue
San Francisco, California 94102

      Re:    *Camenisch et al. v. Umpqua Bank*, Case No. 3:20-cv-05905-RS

Dear Judge Seeborg,

The parties submit this joint discovery letter regarding Plaintiffs' request that Umpqua produce various documents that Umpqua believes to be protected by the Suspicious Activity Report (SAR) privilege. The parties disagree as to whether the privilege applies. The parties met and conferred by telephone and e-mail, but have not resolved this issue.

**Plaintiffs' Position**

Plaintiffs requested that Umpqua produce all documents relating to suspicious activity alerts on accounts linked to Professional Financial Investors, Inc. (PFI)—the Umpqua customer that has recently admitted to perpetrating a decades long Ponzi scheme. PFI used Umpqua for all its business banking needs and, at various times during the scheme, had over 300 accounts there. The suspicious activity alert documents are relevant because Plaintiffs have alleged Umpqua aided and abetted the Ponzi scheme, and the requested documents are important circumstantial evidence of PFI's knowledge of that scheme. Dkt. 41 at ¶ 25-31.

Umpqua has produced a spreadsheet listing 152 suspicious activity alerts generated by the bank's artificial intelligence system. The system provides an alert for any activity that is unusual, not just activity that is actually indicative of fraud. Bank personnel are then required by internal policy to investigate the flagged activity and decide what action to take next. In some cases, a Suspicious Activity Report (or SAR) may ultimately be filed with the federal government, but in other cases, the bank may decide that filing a SAR is not necessary. The spreadsheet shows basic information about each alert – such as its date, the general conduct that triggered it (e.g. "excessive daily outgoing fund transfers"), and whether it was "closed." Umpqua, however, objects to producing any documentation related to these alerts, including analyst notes and 133 documents related to investigations stemming from the alerts.

The SAR privilege prohibits banks from disclosing the actual Suspicious Activity Reports filed with the federal government or the fact that a SAR was indeed filed. 12 C.F.R. § 21.11(k)(1)(i). The public policy behind the privilege is to encourage banks to candidly report suspicious activity without fear of retaliation. Confidentiality of Suspicious Activity Reports, 75 Fed.Reg. 75593, 75595 (Dec. 3, 2010).

Although it's clear that a bank is not allowed to produce any document that expressly states whether a SAR has been filed, the law is evolving on whether the SAR privilege extends to

To: Hon. Judge Richard Seeborg
Re: *Camenisch et al. v. Umpqua Bank*
Date: July 30, 2021
Page: 2 of 6

a bank's internal investigation documents (i.e., documents that identify unusual activity but are silent on whether a SAR has been filed). While the Ninth Circuit has not addressed this issue, the First Circuit and many district courts have found that the privilege does not extend as far as Umpqua claims. Courts agree that the privilege does not cover "[t]he underlying facts, transactions, and documents upon which a SAR is based." *In re JP Morgan Chase Bank, N.A.*, 799 F.3d 36, 43 (1st Cir. 2015). It also does not cover "'documents produced in the ordinary course of business pertaining to the defendants' banking activities, transactions, and accounts that do not suggest the existence of a SAR." *Id.* (quoting *Whitney Nat. Bank v. Karam,* 306 F. Supp. 2d 678, 683 (S.D. Tex. 2004)).

When the First Circuit was deciding whether a set of documents was protected by the SAR privilege in the *JP Morgan* case, it conducted an *in camera* review and asked "the key query" – "whether any of those documents suggest, directly or indirectly, that a SAR was or was not filed." *Id*. It then concluded that none of the documents did; for example, none of them were draft SARs, documents reflecting the decision-making process on whether a SAR should be filed, or documents about the process of preparing a SAR. *Id*. The First Circuit specifically declined to extend the privilege to any document about "the investigative methods of financial institutions," since that "approach would see the bulk of a financial institution's investigative file in a particular case shielded from discovery." *Id*. at 44.

District courts have similarly held that because "detecting fraud is a part of a bank's ordinary course of business," documents created from that standard business practice are discoverable. *First Am. Title Ins. Co. v. Westbury Bank*, 2014 WL 4267450, at *3 (E.D. Wis. Aug. 29, 2014). This means "discovery reports, memoranda, or underlying transactional documents generated by a bank's internal investigation procedures" are not protected. *Wiand v. Wells Fargo Bank, N.A.*, 981 F.Supp.2d 1214, 1217 (M.D. Fla. 2013). The fact that these documents show a bank was aware of fraud that may have been reported in a SAR, and there is a reasonable inference that the bank generally complies with federal regulations, does not mean that information "would" reveal that a SAR was filed. *First Am. Title Ins. Co.*, 2014 WL 4267450 at *2; *Freedman & Gersten, LLP v. Bank of America, N.A.*, 2010 WL 5139874, at *3 (D.N.J. Dec. 8, 2010) (compelling production of "any memoranda or documents drafted in response to the suspicious activity at issue").

