UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al.,<br>    Plaintiffs,<br>    v.<br>UMPQUA BANK,<br>    Defendant. | Case No. 20-cv-05905-RS<br><br>**ORDER DENYING SUMMARY JUDGMENT AND GRANTING CLASS CERTIFICATION** |

## I.  INTRODUCTION

Plaintiffs in this putative class action are victims of an alleged Ponzi scheme carried out by Kenneth Casey through two companies he founded and controlled—Professional Investors Security Fund, Inc. ("PISF") and Professional Financial Investors, Inc. ("PFI"). Casey is deceased, and PISF and PFI are in bankruptcy. Plaintiffs therefore seek to recover damages from Umpqua Bank, the financial institution that handled all of the accounts of PISF and PFI. Plaintiffs now move to certify the class, and Umpqua moves for summary judgment. The motion for summary judgment will be denied, and a class will be certified.

## II.  BACKGROUND

There is no dispute that PISF and PFI started out as legitimate, profitable, businesses that focused on acquiring and operating commercial real estate in Marin and Sonoma Counties. PISF was founded by Casey in 1983. PFI was incorporated in 1990. Around that same time, Casey hired

Lewis Wallach, who later became PFI's President and began handling its day-to-day operations. Although it was originally contemplated that PFI would take over PISF's business, the entities instead began operating together. Hereinafter, the two entities will be referred to collectively as PFI, unless otherwise specified.

PFI's model was to use investor-sourced funds to purchase and operate properties, with the ultimate goal of selling them after they had appreciated. PFI ultimately acquired 71 properties, estimated to be worth $550 million when it eventually filed for bankruptcy.

PFI offered five different forms of investment vehicles over the years. Initially, PFI gave investors the opportunity to become limited partners in partnerships that acquired and managed specific properties. Later PFI offered second deeds of trust on properties it acquired in its own name, with commercial financing. PFI eventually also offered unsecured promissory notes, with higher interest rates than provided by the deeds of trust. In 2012, PFI began offering membership interests in limited liability companies, which like the earlier limited partnerships, were formed for specific properties. Finally, PFI offered interests in tenancies-in-common, which enabled investors who were selling their own investment properties to acquire title directly and thereby take advantage of the IRS's "1031 exchange" rules.[1]

Although PFI began as a legitimate enterprise, at some point its revenues became insufficient to pay its debts and it began relying on new investments to help pay expenses. At that point, in plaintiffs' view, it became a Ponzi scheme. Plaintiffs assert Wallach has admitted those conditions arose in the mid-2000s.[2]

---

[1] A "1031 exchange" is a transaction structured under IRS regulations to permit deferral of taxation on capital gains.

[2] More precisely, however, Wallach testified only that he became aware that PFI was not profitable in the mid to late 2000s. He went on to explain that because of the substantial equity in the assets, he believed the business remained legitimate, despite the losses. It was not until after 2012, when there was no longer sufficient value in the enterprise, that Wallach viewed the operation as fraudulent.

PFI offered its investment vehicles primarily to Bay Area locals. Over the past fifteen years, it raised hundreds of millions of dollars from more than a thousand investors. Plaintiffs complain that none of them were told the truth that PFI was raising money from new investors to pay existing investors and that Casey and Wallach were diverting funds to themselves. Plaintiffs admit the real estate investments were genuine, but contend they generated far less rental income than necessary to pay investors as promised, and were so heavily encumbered as to make the supposed collateral worthless or nearly worthless.

In May of 2020 Casey died. His former wife, apparently the beneficiary of his estate, asked an attorney to help transition ownership of the business. The attorney immediately recognized PFI was insolvent and could not legitimately meet its monthly obligations to investors. Further investor payments were frozen, the SEC was alerted, and the companies were forced into bankruptcy. All of the companies' officers resigned. June Weaver, who was the Umpqua employee with primary responsibility for PFI's accounts—its so-called "private banker"—retired.

Wallach later pled guilty to defrauding investors and embezzling over $26 million of investor money from the companies' bank accounts and is currently serving a 12-year prison sentence. A subsequent financial review commissioned by PFI's newly appointed independent director confirmed that new investor funds had been transferred to existing investors and to Casey and Wallach's personal bank accounts since at least 2007.[3]

Plaintiffs contend that as result of PFI's fraud, the 1,267 investors in the proposed class contributed $454 million they otherwise would not have invested with the entities. The investors are expected to recover only $100 to $120 million from the bankruptcy proceedings, leaving them with uncompensated losses in excess of $300 million.

