UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHELA CAMENISCH, et al.,

    Plaintiffs,

    v.

UMPQUA BANK,

    Defendant.

Case No. 20-cv-05905-RS

**ORDER RE CHOICE OF LAW AND PREJUDGMENT INTEREST CLAIM**

The factual and procedural background of this action has been set out in prior orders and will not be recounted here. Defendant now moves for (1) a determination that California law cannot be applied to the claims of at least some of the plaintiff class members who currently reside in other states or in foreign countries, and that therefore partial decertification is warranted, and (2) summary judgment that plaintiffs will not be entitled to prejudgment interest even if they prevail on the merits of their claims.[1] Both motions will be denied.

---

[1] Umpqua also seeks a ruling that plaintiffs are not entitled to damages arising from any pre-2007 investments. Plaintiffs have disclaimed any intent to pursue such damages and will be held to that disclaimer.

A. Choice of law

1. *Background*

In its opposition to plaintiffs' class certification motion Umpqua asserted plaintiffs shoulder an initial burden to show California law could appropriately be applied to the claims of all class members, and Umpqua argued plaintiffs had made no effort even to address that issue. Indeed, under California's choice of law rules, which apply in this diversity action, the class action proponent bears the initial burden to show that California has "'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Washington Mutual Bank v. Superior Court*, 24 Cal.4th 906, 921 (Cal. 2001). This is necessary to ensure application of California law to all the class members' claims is constitutional. *Id.* at 589-90. Umpqua was also correct that plaintiffs' moving papers in support of class certification had not *expressly* addressed the point.

There was, however, little need for plaintiffs to spell it out. Their moving papers plainly described the basic circumstances here—a real estate investment scheme involving properties in Marin County, conducted in and from Marin County, with the alleged aiding and abetting by the Umpqua's Novato branch and its employees, in Marin County. Unlike *Mazza* and other consumer cases where the issue is whether California consumer protection laws are properly applied to retail sales nationwide, the connection of California to all of the class members' claims was self-evident.

Moreover, even in *Mazza* itself, it was uncontested that California had adequate contacts to the claims to satisfy the initial step simply because, "Honda's corporate headquarters, the advertising agency that produced the allegedly fraudulent misrepresentations, and one fifth of the proposed class members are located in California." *Mazza*, 666 F.3d at 590. There can be no real dispute that the facts in this case are sufficient to make application of California law to the entire class constitutional.

At the next step of the analysis, the burden shifts to the party *opposing* class certification "to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Id.* (citing *Washington Mutual*, 24 Cal.4th at 921). The order granting class certification concluded

Umpqua had not met its burden on that point, but left open the possibility that the issue could be revisited at a later point, and the class narrowed to exclude plaintiffs living in at least some non-California jurisdictions. Umpqua now seeks such an order.

2. *Burden allocation*

As noted, once the constitutionality of applying California law to all class members is resolved, it becomes defendants' burden to show doing so is not permissible under choice-of-law rules. Umpqua repeatedly confuses the burdens, citing to specific passages in *Mazza* and *Washington Mutual* without recognizing the particular issue those courts were considering in the cited portions of the opinions.

In one instance, Umpqua insists the order granting class certification "inverted the choice-of-law burdens." To support that assertion, Umpqua quotes language in *Washington Mutual* finding that the lower courts had erred in that instance by placing the burden on the defendant to "demonstrate dispositive conflicts between California law and the law of other states." As the cited passage makes clear, however, it was only error to put that burden on defendant where the claims were subject to enforceable *contractual* choice-of-law provisions.

Umpqua's quote correctly included the court's language "the party challenging certification is not required to make such a showing . . . ." Had Umpqua included the rest of the sentence, which it chose to omit with ellipses, the actual holding would have been apparent. "[T]he the party challenging certification is not required to make such a showing when the claims of putative class members must, by virtue of an advance consent, be resolved under the laws of other states." 24 Cal.4th at 928. The court further explained, "when an enforceable choice-of-law agreement is involved, the burden rests upon the party seeking nationwide class certification to identify any variations of applicable state law and to meaningfully demonstrate how a trial on the class causes of action can be conducted fairly and efficiently in light of those variations." *Id.*[2]

---

[2] Here, Umpqua acknowledges that some class members claims are subject to California choice-of-law provisions in the documents they executed in connection with their investments. Umpqua

In other words, if it has already been determined that the law of more than one state must be applied, *then* the plaintiff must show that a class action can nonetheless be maintained. Nothing in the cited passage undermines the clear teaching elsewhere in *Washington Mutual* and in *Mazza* that—absent contractual choice of law provisions—defendants have the burden of showing material differences in foreign law preclude application of forum law to the entire class, under the applicable choice-of-law rules. The class certification order did not "invert" the burdens.