Based on guidance from these district courts and the First Circuit, Umpqua should be required to produce any documents related to suspicious activity alerts on PFI that do not reveal the existence of a SAR. Information on these 152 alerts and how Umpqua reacted to them is likely to be highly relevant to the primary issue in this case: whether Umpqua had actual knowledge of the alleged fraud. Dkt. 33 at 5-6.

Umpqua may have internal investigation procedures for the dual purposes of routine fraud monitoring and compliance with federal reporting regulations, but that fact should not shield every analyst note or document on unusual activity from discovery. If that were the case, a

To:   Hon. Judge Richard Seeborg
Re:   *Camenisch et al. v. Umpqua Bank*
Date: July 30, 2021
Page: 3 of 6

bank's entire internal investigation file on any conduct that may have been reported in a SAR would be privileged. But the SAR privilege only prevents disclosure of information that "would" reveal the existence of a SAR – not "information that 'could' or 'might' reveal the existence." *First Am. Title Ins. Co.*, 2014 WL 4267450 at *2. If Umpqua maintains that each and every document related to these 152 alerts "would" reveal the existence of a SAR, Plaintiffs propose the Court conduct an *in camera* review of these documents (or a sampling of them that includes each type of document the bank is withholding) as other courts have done to determine whether the privilege applies. *See Wiand,* 981 F.Supp.2d at 1215.

In sum, Plaintiffs respectfully request that Umpqua produce documents relating to the 152 alerts that do not on their face reveal that a SAR was filed. If sections of certain documents do reveal whether a SAR was previously filed, Umpqua can redact those sections and produce the remainder of those documents. *See Wiand*, 981 F.Supp.2d at 1218 n.5 (ordering bank to produce internal documents, reports, and transaction documents with specific pages redacted based on SAR privilege).

**Defendant's Position**

Plaintiffs seek information and documents ("SAR Information") implicating the SAR privilege. RFP 12 (documents triggering an alert within any monitoring or detection system maintained by Umpqua); Interrogatory 6 (describe transactions requiring investigation), 8 (describe actions Umpqua took to respond to alerts), 12 (identify investigations, including analysis, conclusions, and summaries, of any accounts). While Umpqua asserted various objections to these discovery requests, the threshold issue presented to the Court here is whether the SAR Information is protected by the SAR privilege.

Subject to its objections and the protective order, Umpqua confidentially produced a spreadsheet identifying all automated alerts from NICE Actimize (Actimize), a third-party artificial intelligence platform/system used by Umpqua to help, through automated means, detect potential money laundering activity. *See* UMPQUA_0046634. The spreadsheet identifies 152 automated SAM alerts, and 0 enhanced due diligence alerts, from 2018 through 2021. The spreadsheet shows the date of the alert, a unique alert identifier, the entity triggering the alert, the action taken on the alert, including if the alert closed, the Umpqua analyst reviewing the alert, and the "rule" name, or brief explanation, for why the alert triggered.

Actimize uses artificial intelligence, machine learning, and robotic process automation combined with rules-based models and analytics to identify potential money-laundering risks. An alert generates, or triggers, when Actimize matches data against pre-determined scenarios and thresholds that cause a rule deviation. An alert in the Actimize system means that a certain business transaction may ***potentially*** contain suspicious activity—not that there is suspicious activity—such that further review of that transaction is warranted. A bank analyst is assigned to examine the alert, investigate the transaction or context for why the alert triggered, and determine the disposition of the alert, including whether it should be closed, escalated for further

To:    Hon. Judge Richard Seeborg
Re:    *Camenisch et al. v. Umpqua Bank*
Date:  July 30, 2021
Page:  4 of 6

investigation, or recommend if a SAR should be filed. During the investigation, an analyst may attach documentation to the alert if he or she relied upon any in reaching a decision.

Umpqua has already produced the information and documents it can to Plaintiffs. The remaining documents Plaintiffs demand are not discoverable because they are protected by the federal SAR privilege. The SAR privilege, which is not Umpqua's privilege to waive, prohibits Umpqua from producing documents that reflect Umpqua's decision-making processes. The SAR privilege prohibits Umpqua from disclosing documents relating to a SAR and imposes serious civil and criminal penalties for improper disclosure. 31 U.S.C. § 5322 and 31 U.S.C. § 1010.840. The SAR framework is critical to the government's efforts to combat financial crimes. The SAR framework creates "an environment that encourages banks to report suspicious activity" freely, comprehensively and without fear of reprisal. 75 Fed. Reg. 75576-01, 75579 (Dec. 3, 2010).

The SAR privilege requires banks "to report any suspicious transaction relevant to a possible violation of law or regulation" by filing a SAR with FinCEN. 31 U.S.C. § 5318(g). The privilege covers the SAR itself, documents expressly stating the existence of a SAR, and documents that indirectly suggest the existence or nonexistence of a SAR. *In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 43 (1st Cir. 2015). Documents generated "in the context of the SAR/no-SAR decision-making process" are protected as are documents that contain a "SAR/no-SAR narrative". *Zeitlin v. Bank of America, N.A.,* 2021 WL 2595102, *3 (D. Nev. June 24, 2021)*. Documents with "material of an evaluative nature" prepared "for the specific purpose of complying with federal reporting requirements" are also protected. *Id.* In short, the SAR privilege prevents a bank from producing documents that would reveal whether a SAR was filed without the aid of supposition of speculation. *Id*. at *3.