---

[3] Umpqua asserts Wallach's embezzlement did not begin until 2015. This possible disputed factual detail is not material to any substantive issue.

III.  LEGAL STANDARDS

A. Summary judgment

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which that party bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e*., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

B. Class certification

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which represents more than a mere pleading standard. To obtain class certification, plaintiffs bear the burden of showing they have met each of the four requirements of Rule 23(a) and at least one

subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule." *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

Rule 23(a) provides that a court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If all four Rule 23(a) prerequisites are satisfied, a court must also find that plaintiffs "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). Relevant here is Rule 23(b)(3), which permits certification if a court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These requirements are often referred to as predominance and superiority. The class certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Dukes*, 131 S. Ct. at 2551).

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

IV.  DISCUSSION

A. Summary Judgment

As they did at the motion to dismiss stage, the parties agree that Umpqua cannot be liable for aiding and abetting PFI's fraud unless it had actual knowledge of the wrongdoing—

constructive knowledge will not suffice. Therefore, even the existence of "red flags" that arguably should have put Umpqua on notice that something "fishy" was taking place is insufficient to create a triable issue of fact.

As Umpqua correctly acknowledges, however, in some instance the same kinds of evidence that could be used to argue the bank *should have* known (were constructive knowledge sufficient), may support an inference that the bank *must have* known. Although plaintiffs are sometimes imprecise and use the term "red flags" or other language more applicable to a constructive knowledge standard, they concede they will be required to show at trial that the bank had actual knowledge. The question at this juncture, therefore, is whether the evidence to which plaintiffs point, whether described as "red flags" or otherwise, is sufficient to permit a reasonable jury to infer that Umpqua *must have* known—*i.e.*, had actual knowledge—of the fraud.

*Plaintiffs' evidence*

Plaintiffs contend that all of the following facts give rise to at least a triable issue of fact that Umpqua had actual knowledge:

In 1997, Casey pled guilty to 21 counts of bank fraud, five counts of tax evasion, five counts of filing a false income tax return, and one count of conspiracy to defraud the United States. He was sentenced to 18 months in prison and lost his CPA license. Other banks were unwilling to do business with PFI once they discovered that Casey was involved. Casey, however, was acquainted with the CEO of a small bank named Novato Community Bank, who agreed to provide PFI with banking services. Novato Community Bank later became known as Circle Bank. June Weaver began serving as PFI's private banker in that general time frame.

Umpqua acquired Circle Bank in 2012, and retained Weaver as PFI's private banker. Umpqua continued handling PFI's accounts for the next eight years. Although Umpqua did not generally retain Circle Bank's customer files, an email produced by Umpqua's employees included a write-up on PFI that Circle Bank had prepared shortly before the acquisition. Exh. 18. That memorandum shows Circle Bank was aware of Casey's criminal history, and that the PFI and

PISF entities served to downplay his involvement in the real estate investment business. "Ken Casey got into trouble with the IRS and was prosecuted for false representation of financial statements. As a result, PFI, Inc. was formed . . . and it became general partner of all the properties."[4] Exh. 19.

Several Umpqua employees reviewed the Circle Bank memo in 2012. Umpqua itself later declined to approve a real estate loan to PFI because of Casey's criminal conviction and ongoing continued involvement in the business. An Umpqua document states Casey, "was prosecuted by the IRS for tax evasion and fraud. His current role is 'advisor' but . . . he effectively is still running the company. Given that . . . we are going to pass [on loaning money to PFI]." Exh. 20. Umpqua chose to continue serving as PFI's bank, however.

Allegedly to facilitate PFI's ability to borrow from other institutions, Umpqua proactively assisted it in removing Casey's name from all bank statements and account documents. An email states: "are there any other accounts that Ken needs to come off of?"[5] Exh. 21.