In another instance, Umpqua follows a citation to *Washington Mutual* with a parenthetical stating "it is the plaintiff's burden to prove there are no choice-of-law issues," which clearly mischaracterizes the holding of the case. In yet another place, Umpqua quotes a statement in *Washington Mutual* that "the court cannot accept 'on faith' an assertion that variations in state laws relevant to the case do not exist or are insignificant; rather, the party seeking certification must affirmatively demonstrate the accuracy of the assertion." 24 Cal.4th at 924. While Umpqua quotes the language accurately, it has missed the context. The court was discussing the determination of whether a class action applying the law of multiple states is *manageable*, a question that does not arise unless and until the defendant has met its burden to show the forum law cannot be applied to all class members.

In short, plaintiffs have the burden to show it would be constitutional to apply California law to all class members—a burden they have satisfied. Were Umpqua to succeed in showing California law should not be applied to class members residing in one or more particular states or foreign country, the class certification would simply be limited to exclude those jurisdictions. Because plaintiffs have not suggested this matter should proceed with subclasses for differing jurisdictions, the burden would not shift back to them to show that doing so would be feasible. Accordingly, the remaining burdens are now all on Umpqua.

---

does not seek invalidation of those provisions even with respect to any such class members who reside outside California.

3. *Analysis*

The *Mazza* decision represents the most definitive explication of current Ninth Circuit choice of law rules in the context of class actions. It explains that "California law may only be used on a classwide basis if 'the interests of other states are not found to outweigh California's interest in having its law applied.'" *Id.* at 590 (citing *Washington Mutual*, 24 Cal.4th at 921.

A three-step governmental interest test is applied to determine whether the interests of other states outweigh California's interest:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.
>
> Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.
>
> Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Id*.

Here, plaintiffs effectively concede there are material differences between California law and that of at least some of the other states in which class members reside, and that some of those differences could be outcome dispositive. Plaintiffs focus instead on arguing Umpqua has not shown any such other state (or country) has a legitimate governmental interest in applying its own law that outweighs California's interest in applying its law under these circumstances.

Plaintiffs' decision not to contest that there may be at least some jurisdictions with material differences in law is appropriate, and this order will likewise assume the existence of such. It must be noted, however, that Umpqua has not met its burden to show the scope of the relief to which it would be entitled even if had shown the competing governmental interests preclude application of California law to all class members' claims. Umpqua's motion asserts that of the 1,217 class

members, 311 presently live outside of California, spread among 39 different states, the District of Columbia, and eight foreign countries. Umpqua has also provided a lengthy description of various differences in law among the jurisdictions, acknowledging that some of them are substantially similar to California, and that at least one (Arizona) appears to present *fewer* barriers to recovery than does California.

Umpqua's showing is deficient, however, because it has presented no reason that the *present* domicile of any class member is relevant to the analysis. *See Huynh v. Chase Manhattan Bank,* 465 F.3d 992, 1001–02 (9th Cir. 2006) ("California 'courts have consistently declined to recognize after-acquired residence as a source of governmental interest on the grounds that consideration of this factor would encourage forum shopping.'") (citing *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989).

Although plaintiffs' own briefing at the time of class certification acknowledged that some small percentage of class members resided out of state at the time they made their investments, the record is insufficient to determine which particular class members—and jurisdictions—would thereby be implicated and relevant for potentially applying foreign law. It is at least theoretically possible that no class members lived in *any* of the jurisdictions with material differences in law, at the time they made the investments.

Again assuming, however, that there were class members living in one or more jurisdictions with materially different law when the investments were made, or at some other point in time relevant to the analysis, Umpqua has not met its burden to show that the governmental interests of any such jurisdiction would outweigh California's interests such that California law cannot properly be applied to the entire class.

Unlike *Mazza* and similar cases, this is a matter involving conduct almost exclusively within California.[3] The *Mazza* court recognized "each state's valid interest in shielding out-of-

---

[3] Umpqua has not provided any explanation or evidence regarding the circumstances under which PFI obtained investments from a small number of people living outside of California. There is no indication that PFI undertook any deliberate efforts to advertise or otherwise market its services

state businesses from what the state may consider to be excessive litigation" and therefore rejected an argument that another state could have no interest in "denying its citizens recovery under California's potentially more comprehensive consumer protection laws." 666 F.3d at 592. The point, however, was that "each state has an interest in setting the appropriate level of liability *for companies conducting business within its territory.*" *Id.* (emphasis added). Regardless of how PFI may have managed to obtain a few out-of-state investors, there is simply no basis to conclude it was "conducting business" in any state (or foreign country) under circumstances giving that jurisdiction a compelling interest in setting the appropriate level or criteria of liability either for PFI directly or Umpqua derivatively.