The withheld SAR Information is subject to the SAR privilege for four reasons. ***First***, this SAR Information[1] is protected because it is solely used to make a decision about whether to file a SAR. Pursuant to Umpqua's policies and procedures, in investigating the triggered alert, the analyst is required to affirmatively indicate on the Actimize platform if there exist prior alerts and SARs to determine dispositions and activity associated with the entity under review. *See* UMPQUA_0047443 (Anti-Money Laundering Investigations (AMLi) Procedures). Thus, production of this information will "suggest, directly or indirectly, that a SAR was or was not filed," is used solely in the context of the SAR decision-making process, and is part of Umpqua's federal reporting requirements *In re JP Morgan Chase Bank, N.A.*, 799 F.3d at 43.

***Second,*** the SAR Information is protected because it does not reflect information related to "[t]he underlying facts, transactions, and documents upon which a SAR is based" and are not "made in the ordinary course of business." *Supra* at p. 2. Documents representing underlying facts and transactions, or documents "made in the ordinary course of business" include routine bank-created documents with factual information like business records, account information,

---

[1] Umpqua compiled an excel spreadsheet of the analyst notes on each alert and identified 7 documents attached to the alerts along with other protected documents stemming from the alerts.

To: Hon. Judge Richard Seeborg
Re: *Camenisch et al. v. Umpqua Bank*
Date: July 30, 2021
Page: 5 of 6

bank statements, or funds transfer records (*i.e.*, cash deposits, wire transfers, checks, withdrawals).  *See* Confidentiality of SARs, 75 Fed. Reg. 75593–01, 75595 (Dec. 3, 2010); *see also Cotton v. PrivateBank and Trust Co.*, 235 F. Supp. 2d 809, 814 (N.D. Ill. 2002) (underlying documents such as "wire transfers, checks, deposits, etc. are disclosed as part of the normal discovery process").  To that end, Umpqua has already produced over 27,000 documents amounting to over 50,000 pages of information to Plaintiffs that reflect the "underlying facts, transactions, and documents." These documents, upon which a SAR may be based, include email correspondences, bank statements, account information, checks and wires, account formation, signature cards, customer due diligence documentation on customer verification, identification, and beneficial ownership, and policies and procedures.

    ***Third,*** the SAR Information is protected because it consists of "material of an evaluative nature" prepared "for the specific purpose of complying with federal reporting requirements." *Zeitlin*, 2021 WL 2595102, at *3 (applying SAR privilege to documents that contained a SAR/no-SAR narrative because the "free-text area" describing potentially suspicious activity is of an evaluative nature); *Lan Li*, 2020 WL 5887443, at *2 ("[T]ransaction monitoring alerts and processes/algorithms used to detect suspicious transactions and comply with BSA and AML . . . are protected by the SAR privilege" because they were of an "evaluative nature"); *Fed. Trade Comm'n v. Marcus*, 2020 WL 1482250, at *5 (S.D. Fla. Mar. 27, 2020) (same).  The SAR Information is of an evaluative nature, and protected, because analysts provide their investigative, free-narrative, comments about the triggered rule activity, explain whether the conduct reflects routine business activity or potentially suspicious activity, evaluate account information and provide a recommendation as to how to handle the alert, including whether to file or not file a SAR.  For alerts, analysts are also required to affirmatively indicate on the Actimize platform if there exist prior alerts and SARs on the entity under review, and screenprints come from Actimize—Umpqua's SAR case management system.  *Zeitlin*, 2021 WL 2595102, *3 (protecting documents that included SAR/no-SAR narratives, and "screenprints of [defendant's] case-management system" because they are "material of an evaluative nature").

    ***Fourth,*** public policy supports application of the privilege.  FinCEN and the OCC are in accord, explaining that the "strong public policy that underlies the SAR system . . . leans in favor of applying SAR confidentiality not only to a SAR itself, but also in appropriate circumstances to material prepared by the national bank as part of its process to detect and report suspicious activity, regardless of whether a SAR ultimately was filed or not." Confidentiality of Suspicious Activity Reports, 75 FR 75576-01.  Disclosure of this information harms the need for transparency purposefully cultivated in the reporting environment—banks should not have to second guess whether to comply with reporting requirements. Umpqua respectfully requests the Court deny Plaintiffs' request.  If the Court is inclined, it could review the documents *in camera*, or order the parties to provide additional briefing if that will assist with its determination.

To: Hon. Judge Richard Seeborg
Re: *Camenisch et al. v. Umpqua Bank*
Date: July 30, 2021
Page: 6 of 6

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| */s/ Linda Lam* | */s/ Alicia Baiardo* |
| Linda Lam | Alicia Baiardo |
| *Counsel for Plaintiffs* | *Counsel for Defendant Umpqua Bank* |