Plaintiffs contend Umpqua knew that PFI was commingling investor funds and using new investor money to benefit existing investors. The various partnerships or limited liability companies associated with each investment property typically opened their own separate bank accounts, which is a common practice designed to ensure that money from one investment is not commingled with money from another investment. As an Umpqua banker stated, "it's to keep them separate from each other." Exh. 24. The Circle Bank memo disclosed, however, that PFI was engaged in "unrestricted inter-company borrowing," Exh. 19, with the result that money belonging to investors in one property was sometimes used for the benefit of prior investors in other properties.

---

[4] The evidence actually is that "PFI, Inc." was formed in 1990, long before Casey's guilty plea in 1997. It may be, however, that PFI, as opposed to PISF, started serving as general partner for the projects to create greater apparent separation from Casey.

[5] Umpqua, however, contends Weaver worked to remove Casey's name from accounts only because she believed he was retiring.

PFI was constantly shuffling money among various investment accounts because the underlying real estate did not produce enough rental income to satisfy the companies' monthly obligations to investors. June Weaver was very familiar with the practice. An email from Wallach to Weaver commented, "It's probably scary how much you will remember about all of our accounts. 50 years from now you will always remember 20064735"— which was the account number for the PISF "clearing account" prior to 2015. Exh. 25.

Weaver spent a great deal of time monitoring PFI's accounts for overdrafts and helping to cover the shortfalls. In an email she wrote: "I'm actually off today but I always check on our overdrafts. [A certain account] is negative approx. $8800." Exh. 27; *see also* Exhs. 28, 29 (reporting other account shortages); Exh 14 (Weaver testifying that a $400,000 shortfall was not an unusually large amount.)

Weaver worked to ensure these chronic account shortages were always covered—even if it meant using atypical banking procedures. On some occasions she transferred investor funds into deficient accounts without first obtaining PFI's authority—a violation of banking protocol. In one instance Weaver advised PFI, "I had to do a quick transfer to make sure the $75000 check got paid." Exh. 30. Another time, she agreed to deposit a check into an account she had previously identified as "short almost $95,000"—even though a different account number was written on the check. Exh. 31. On yet another occasion, Weaver falsely recorded a deposit to cover a check, advising PFI that she "made a 'ghost' deposit so I could pay the item." Exh. 33. Weaver also regularly reversed overdraft fees associated with PFI's recurrent shortage of funds, a practice that was unusual for Umpqua.

PFI's account shortages frequently involved so-called "clearing accounts." Plaintiffs contend this is significant because the clearing accounts are supposed to be "pass-through" accounts for investor money, used to receive money from investors to then be immediately distributed to the appropriate investment account, and to direct monthly payments back out to investors. According to plaintiffs, balances were not to be kept in clearing accounts and they should never have been overdrawn.

1    PFI, however, regularly used investor funds in the clearing accounts to cover shortfalls in
2    other accounts and regularly transferred funds from other accounts to cover overdrafts in the
3    clearing accounts. At her deposition, Weaver appeared to acknowledge she knew both that the
4    clearing accounts contained new investor money and that PFI was using that new investor money
5    to cover shortfalls in other accounts. Exh. 14.[6]

   Bank records show that Casey and Wallach used at least $26 million of investor funds for
their own personal benefit between 2015 and 2020. Weaver knew about these disbursements and
frequently transferred large sums of money into Casey or Wallach's personal accounts at their
request. Other Umpqua employees at the Novato branch, including branch manager, A.J. Vazquez,
were aware of these personal transfers and assisted in executing them. See Exhs. 44-47.

   Plaintiffs contend Vazquez and Weaver had "powerful incentives" not to call attention to
what PFI was doing. Umpqua assigned each branch and each branch employee specific goals for
deposits and accounts. Those goals were relevant to performance reviews, commissions, bonuses,
and even continued employment. PFI represented a major portion of the Novato branch's deposits
and accounts, and was among Umpqua's top 20 business banking relationships overall.

   Plaintiffs assert the Novato branch was well aware of how important PFI was to its own
success as well as to the bank's overall success. Employees monitored PFI's business closely and
worried when PFI's combined balances would drop even temporarily. Emails between Weaver
and Vasquez included exchanges such as, "PFI is wiring out 7 million this morning . . . darn" with
a response, "noooooooooo!!!!!!!!!!! . . . oh man. hopefully they bring it in again." Exh. 52.