In contrast, California's compelling interest in regulating the conduct at issue here (of PFI and of Umpqua) is manifest, even to the extent a few of the class members may have been residing elsewhere when they sent their investments to California, and the wrongs occurred. Umpqua's motion for partial decertification must be denied.

B. Prejudgment interest

By prior order, Umpqua was relieved from presumptive limit of one summary judgment motion per party to the extent it was permitted to seek a ruling that plaintiffs are precluded from recovering prejudgment interest in this action. Umpqua contends that under the doctrines of collateral estoppel and or judicial estoppel plaintiffs cannot now recover prejudgment interest from Umpqua because they gave up their right to recover prejudgment interest from PFI itself in the bankruptcy proceedings.

Umpqua may be correct that its liability, derivative in nature, cannot exceed the liability of PFI itself. *See Ponce v. Tractor Supply Co.*, 29 Cal. App. 3d 500, 505 (1972) ("[A] party secondarily liable is entitled to the benefits of a prior judgment or ruling in favor of the primary tortfeasor."). It has not shown, however, that the bankruptcy proceedings give rise to either

---

out of state.

collateral estoppel or judicial estoppel on this issue.

For collateral estoppel to apply, three essential conditions must be met: "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000). "The doctrine of judicial estoppel precludes a party from taking inconsistent positions in separate judicial proceedings." *Swahn Grp., Inc. v. Segal*, 183 Cal. App. 4th 831, 841 (2010). In determining whether judicial estoppel applies, courts look to three factors: (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

In PFI's bankruptcy, investors were classed as either "net winners" or "net losers." Net winners were those who had already, prior to the bankruptcy, recovered the principal amount of their investments and some additional sums. Net losers had not received return of their principal. By definition, the class members in this action were all "net losers."

In the context of a Ponzi scheme, the "netting rule" refers to the concept "that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers[.]" *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008). The policy rationale is that "[t]he 'winners' in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to 'enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.'" *Id.* (citation omitted).

Umpqua contends that under the settlement agreement approved by the bankruptcy court, the distributions made to "net winners" in excess of their principle investments were "clawed

1  back" as preferential transfers. The only allowed claims for *all* investors were "Investor
2  Restitution" claims, which were limited to the "total Outstanding Principal Amount minus the
3  Prepetition Distribution." Thus, Umpqua contends, "interest was not allowed under the bankruptcy
4  plan, and class members agreed that, as to PFI, they would recover the principal amount on their
5  investment."

6  Umpqua contends class members deliberately forfeited their right to recover interest from
7  PFI in exchange for the right to share in the increase in the bankruptcy estate that resulted from the
8  "claw back" of the interest previously paid out to the "net winners."  Plaintiffs, however, have
9  shown that the bankruptcy settlement actually called for recovery of interest if and when investors
10 received full return of their principal investments. Although the bankruptcy estate ultimately
11 proved far too small to permit such payouts, it cannot be said that there was a determination in the
12 bankruptcy proceeding, applicable here through collateral estoppel or judicial estoppel, that
13 plaintiffs' claims against PFI for interest were invalid or barred.

14 Umpqua insists the fact that plaintiffs could have recovered interest in the bankruptcy had
15 the estate been large enough is irrelevant because as a factual matter such claims were never
16 allowed and paid, whereas the "claw back" of what the net winners had received in excess of their
17 principal investments did take place, to the benefit of plaintiffs. Umpqua argues this means the net
18 winners were precluded from recovering interest, and plaintiffs must be as well. The claw back
19 from net winners, however, did not preclude them from seeking interest should the estate prove
20 large enough.

21 Umpqua's basic argument is the bankruptcy settlement must be seen as denying interest to
22 all investors. It is more appropriate to characterize it merely as requiring that all investors receive
23 return of their principal in full before recovering interest from the bankruptcy estate. While the
24 estate proved too small to pay all principal and interest, plaintiffs are not estopped from pursuing
25 prejudgment interest claims in this action.

**IT IS SO ORDERED**.

Dated: June 25, 2024

_____
RICHARD SEEBORG
Chief United States District Judge