   As typical in the banking industry, Umpqua uses an automated system to monitor for
suspicious activity and detect fraud. Between June 2018 and April 2020, Umpqua's system issued
146 alerts for PFI. Umpqua has indicated the system it used prior to that time generated a similar

---

[6] Umpqua argues the deposition testimony could be interpreted as only an acknowledgement by Weaver as to what was shown by documents presented to her at the time of the deposition, rather than an admission as to what she knew at the time of the underlying events. Perhaps so, but that at most creates a factual issue.

United States District Court
Northern District of California

quantity of alerts and assigned PFI a risk score three times above the threshold for "high risk." Umpqua's analysts investigated all the alerts and ultimately dismissed each one without taking preventative action. Plaintiffs insist that during the course of those investigations, which at minimum would have included a review of the transactions leading up to the alert, Umpqua's analysts would have seen new investor money being used to pay existing investors or being transferred into Casey and Wallach's personal accounts. While the record does not show why Umpqua did not take further action in response to the system's warnings, plaintiffs suggest the bank's analysts were influenced by Weaver's efforts to shield PFI.

Plaintiffs contend that the reactions of Umpqua employees when Casey died and the Ponzi scheme came to light support an inference they already knew. According to plaintiffs, neither Weaver's nor Vazquez's internal messages evidence surprise or sympathy for PFI's investors. Instead, Vazquez lamented the loss of PFI's deposits in a text message to the Novato branch's prior manager: "sooo im pretty sure I will be losing all the PFI deposits." Ex. 67. Weaver, who had only just recently returned to work after self-isolating for the first few months of the COVID pandemic, abruptly retired.

Finally, plaintiffs claim that if Umpqua had not been complicit in the Ponzi scheme, standard banking procedure would call for the bank to conduct a thorough internal investigation, issue a post-mortem report documenting how Casey was able to hide his illicit activities from the bank for fifteen years, and implement comprehensive changes in its fraud-monitoring policies and practices. Umpqua has neither issued a post-mortem report nor made any changes to its internal policies and procedures. Umpqua's Operations Manager did visit the Novato branch to investigate, but there is no documentation of that investigation after she noted that money had flowed from a PISF clearing account to Casey's personal accounts. "Holy Moly I see transfers were allowed." Exh. 68.[7]

---

[7] Plaintiffs have also offered an expert declaration from Catherine Ghighlieri, who has extensive experience in the banking regulatory field. Umpqua is correct that expert testimony regarding what banks *should* do in various circumstances does not in itself create a triable issue of fact as to whether Umpqua had actual knowledge here. An expert also may not offer legal opinions or

CASE NO. 20-cv-05905-RS
10

*Umpqua's arguments*

Umpqua begins by observing the order on the motion to dismiss noted it was "a close case at the pleading stage" whether Plaintiffs' aiding and abetting claims would be allowed to proceed due to the high bar that California law imposes on aiding and abetting claims brought against depository banks. "[T]he present banking system operates under rules requiring banking transactions to be processed quickly and automatically and imposing strict deadlines for the payment or timely dishonor of checks. Under this system a bank cannot be expected to track transactions in fiduciary accounts or to intervene in suspicious activities." *Casey v. U.S. Bank Nat. Ass'n*, 127 Cal. App. 4th 1138, 1151 (2005) (citation, alteration and internal quotation marks omitted). To preserve basic banking practices, therefore, California law makes clear that a depository bank cannot be liable for aiding and abetting unless the bank has actual knowledge of the specific tort being committed such that the bank can be said to have made a conscious decision to help facilitate the commission of the tort. *Id*. at 1145.

Under California law, liability may be "imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Casey*, 127 Cal. App. 4th at 1144 (citations and internal quotation marks omitted). California law makes clear that Umpqua did not owe the named plaintiffs, four non-customers, a duty of care. *See Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 543 (1998) (banks do not owe third parties any duty of care). Plaintiffs therefore can only pursue their aiding and abetting claims under the "knowledge" plus "substantial assistance" prong.

Umpqua insists plaintiffs have no evidence that it had actual knowledge of the specific

---

ultimate opinions, and portions of her declaration stray into that territory. Ghighlieri, however, may properly offer evidence regarding normal banking practices, for the purpose of evaluating whether an inference of actual knowledge may be drawn from how Umpqua behaved here.

CASE NO. 20-cv-05905-RS
11

torts it is alleged to have aided and abetted—*i.e.,* the "Ponzi scheme" Casey and Wallach purportedly carried out through PFI, which encompassed both fraud and breach of fiduciary duty. While faulting plaintiffs for never specifically defining "Ponzi scheme," Umpqua contends plaintiffs cannot prevail at trial without showing both (a) that PFI was insolvent and reliant upon new investor funds to pay off existing investors; and (b) that PFI was concealing its insolvency from investors in order fraudulently to portray itself as a legitimate, money-making enterprise, and, of course, that Umpqua had actual knowledge of both (a) and (b).

Having defined what plaintiffs must show in that manner, Umpqua attempts to make short work of the case by pointing out that plaintiffs have offered nothing to show what PFI did or did not represent to investors, or what knowledge the bank had of such representations. While that may be true, it is premised on the notion that a bank could never recognize that a customer is carrying out a Ponzi scheme just because the bank has not been privy to exactly what the customer is saying to the investors. There is no basis to reach such a conclusion as a matter of law.

Umpqua does not rely solely on its insulation from PFI's representations to investors, however. It offers five basic categories of evidence or argument that it contends show it lacked actual knowledge. First, Umpqua points out that PFI was not set up as a fraudulent scheme from its inception. It was a real business, with tangible assets, that apparently operated profitably—and lawfully—for many years. Umpqua points to testimony from Weaver and others that they were aware of PFI's substantial real estate holdings, and believed it to be a legitimate business.

Second, and relatedly, Umpqua points to testimony from its employees stating that they were shocked to learn of the embezzlement and fraud after Casey died. Plaintiffs naturally argue such testimony is "self-serving and entitled to no weight. Similarly, Umpqua next points to Wallach's testimony that he did everything he could to conceal the fraud and embezzlement from Umpqua, because he believed the Bank would refuse to continue providing banking services if it learned of the wrongdoing. Umpqua further contends PFI provided financial statements showing it was solvent and profitable. While all these points may serve to persuade a trier of fact that Umpqua lacked actual knowledge, they do not eliminate the existence of a material dispute on the

question.

Finally, Umpqua points to the fact that in connection with the bankruptcy, auditors spent months and $11 million going through PFI's accounts and transactions attempting to unravel the fraud and confirm it was a Ponzi scheme. The fact that it took auditors a long time to unravel the details and to trace funds in no way forecloses the possibility that the Umpqua had actual knowledge that a fraudulent scheme had been ongoing.

Taking this factual record as a whole, Umpqua is not entitled to summary judgment. Umpqua correctly characterizes California case law as setting a high bar for bank liability. In *Casey*, for example, the trustee of a bankrupt corporation sued the bank defendants for aiding and abetting alleged embezzlement by the former officers and directors of the bankrupt corporation. *Casey*, 127 Cal. App. 4th at 1141-42. The trustee alleged the bank defendants knew "something fishy" was going on with accounts opened by former officers and directors of the bankrupt corporation and that they had been allowed to open the accounts in the names of fraudulent entities despite knowing they were not legitimate businesses. *Id*. at 1149. The trustee also alleged the banks knew the former officers and directors were withdrawing money with forged checks and checks that exceeded written limits, and, most suspiciously, that they were carrying large, unreported amounts of cash out of the bank in unmarked duffel bags. *Id.* Nevertheless, the complaint did not survive demurrer.

Here, while there are no allegations as dramatic as cash removed in unmarked duffel bags, there is evidence of *direct* participation by bank employees, and in particular Weaver, in some of the mechanics of the scheme. While Umpqua stresses that performing ordinary banking transactions at the customer's request does not suffice, the evidence here includes instances where Weaver went well outside the bounds of ordinary banking transactions, including times where she did so on her own initiative. *Casey* and the other case precedents on which Umpqua relies did not involve similar affirmative conduct by bank employees, and therefore do not preclude liability as a matter of law in these circumstances. The motion for summary judgment therefore must be denied.

B. <u>Class certification</u>

Plaintiffs seek to certify a class of:

> All persons who invested money with Professional Financial Investors, Inc. (PFI) or Professional Investors Security Fund, Inc. (PISF) through secured or unsecured debt instruments or an LLC membership purchase agreement; who did not recover the principal amount of their investment prior to July 14, 2020; and who have a valid, allowed claim in In re Professional Financial Investors, Inc., Case No. 20-bk-30604 (Bankr.N.D. Cal.) or any of its affiliated debtor bankruptcy cases, jointly administered under Case No. 20-bk-30604.

In response to Umpqua's objection that this class definition includes corporate entities, plaintiffs express a willingness to modify the definition to clarify that it applies only to individual investors. Such a modification is appropriate and will be required.

The foundation of Umpqua's opposition to class certification is its view that the members of the proposed class hold "fundamentally different claims," based on distinctions in the various types of investments they made, profitability differences among the various projects, and the different points in time in which class members made investments. Umpqua insists plaintiffs therefore cannot meet the commonality requirement, the requirement that the named plaintiffs' own claims be typical, or the requirement that common issues predominate.

Plaintiffs' theory, however, is that all members of the proposed class were defrauded in the course of the same overall scheme. That they were supposedly investing in different entities, under different terms, and at different times is not material, given the alleged commingling of funds. Plaintiffs will either succeed in proving there was such a global fraud, or they will not, but the question is one that is suitable for resolution on a class-wide basis. While Umpqua likely will be able to present many of the same arguments it offers now regarding supposed distinctions among investors to attempt to persuade the trier of fact there was no scheme of the kind plaintiffs allege, that is still a class-wide question.

Similarly, the critical and central question of whether Umpqua had knowledge of the alleged scheme can be decided based on common evidence of the kind discussed above in

1   connection with the summary judgment motion. Both the evidence to which plaintiff points and

2   Umpqua's evidence offered in rebuttal on the knowledge issue apply to the entire class, and

3   involve no individualized inquiries.

4   Plaintiffs also have presented a common method for calculating damages, although

5   individual calculations for each class member will be required. While Umpqua challenges the

6   propriety of the measure of damages plaintiffs seek, it has not shown that legal dispute is a basis to

7   preclude class certification.[8]

8   Finally, Umpqua contends that the out-of-state resident status of some named plaintiffs and

9   some other members of the proposed class present individualized choice of law issues. At this

10  juncture, however, Umpqua has failed to show that out-of-state plaintiffs cannot pursue claims

11  under California law in these circumstances. Moreover, even assuming a choice of law analysis

12  may at some point require a narrowing of the class to exclude any plaintiffs living in particular

13  non-California jurisdictions, that is not a basis to deny class certification. Plaintiffs having made

14  an adequate showing on all of the prerequisites for certification, the motion will be granted.

C.   Sealing motions

A large number of sealing motions have been filed in connection with the present matters. Although some designations of material as confidential have been withdrawn, the portions of briefing, declarations, and exhibits still proposed to remain under seal are grossly excessive. Some very narrow categories of information, such as personal financial information of proposed class members, may warrant sealing. Upon a sufficiently strong showing of a need for confidentiality,

---

[8] Umpqua has filed a separate motion to exclude the expert report of Dan Salah, offered by plaintiffs on the topic of damages. The objections Umpqua raises primarily go to issues properly the subject of cross-examination, and likely would not support exclusion of Salah's opinion even at trial. At this juncture, however, the ultimate admissibility of Salah's report need not be determined, because plaintiffs' proffered methodology for calculating damages rests on PFI's underlying records, not Salah's analysis. The motion to exclude is denied, but the conclusions of this order do not turn on the contents of the report.

Umpqua might be entitled to seal particularly sensitive details of its internal operations. The broad swaths of material presently proposed for sealing as relating to the bank's business and procedures, however, is wholly inappropriate.

The parties are directed to meet and confer within the next 60 days to negotiate a joint proposed omnibus sealing order that addresses all of the sealing motions and that is narrowly tailored to seal only the properly sealable material. The proposed order should clearly identify the limited material one or both parties still contend is appropriately sealed. To the extent Umpqua seeks sealing of information regarding its operations or conduct, it must establish cause with adequate explanation and non-conclusory declarations. See Civil Local Rule 79-5 (c) (1) and (2).

## V. CONCLUSION

Umpqua's motion for summary judgment and its motion to exclude the report of Dan Salah are denied. Plaintiffs' motion for class certification is granted. The pending sealing motions are denied without prejudice to the parties' submission of a proposed sealing order, as set out above.

**IT IS SO ORDERED**.

Dated: December 16, 2022

RICHARD SEEBORG
Chief United States District Judge