Amy M. Zeman (SBN 273100)
Linda P. Lam (SBN 301461)
E. Wynne Tidwell (SBN 348179)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
amz@classlawgroup.com
lpl@classlawgroup.com
ewt@classlawgroup.com

(Additional counsel on signature page)

*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al. | Lead Case No. 3:20-cv-5905-RS (AGT) |
| Plaintiffs, | **PLAINTIFFS' MOTIONS IN LIMINE** |
| v. | Trial Setting Conference: August 28, 2024 |
| UMPQUA BANK, | Time: 10:00 a.m. |
| Defendant. | Dept: Courtroom 3, 17th Floor |
| | Judge: Hon. Richard Seeborg |

1

**TABLE OF CONTENTS**

2
Page

3

MOTION IN LIMINE NO. 1: To exclude argument or evidence suggesting class members could
4    have recovered more from PFI through the bankruptcy settlement (FRE 401-403, 408) ...................... 1

5

MOTION IN LIMINE NO. 2: To exclude expert testimony that PFI properties would have
    returned a net gain for investors if bankruptcy sale proceeds were distributed differently
6    (FRE 401-403, 408, 702) ........................................................................................................................ 4

7

MOTION IN LIMINE NO. 3: To exclude testimony and argument that Plaintiffs' damages
    calculations do not account for bankruptcy distributions that may be made in the future
8    (FRE 401-403, 702) ............................................................................................................................... 6

9

MOTION IN LIMINE NO. 4: To exclude expert testimony on state of mind and standard of care
10   (FRE 702)................................................................................................................................................ 7

11

MOTION IN LIMINE NO. 5: To exclude testimony and argument regarding Cal. Fin. Code
    §§ 1450-1451 or hypothetical claims against Umpqua for dishonoring authorized transfers
12   (FRE 401-403, 702) ............................................................................................................................... 9

13

MOTION IN LIMINE NO. 6: To preclude testimony and argument referring to employees as
14   "lower-level" (FRE 401-403, 702)...................................................................................................... 12

15

MOTION IN LIMINE NO. 7: To exclude any reference to documents withheld by Umpqua Bank
16   pursuant to the SAR privilege (12 C.F.R. § 21.11(k), FRE 403, FRCP 37(c)(1)) ............................... 13

MOTION IN LIMINE NO. 8: To preclude Umpqua from calling *Bagatelos* plaintiffs
17   (FRE 401-403, 611(a)(3), FRCP 37(c)(1)) ......................................................................................... 15

18

MOTION IN LIMINE NO. 9: To preclude live testimony from witnesses Umpqua controls if it
    does not make the witnesses available to testify in person during Plaintiffs' case-in-chief
19   (FRE 611(a)) ........................................................................................................................................ 17

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                    Page(s)

*Albrecht v. Broughton*,
   6 Cal. App. 3d 173 (1970)................................................................................................2

*BJB Elec. LP v. Bridgelux, Inc.*,
   No. 22-CV-01886-RS, 2023 WL 4849764 (N.D. Cal. July 28, 2023)................................6

*Brawley v. J.C. Interiors, Inc.*,
   161 Cal. App. 4th 1126 (2008)......................................................................................1, 2

*Buchwald v. Renco Grp., Inc.*,
   No. 13-CV-7948 AJN, 2014 WL 4207113 (S.D.N.Y. Aug. 25, 2014) ............................18

*Casey v. U.S. Bank Nat. Assn.*,
   127 Cal. App. 4th 1138 (2005)...............................................................................10, 11

*Chazen v. Centennial Bank*,
   61 Cal. App. 4th 532 (1998)..........................................................................................10

*Collins v. Cnty. of San Diego*,
   60 Cal. App. 5th 1035 (2021).........................................................................................2

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).......................................................................................................5

*FMC Corp. v. Plaisted & Companies*,
   61 Cal. App. 4th 1132 (1998)........................................................................................13

*Garcia v. Duro Dyne Corp.*,
   156 Cal. App. 4th 92 (2007)..............................................................................1, 4, 6, 7

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004)........................................................................................10

*Holcomb v. Ramar*,
   No. 1:13-CV-1102 AWI SKO, 2017 WL 2930854 (E.D. Cal. July 10, 2017) .................8

*In re Apple Inc. Sec. Litig.*,
   No. 4:19-CV-02033-YGR, 2023 WL 4556765 (N.D. Cal. July 17, 2023) .......................13

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006).........................................................................................8

*In re Hedgeside Distillery Corp.*,
   123 F. Supp. 933 (N.D. Cal. 1952) ...............................................................................13

*In re JPMorgan Chase Bank, N.A.*,
    799 F.3d 36 (1st Cir. 2015) ................................................................................................ 14

*In re JTS Corp.*,
    617 F.3d 1102 (9th Cir. 2010) ............................................................................................. 2

*In re Loestrin 24 Fe Antitrust Litig.*,
    No. 1:13-MD-2472 WES, 2019 WL 13257216 (D.R.I. Dec. 6, 2019) ............................... 17

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
    No. 05CV633 JLS (CAB), 2009 WL 3415689 (S.D. Cal. Oct. 21, 2009) .......................... 18

*Jasso v. Wells Fargo Bank*,
    No. 2:20-cv-00858-CDS-BNW, 2022 WL 18141573 (D. Nev. Nov. 29, 2022) ................ 15

*Knox v. Cnty. of Los Angeles*,
    109 Cal. App. 3d 825 (1980) ................................................................................................ 3

*Leung v. Verdugo Hills Hosp.*,
    55 Cal. 4th 291 (2012) .......................................................................................................... 2

*Low v. Trump Univ., LLC*,
    No. 3:10-cv-00940-GPC-WVG, 2016 WL 6732110 (S.D. Cal. Nov. 15, 2016) .......... 16, 17

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ................................................................................... 9, 10, 11

*Newby v. Vroman*,
    11 Cal. App. 4th 283 (1992) .............................................................................................. 3, 4

*Olin Corp. v. Lamorak Ins. Co.*,
    No. 84-CV-1968 (JSR), 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) ............................... 7

*PacifiCare Life & Health Ins. Co. v. Jones*,
    27 Cal. App. 5th 391 (2018) ............................................................................................... 13

*Paulus v. Crane Co.*,
    224 Cal. App. 4th 1357 (2014) ............................................................................................. 6

*R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*,
    945 F.2d 269 (9th Cir. 1991) .............................................................................................. 18

*Rapp v. NaphCare Inc.*,
    No. 3:21-CV-05800-DGE, 2023 WL 5844724 (W.D. Wash. Sept. 11, 2023) ................... 10

*Regalado v. Callaghan*,
    3 Cal. App. 5th 582 (2016) ................................................................................................... 2

*Sanders v. Magill*,
    9 Cal. 2d 145 (1937) ........................................................................................................... 13

*Shepherd v. Walley*,
    28 Cal. App. 3d 1079 (1972)......................................................................................................2

*Simi Mgmt. Corp. v. Bank of Am., N.A.*,
    930 F. Supp. 2d 1082 (N.D. Cal. 2013) ...................................................................................7

*Smith v. Workers' Comp. Appeals Bd.*,
    152 Cal. App. 3d 1104 (1984) ................................................................................................13

*State of California v. Cont'l Ins. Co.*,
    55 Cal. 4th 186 (2012) ...........................................................................................................13

*Toland v. McFarland*,
    No. 2:21-cv-04797-FWS-AGR, 2023 WL 8883329 (C.D. Cal. Oct. 31, 2023) ....................9

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
    No. 3:15-CV-185-SI, 2022 WL 3017524 (D. Or. July 29, 2022).........................................11

*United States v. Boulware*,
    558 F.3d 971 (9th Cir. 2009)..................................................................................................10

*Weiner v. Ocwen Fin. Corp.*,
    No. 2:14-CV-02597-DJC-DB, 2023 WL 6519292 (E.D. Cal. Oct. 5, 2023) ........................18

Statutes

Cal. Civ. Code § 3288 ......................................................................................................................3

Cal. Code Civ. Proc. § 877.......................................................................................................2, 3, 6

Rules

Fed. R. Civ. P. 45(c) .......................................................................................................................17

Regulations

12 C.F.R. § 21.11(k)..................................................................................................................14, 15

Other Authorities

CACI No. 3296 ..................................................................................................................................3

CACI No. 3935 ..................................................................................................................................3

**MOTION IN LIMINE NO. 1**

**To exclude argument or evidence suggesting class members could have
recovered more from PFI through the bankruptcy settlement (FRE 401-403, 408)**

### A.        Summary of Argument

In pre-trial briefing and depositions, Umpqua has argued that certain categories of investors should have obtained more money from PFI's bankruptcy proceedings than they ultimately did. When a plaintiff achieves a partial pre-trial recovery by settling with one of two joint tortfeasors, the amount of that settlement is often deemed inadmissible at future trials involving the remaining tortfeasor. *See Brawley v. J.C. Interiors, Inc.,* 161 Cal. App. 4th 1126, 1133–34 (2008). Here, Plaintiffs agree that the amount investors recovered from PFI through a bankruptcy settlement can be admitted for the limited purpose of calculating the amount of their unreimbursed losses and an appropriate amount of prejudgment interest. But there is no basis for admitting evidence regarding the amounts that Plaintiffs and class members *might* have recovered had they litigated their claims against PFI differently or settled on more favorable terms. Umpqua is entitled to a setoff of any money *actually* recovered from PFI, but it is not entitled to any setoff for amounts that have not actually been recovered—whether or not that money could have been recovered in an alternate reality. *See Garcia v. Duro Dyne Corp.,* 156 Cal. App. 4th 92, 100 (2007) ("trial courts have awarded nonsettling defendants offset credits only for settlement monies the plaintiffs have actually *received"*). Any evidence regarding what investors could have recovered from PFI through bankruptcy is therefore irrelevant to the amount of Umpqua's liability and risks confusing the jury and prejudicing Plaintiffs' ability to obtain relief for their injuries.

### B.        Argument

The money Plaintiffs and class members received in PFI's bankruptcy proceedings was distributed pursuant to a settlement between PFI and investors. After the PFI Ponzi scheme was publicly exposed and PFI was forced into bankruptcy, investors asserted legal claims against PFI for return of their principal investments and interest thereon. (*See* Lam Decl., Ex. 1 (Bankruptcy Plan), ¶¶ 1.81, 1.84-1.85.) In full satisfaction, settlement, and release of those claims, each category of investors agreed to compensation that ultimately amounted to 40-42% of their net investment losses. (*Id.*, ¶¶ 2.5, 2.6, 2.11.1.) The bankruptcy court approved the resulting plan and distributions as a "good faith

compromise and settlement of all claims and controversies relating to the rights" that investors might have against PFI. (*Id.*, Ex. 2 (Order on Bankruptcy Plan) at 5-6, Sec. H.)

Under California law, the money class members received from the PFI bankruptcy settlement reduces the total amount Umpqua could be required to pay for aiding and abetting PFI's tortious conduct. California Code of Civil Procedure section 877 allows a nonsettling tortfeasor to set off the amount of a jointly liable tortfeasor's settlement against damages awarded at trial. *Collins v. Cnty. of San Diego,* 60 Cal. App. 5th 1035, 1064 (2021). Umpqua and PFI are joint tortfeasors under section 877 because they are alleged to have caused the same harm. *In re JTS Corp.*, 617 F.3d 1102, 1116–18 (9th Cir. 2010). And although section 877 speaks only of "good faith" settlements, even if the PFI bankruptcy settlement were not entered into in good faith, Umpqua would be entitled to the same setoff. *Leung v. Verdugo Hills Hosp.*, 55 Cal. 4th 291, 308 (2012).

The payments class members have received as a result of the PFI bankruptcy settlement are therefore "admissible for the purpose of reducing pro tanto the amount of the damages [class members] may be entitled to recover." *Regalado v. Callaghan*, 3 Cal. App. 5th 582, 600 (2016). That does not mean, however, that Umpqua can introduce evidence at trial suggesting class members could have received even more money from PFI if they had litigated their claims against PFI differently. In fact, when the right to an offset is undisputed, as it is here, the remaining alleged tortfeasor is often not allowed to mention even the *actual* amount of the settlement—much less argue that it should have been more. *See Brawley,* 161 Cal. App. 4th at 1133–34 (summarizing three approaches to handling section 877 setoffs). Once the plaintiff has agreed that the proceeds of a prior settlement should be deducted from any jury award, the amount paid in that settlement is typically no longer of any relevance to a fact in dispute, and it can constitute error to admit evidence regarding the settlement. *Albrecht v. Broughton*, 6 Cal. App. 3d 173, 177-78 (1970). "The presentation of evidence concerning the amount or fact of settlement to the jury, in such a case, is not only confusing, but also can lead to abuse in argument." *Shepherd v. Walley*, 28 Cal. App. 3d 1079, 1083 (1972). California's model jury instruction on settlement deductions accordingly provides that even when a jury is told about the plaintiff's settlement with a joint tortfeasor, the amount can be withheld and the jury told that "[a]ny award of damages to [plaintiff] should be made without considering any amount the [plaintiff] may have received under this

settlement." CACI No. 3296; *see also Knox v. Cnty. of Los Angeles,* 109 Cal. App. 3d 825, 834–35 (1980) (it has been "held proper to exclude evidence of the pretrial settlement by one joint tortfeasor from the jury's consideration, leaving it to the court to apply Code of Civil Procedure section 877 to reduce the verdict").

Here, while Plaintiffs agree that Umpqua is entitled to a credit for payments class members received from the PFI bankruptcy proceedings, they do not believe it is practical to avoid disclosing those amounts to the jury. That is because, in this case, the jury will likely be asked to award prejudgment interest to compensate class members for loss of use of their funds. *See* Cal. Civ. Code, § 3288 (affording jury discretion to award interest in fraud cases); CACI No. 3935 (model jury instruction on prejudgment interest). And to properly calculate prejudgment interest, the jury will need to take into consideration the payments that class members received from the PFI bankruptcy case. The jury needs to know the date and amount of those payments because, under section 3288, class members are entitled to prejudgment interest on their original net loss up until the date they received a settlement payment from PFI, but after that date, they are only entitled to prejudgment interest on their remaining net loss (after first deducting the settlement amounts paid by PFI). *Newby v. Vroman*, 11 Cal. App. 4th 283, 290 (1992). Experts retained by the parties have calculated the amount of prejudgment interest each class member may be entitled to under section 3288, but to properly consider those proposed calculations, jurors will need to be aware that class members have received settlement payments from PFI and provided with data concerning the amount and timing of those payments.

Evidence of the amount class members received from PFI through bankruptcy proceedings should therefore be admitted for the limited purpose of facilitating the jury's calculation of prejudgment interest. But it should not be admitted for other purposes and Umpqua should not be permitted to argue that class members could have or should have recovered even more money from PFI's bankruptcy estate. Even if certain categories of investors could have litigated their claims differently in bankruptcy court and potentially recovered a greater share of the bankruptcy estate (leaving other categories of investors to recover a lesser share), that hypothetical recovery is not relevant to Umpqua's liability or the damages Umpqua would be legally responsible for if it is found to have aided and abetted PFI's tortious conduct. Umpqua is entitled to an offset only for amounts

actually received by class members, not for money it has not yet received or will never receive. *Garcia*, 156 Cal. App. 4th at 100. And prejudgment interest is likewise calculated based only on money actually received by class members. *Newby*, 11 Cal. App. 4th at 290.

California law on settlement offsets and prejudgment interest are designed to encourage settlement and maximize plaintiffs' recovery to the extent others have contributed to their injuries. *Id.*; *Garcia*, 156 Cal. App. 4th at 101. Allowing Umpqua to introduce evidence that suggests class members could have recovered more money from PFI would undermine those policies. It would also likely run afoul of FRE 408, which prohibits evidence regarding actual or proposed compromises of legal claims to prove or disprove the validity or amount of a disputed claim. If a jury could find Umpqua not liable for amounts Umpqua believes class members could have recovered through PFI's bankruptcy, the end-result would be to penalize class members for settling their claims against PFI. *See Garcia*, 156 Cal. App. 4th at 101 (allowing a nonsettling defendant to reduce the award against it due to settlement amounts not actually paid would "penalize the plaintiff for having settled the claims against some of the defendants"). Admitting evidence suggesting class members could have recovered more from PFI's bankruptcy proceedings would also confuse the issues and prejudice class members by requiring them and the PFI Trustee to spend time explaining the law and reasoning that drove the bankruptcy settlement.

## MOTION IN LIMINE NO. 2

### To exclude expert testimony that PFI properties would have returned a net gain for investors if bankruptcy sale proceeds were distributed differently (FRE 401-403, 408, 702)

Umpqua has submitted multiple expert reports from Jennifer Marietta-Westberg, Ph.D., an economic and financial consultant at Cornerstone Research. (Lam Decl., Ex. 3 (Marietta-Westberg Report); Ex. 4 (Marietta-Westberg Rebuttal Report). One of Marietta-Westberg's opinions is that certain properties owned by PFI "would have returned a net gain for Class Members invested in that property had the value of the property or the sale proceeds flowed to investors in accordance with their priority claims." (*Id.*, Ex. 3 (Marietta-Westberg Report), ¶ 32.) This opinion is not based on what actually happened in the PFI bankruptcy—where PFI's real estate holdings were liquidated and the proceeds distributed to LLC investors, DOT investors, TIC investors, and Note investors—but rather

1  what would have happened if PFI's properties had been liquidated in bankruptcy and the sale proceeds

2  distributed only to certain LLC, DOT, and TIC investors (with *none* of the sale proceeds going to Note

3  investors). (*Id.*, Ex 5 (5/31/24 Marietta-Westberg Dep.) at 102:10-103:6.) It therefore falls within the

4  ambit of Plaintiffs' Motion in Limine No. 1, and should be excluded along with all other evidence

5  suggesting class members could have recovered more from PFI's bankruptcy proceedings. But it also

6  may be excluded pursuant to Rule 702, which requires that expert testimony be helpful to the jury and

7  fit the facts of the case. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591 (1993). Marietta-

8  Westberg's opinion about what "would have" happened in an alternative reality is neither.

9       Marietta-Westberg regularly opines on the validity of damages methodologies submitted by

10  plaintiffs in class litigation, and she intends to do the same in this action. (Lam Decl., Ex. 5 (Marietta-

11  Westberg Dep.) at 48:15-57:20; *see also* Ex. 4 (Marietta-Westberg Rebuttal Report).) But she admits

12  that her calculation of how much PFI's properties would have returned to investors "is not a damages

13  calculation." (*Id.*, Ex. 5 (Marietta-Westberg Dep.) at 60:1-11; *see also id.* at 59:5-9 ("I am not providing

14  a damages opinion as of today").). Marietta-Westberg did not conduct the calculation because she

15  thought it would be relevant or potentially helpful to the jury. (*Id.* at 93:20-95:11.) It is not a calculation

16  she has performed in other Ponzi scheme cases and, in fact, she is not aware of a similar methodology

17  ever being used in another Ponzi scheme case. (*Id.* at 95:12-97:17.) She performed the calculation

18  simply because she was asked by defense counsel to do so. (*Id.* at 93:6-94:16.)

19       Marietta-Westberg has stated that she has no opinion of what part of her analysis would be

20  helpful to the jury, and that she will defer to the Court on that. (*Id.* at 94:8-95:11.) But to be helpful,

21  expert testimony must have a valid connection to the facts of the case; "[e]xpert testimony which does

22  not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. And

23  here, Marietta-Westberg acknowledges that she "did not analyze what class members *actually*

24  received" from the sale of PFI's investment properties. (Lam Decl., Ex. 5 (Marietta-Westberg Dep.) at

25  64:8-12 (emphasis added).) She was asked to assume a counterfactual scenario where the sale of PFI's

26  investment properties would be distributed only to certain categories of investors "in accordance with

27  their priority claims"—even though, in fact, none of the investors were ever found to possess priority

28  claims and proceeds from the sale of PFI's investment properties were distributed pro rata among all

investor categories. (*Id.*, Ex. 3 (Marietta-Westberg Report), ¶ 32.) Marietta-Westberg's testimony would therefore confuse rather than help the jury, who will be asked to decide liability and calculate damages based on how proceeds from the sale of PFI's investment properties were actually distributed. *See BJB Elec. LP v. Bridgelux, Inc.,* No. 22-CV-01886-RS, 2023 WL 4849764, at *2 (N.D. Cal. July 28, 2023) ("expert testimony is not admissible under Rule 702 if it is based on assumptions that are unsubstantiated by the record").

## MOTION IN LIMINE NO. 3

**To exclude testimony and argument that Plaintiffs' damages calculations do not account for bankruptcy distributions that may be made in the future (FRE 401-403, 702)**

Umpqua's damages expert, Jennifer Marietta-Westberg, Ph.D., is of the opinion that the damages calculations conducted by Plaintiffs' expert, Dan Salah, are flawed because they do not include an offset for a third round of bankruptcy payments that may be distributed to class members at some point in the future. (Lam Decl., Ex. 4 (Marietta-Westberg Rebuttal Report), ¶¶ 28-29.) PFI's bankruptcy settlement has resulted in two distributions to class members to date: one in February 2022 and one in July 2022. These two distributions constitute settlement payments by a joint tortfeasor under California Code of Civil Procedure section 877, and so Umpqua is entitled to offset credits when calculating its potential liability. Marietta-Westberg agrees, but thinks that Salah also should credit Umpqua with an offset for a final bankruptcy distribution that the trustee of the PFI Trust expects to make at the conclusion of bankruptcy proceedings. (*Id.*, ¶ 28.) California law provides otherwise: nonsettling defendants are entitled to offset credits only for "settlement monies the plaintiffs have actually *received*." *Garcia v. Duro Dyne Corp.*, 156 Cal. App. 4th 92, 100 (2007) (emphasis in original). To allow Umpqua to reduce the award against it in the amount of a settlement distribution that has not yet been paid "would frustrate the policy of splitting an award of damages among the parties at fault by placing the burden of an unpaid settlement on the innocent plaintiff[s]." *Id.* at 101; *see also Paulus v. Crane Co.,* 224 Cal. App. 4th 1357, 1367 (2014) (defendant's request for a further offset for settlement payments that had not yet been received was "based on nothing more than speculation about future events").

1   If and when the trustee of the PFI Trust makes a further distribution to class members, Umpqua

2   will be entitled to a further credit and any judgment then pending against Umpqua can be adjusted

3   accordingly. *See Garcia*, 156 Cal. App. 4th at 100. But at the present time, Umpqua is not entitled to

4   that offset, and Umpqua should be precluded from suggesting otherwise under FRE 401-403 and 702.

5   *See Olin Corp. v. Lamorak Ins. Co.,* No. 84-CV-1968 (JSR), 2018 WL 1901634, at *21 (S.D.N.Y. Apr.

6   18, 2018) (excluding expert testimony on "judgment-reduction issues"; "those amounts, if any, … are

7   not relevant to the Court's instant calculation of [defendant's] liability").

8   **MOTION IN LIMINE NO. 4**

9   **To exclude expert testimony on state of mind and standard of care (FRE 702)**

10   Did Umpqua know that PFI was misappropriating investor money? That is one of the most

11   important factual questions the jury will be called upon to answer at trial. To help jurors assess what

12   PFI knew and when it knew it, both Plaintiffs and Umpqua intend to call expert witnesses familiar with

13   the banking industry: Plaintiffs intend to call Catherine Ghiglieri, a former Texas Banking

14   Commissioner with fifty years of experience in the banking industry, while Umpqua intends to call

15   Frederick Egler, an attorney who previously worked for defense counsel and for PNC Bank. (Lam

16   Decl., Ex. 6 (Egler Report), Attachment A.) While Plaintiffs believe that both experts should be

17   permitted to help the jury understand the plentiful banking evidence at issue in this case, Plaintiffs ask

18   that they also be ordered to refrain from invading the province of the jury by directly opining on

19   whether Umpqua acted with a knowing, conscious, or deliberate state of mind. Plaintiffs also ask that

20   both experts be directed to avoid using the term "standard of care," which could confuse the issues

21   before the jury by suggesting that Umpqua's conduct is to be judged under a negligence standard.

22   When Umpqua retained Egler, it asked him to opine on two overarching topics: (i) whether

23   Umpqua's conduct was consistent with reasonable and customary banking practices; and (ii) whether

24   any departure from customary banking practices evidenced a conscious disregard for any applicable

25   standard of care. (*Id.*, ¶ 11.) Plaintiffs have no objection to Egler conveying his opinion on the first

26   topic to jurors. A bank's knowledge of its customer's unlawful conduct can be inferred from evidence

27   that the bank employed atypical banking procedures, processed transactions that were inconsistent with

28   the customer's business, or ignored banking red flags concerning that customer. *Simi Mgmt. Corp. v.*

*Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1099 (N.D. Cal. 2013); *In re First All. Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006). So it is appropriate for both banking experts to help a jury understand whether Umpqua's conduct with respect to PFI was atypical, whether the transactions that Umpqua processed for PFI were unusual, and whether any of the red flags recognized by the banking industry as an indication of illicit activity were present during PFI's tenure as an Umpqua customer.

Plaintiffs' concern lies with Egler's second topic. Egler acknowledges that at least some of Umpqua's conduct departed from customary banking practices; in particular, the manner and frequency in which June Weaver assisted PFI in covering overdrafts. (*See* Lam Decl., Ex. 6 (Egler Report), ¶ 52; Ex. 7 (Egler Dep.) at 218:5-219:23.) But Egler wishes to add that he "do[es] not, however, consider Weaver's actions to evidence a conscious disregard of the applicable standard of care." (*Id.*, Ex. 6 (Egler Report), ¶ 52.) Egler's reference to a "standard of care" is out of place in a case that does not involve any claims for negligence and threatens to "inject potentially confusing legal concepts and standards that are not at issue." *Holcomb v. Ramar*, No. 1:13-CV-1102 AWI SKO, 2017 WL 2930854, at *10 (E.D. Cal. July 10, 2017) (excluding questions and answers relating to the standard of care where the claims at issue did not include negligence). Plaintiffs accordingly object to Egler's repeated references to a "standard of care" in his reports and request that he be precluded from using the term at trial. (*See, e.g.,* Lam Decl., Ex. 6 (Egler Report), ¶¶ 11, 44, 52; Ex. 8 (Egler Rebuttal Report), ¶¶ 1, 11, 13, 14, 27, 30.) Egler can assist the jury in understanding whether Umpqua's conduct was typical or atypical by using terms like "standard banking practices" and "customary banking practices" (as he does elsewhere in his expert reports), but the term "standard of care" in unnecessarily suggestive of a negligence standard. That is of particular concern given that Egler is a lawyer who has spent much of his career defending banks and someone jurors could reasonably expect to know the legal standards that apply to aiding-and-abetting claims against banks.

Egler's opinion that Weaver did not act with "conscious disregard" is also potentially problematic—as is Egler's related opinions that Umpqua did not "consciously" choose to ignore evidence of illegal activity or make a "conscious decision" to allow PFI and PISF to use their bank accounts to conduct a fraudulent scheme. (*Id.*, Ex. 6 (Egler Report), ¶¶ 44, 52, 62, 81.) Testimony from banking experts like Egler can help the jury to understand the evidence and reach its own conclusion

regarding Umpqua's state of mind. But permitting any of the banking experts in this case to go further and directly opine on whether Umpqua acted consciously or with knowledge of PFI's fraud would risk "substituting the expert's judgement for the jury's." *Toland v. McFarland*, No. 2:21-cv-04797-FWS-AGR, 2023 WL 8883329, at *8 (C.D. Cal. Oct. 31, 2023) (excluding expert testimony as to state of mind); *see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008) (expert testimony that "merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible").

Plaintiffs recognize that it can be difficult within the confines of an expert report to convey the relevance of a banking opinion without mentioning the ultimate fact the testimony is intended to address. Egler's testimony, like the testimony of Plaintiffs' banking expert, may be helpful because it will assist the jury to determine whether Umpqua acted with the requisite state of mind. But neither expert should be permitted to offer an opinion on the ultimate issue of whether Umpqua knew PFI was misappropriating investor funds and consciously assisted. Plaintiffs accordingly request that the Court preclude expert testimony that conveys a direct opinion as to Umpqua's state of mind or any of its employees' states of mind, as well as any expert testimony that refers to a "standard of care."

## MOTION IN LIMINE NO. 5

### To exclude testimony and argument regarding Cal. Fin. Code §§ 1450-1451 or hypothetical claims against Umpqua for dishonoring authorized transfers (FRE 401-403, 702)

Umpqua's banking expert, Frederick Egler, contends that Umpqua was legally and contractually obligated to honor Ken Casey and Lewis Wallach's frequent requests to transfer funds from investor clearing accounts to their personal bank accounts. (Lam Decl., Ex. 6 (Egler Report), ¶¶ 45, 58-61; Ex. 8 (Egler Rebuttal Report), ¶¶ 15(c)-(d), 24(c)-(d).) Egler says that executing these transfers was "consistent with California law," and relies in particular on block-quoted language from California Financial Code sections 1450-51. (*Id.* Ex. 6 (Egler Report), ¶ 59.) He also believes that if Umpqua had not processed these transactions, PFI could have sued Umpqua for wrongful dishonor and breach of contract. (*Id.*, ¶ 60; Ex. 8 (Egler Rebuttal Report), ¶¶ 15(a), 26(c).)

The Court rejected similar legal arguments when it ruled on Umpqua's motion for summary judgment, but now Umpqua wants to present its opinion of the law to the jury through Egler—an

attorney who previously worked for Umpqua's counsel. The legal conclusions that Egler wishes to present are improper and should be excluded—they "not only invade[] the province of the trial judge, but constitute[] erroneous statements of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008). Instructing the jury on applicable law "is the distinct and exclusive province" of the Court. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Expert witnesses are therefore not permitted to express legal opinions, which have the potential to mislead the jury and confuse the issues. *See United States v. Boulware*, 558 F.3d 971, 975 (9th Cir. 2009) (affirming exclusion of expert testimony that corporate distributions were legally non-taxable); *Rapp v. NaphCare Inc.*, No. 3:21-CV-05800-DGE, 2023 WL 5844724, at *2 (W.D. Wash. Sept. 11, 2023) ("Courts have excluded sections of expert reports that 'misleadingly implie[d]' the relevant legal standard.").

Egler's legal opinions are particularly likely to mislead the jury because they are contrary to California law, which holds that Financial Code sections 1450-51 and the case law interpreting those statutory sections yield to California's prohibition against aiding and abetting tortious conduct. *Casey v. U.S. Bank Nat. Assn*., 127 Cal. App. 4th 1138, 1149-52 (2005). The *Casey* court recognized that there are "two distinct legal principles" that apply to a bank's interactions with members of the general public. *Id.* at 1151. The first strictly limits a bank's duties to nondepositors, and is reflected in Financial Code sections 1450-51 (formerly codified as sections 952-953) and related case law like *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532 (1998). *Casey*, 127 Cal. App. 4th at 1151-52. The second extends tort liability to anyone who knowingly aids and abets the tort of another. *Id.* at 1152. This trial implicates the second legal principle and will require the jury to determine whether Umpqua did in fact knowingly aid and abet PFI's misappropriation of investor funds. But Egler wishes to testify regarding the first legal principle instead. And while Egler is correct that Financial Code sections 1450-51 and other case law generally permit banks to process transactions without fear of being held liable by members of the general public, that legal principle does not apply when the elements of aiding-and-abetting are satisfied. *Casey*, 127 Cal. App. 4th at 1151. When a bank actually knows one of its customers is engaged in wrongful conduct and affirmatively helps the customer to perpetuate that wrong, an aiding and abetting claim is a "reasonable exception" to the legal principle that Egler wishes

to testify about. *Id.* Egler's opinion that Umpqua was legally obligated to comply with PFI's repeated requests to transfer funds from its investor clearing accounts to Casey and Wallach is accordingly incorrect under California law and should not be presented to the jury. *Nationwide*, 523 F.3d at 1060 ("a district court may exclude evidence relating to erroneous or inapplicable legal theories"). Egler's opinion that PFI could have sued Umpqua for failing to honor its transfer requests is likewise incorrect. When a bank is asked to process a transaction that the bank knows is unlawful, it has no legal obligation to process that transaction; in fact, its legal obligation is to *not* process the transaction and the bank can be held liable for aiding-and-abetting tortious conduct if it does so. *Casey*, 127 Cal. App. 4th at 1138.

When Umpqua moved for summary judgment, it relied heavily on the legal principle that banks owe no duty to non-customers. (6/2/22 Mot. [Dkt. 121] at 10, 19-21, 23-24; 8/18/22 Reply [Dkt. 134] at 1, 4, 8-10, 14.) Citing repeatedly to California Financial Code sections 1450-51, *Casey*, and *Chazen*, Umpqua argued that Plaintiffs' evidence—including evidence that Umpqua affirmatively helped PFI to transfer investor funds to Casey and Wallach—was insufficient as a matter of law. (*Id.*) The Court correctly found otherwise: the absence of a duty of care to non-customers meant only that Plaintiffs must show knowledge and substantial assistance. (12/16/22 Order [Dkt. 144] at 11.) And because the evidence presented by Plaintiffs was sufficient to permit a reasonable jury to infer that Umpqua knew about PFI's fraud and affirmatively participated, Umpqua was not entitled to judgment as a matter of law. (*Id.* at 6, 13.) The Court's ruling is consistent with *Casey*'s conclusion that "an aiding and abetting claim against a bank is a reasonable exception to the case law limiting bank duties to nondepositors." *Casey*, 127 Cal. App. 4th at 1152. If Plaintiffs successfully prove that Umpqua knew PFI was misappropriating investor funds, then it was not legally permitted to transfer investor funds to Casey and Wallach and may be held liable for doing so. *Id.* at 1151. Umpqua's "[k]nowledge is the crucial element." *Id.* at 1145. Other legal principles that might apply if Umpqua were not alleged to have known about PFI's misappropriation are not relevant and would only confuse and potentially mislead jurors if introduced at trial. *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, No. 3:15-CV-185-SI, 2022 WL 3017524, at *8 (D. Or. July 29, 2022) (excluding expert testimony that "invades the province

of the Court in instructing the jury about the law and may even confuse jurors about the issues that they must decide").

**MOTION IN LIMINE NO. 6**

**To preclude testimony and argument referring to employees as "lower-level" (FRE 401-403, 702)**

The Umpqua banker at the heart of Plaintiffs' case is June Weaver. She was the veteran banker assigned to PFI who exchanged more than 1,600 emails with the company, removed Ken Casey's name from PFI's bank statements, and attempted to warn PFI without creating a paper trail when an attorney called Umpqua to complain about PFI's dishonesty. Weaver spent much of her time monitoring PFI's accounts to make sure its chronic account shortages were always covered—even if it meant using a "ghost deposit" or other atypical banking procedures. She repeatedly helped Casey and Wallach to transfer investor money to their personal bank accounts. And she has since acknowledged under oath that she knew the clearing accounts she was using to fund those transfers contained new investor money. (*See generally* 12/16/22 Order [Dkt. 144] at 6-10 (recounting Weaver-related evidence).)

Umpqua's banking expert, Frederick Egler, attempts to minimize the significance of Weaver's actions by referring to her as a "lower-level employee." (Lam Decl., Ex. 6 (Egler Report), ¶ 25; Ex. 7 (Egler Dep.) at 137:8-11.) Plaintiffs request that Egler and Umpqua be prohibited from referring to Weaver or other Umpqua employees as "lower-level" at trial; that characterization is irrelevant to the issues in dispute and has the potential to mislead the jury. It suggests that Umpqua cannot be held liable for aiding and abetting PFI's fraud unless an upper-level employee knew about the fraud and assisted in its execution. Egler is an attorney who has spent much of his career defending banks, and so jurors may assume that he would not make a distinction between lower-level and upper-level employees unless it was legally significant. In fact, it appears that is exactly what Egler intends to convey to jurors. When asked why it was relevant whether Weaver was a "lower-level" employee, Egler testified he wanted to point out that "to the extent Weaver was aware of [PFI's activities], [that was] not something that was ever transmitted to higher levels or really any level of bank management, which I think is relevant to this question of knowledge." (*Id.*, Ex. 7 (Egler Dep.) at 140:15-141:7.)

The inference that Egler and Umpqua wants jurors to draw—that Umpqua should not be charged with actual knowledge unless the relevant information was transmitted to upper-level

management—was "vigorously repudiated by the Supreme Court of California" over 80 years ago. *In re Hedgeside Distillery Corp.*, 123 F. Supp. 933, 944 (N.D. Cal. 1952) (citing *Sanders v. Magill*, 9 Cal. 2d 145, 154 (1937), and rejecting argument that a bank is not charged with knowledge of information given to an employee in the collection department). More recent cases have underscored the same principle:

- "Corporate employers are charged with knowledge of and responsibility for all of the relevant acts of all their agents done within the scope of employment." *Smith v. Workers' Comp. Appeals Bd.*, 152 Cal. App. 3d 1104, 1110 (1984).

- "Knowledge which a corporation's employee receives or has in mind when acting in the course of his or her employment is in law the knowledge of the corporation, if such knowledge concerns a matter within the scope of the employee's duties." *FMC Corp. v. Plaisted & Companies*, 61 Cal. App. 4th 1132, 1213 (1998), *disapproved on other grounds by State of California v. Cont'l Ins. Co.*, 55 Cal. 4th 186 (2012).

- "[A] corporation can be held responsible for knowing information dispersed among its employees." *PacifiCare Life & Health Ins. Co. v. Jones*, 27 Cal. App. 5th 391, 417–18 (2018).

Egler's characterization of Weaver as a "lower-level" employee is, in other words, intended to apply a different legal standard for corporate knowledge than prescribed by California law. It should therefore be excluded and Egler precluded from referring to Weaver or other Umpqua employees as "lower-level" employees at trial. *See In re Apple Inc. Sec. Litig.*, No. 4:19-CV-02033-YGR, 2023 WL 4556765, at *10 (N.D. Cal. July 17, 2023) (excluding sentence in expert report that "misleadingly implies" the wrong legal standard and ordering defendants to ensure no such testimony is elicited at trial).

**MOTION IN LIMINE NO. 7**

**To exclude any reference to documents withheld by Umpqua Bank
pursuant to the SAR privilege (12 C.F.R. § 21.11(k), FRE 403, FRCP 37(c)(1))**

Plaintiffs' case against Umpqua relies in part on repeated alerts from the bank's account monitoring system. Those alerts frequently identified PFI banking activity as suspicious—such as when

Umpqua's Novato branch transferred $1.1 million from PFI's investor clearing account to Lewis

Wallach's personal bank account. Umpqua confirmed that it reviewed each alert, but the bank

nonetheless continued to provide financial services for PFI, and Umpqua's employees continued to

transfer funds from PFI's investor clearing accounts to Casey's and Wallach's personal bank accounts

on a regular basis. Plaintiffs' banking expert, Catherine Ghiglieri, has reconstructed the transaction

history that Umpqua's alert analysts saw when they reviewed certain automated alerts. She intends to

explain to the jury what those transaction histories show and why it would be highly unusual for a bank

to close those alerts and continue providing financial services for the affected customer.

　　　　Umpqua's banking expert, Frederick Egler, has a different view of the transactions that triggered

automated alerts and intends to testify that Umpqua could have reasonably determined the transactions

were legitimate. (Lam Decl., Ex. 8, (Egler Rebuttal Report), ¶¶ 14-27.) Plaintiffs do not object to Egler

presenting his view of the alerts' significance. But Egler has also expressed the opinion that it is not

possible to conclude what Umpqua learned from those alerts without reviewing analyst notes that

Umpqua has withheld under a claim of privilege. (*Id.*, ¶ 14; Ex. 6 (Egler Report), ¶¶ 71, 76.) Plaintiffs

believe it is improper for Umpqua to refer to the existence of documents that have not been produced to

Plaintiffs and that the jury will not be permitted to review. They request that the Court preclude any

reference to those documents at trial.

　　　　The privilege at issue is known as SAR privilege. It prohibits the disclosure of any Suspicious

Activity Report (or SAR) that a bank files with the Financial Crimes Enforcement Network of the

Department of the Treasury (FinCEN), as well as "any information that would reveal the existence of a

SAR." 12 C.F.R. § 21.11(k). Following guidance from FinCEN, courts have interpreted the privilege to

also cover "documents that indirectly suggest the existence *or nonexistence* of a SAR." *In re JPMorgan

Chase Bank, N.A.*, 799 F.3d 36, 43 (1st Cir. 2015) (emphasis added). The underlying facts and

transactions are specifically exempted from the SAR privilege, however, and remain discoverable. *Id.*

at 44 (citing 12 C.F.R. § 21.11(k)(1)(ii)(A)(2)).

　　　　When Plaintiffs requested that Umpqua produce documents concerning any suspicious activity

alerts that it received concerning PFI, Umpqua initially withheld 136 documents based on the SAR

privilege. Following an *in camera* review of those documents, the Honorable Alex G. Tse determined

1  that the SAR privilege applied to only 12 of those 136 documents. (9/14/21 Order [Dkt. 59] at 3.)

2  Plaintiffs, of course, do not know what information is included in those 12 privileged documents, but a

3  subsequent discovery order did clarify that one of those documents contained analyst notes that directly

4  or indirectly reveal whether a SAR was filed. (2/2/22 Order [Dkt. 76] at 1, ¶ 1.) These are the notes that

5  Egler references in his report and that Plaintiffs believe should not be discussed before the jury at trial.

6        At trial, neither party should be permitted to refer to the 12 documents that Judge Tse found to

7  be protected by the SAR privilege. But the facts and transactions underlying the suspicious activity

8  alerts that Umpqua employees reviewed are not protected by the SAR privilege and so can be presented

9  to the jury by Egler, Ghiglieri, and other witnesses. 12 C.F.R. § 21.11(k)(1)(ii)(A)(2); *see also Jasso v.*

10 *Wells Fargo Bank,* No. 2:20-cv-00858-CDS-BNW, 2022 WL 18141573, at *5 (D. Nev. Nov. 29, 2022)

11 (witness can answer questions regarding bank's closure of customer accounts without disclosing

12 whether or not a SAR was filed). Egler should be permitted to express his own opinions about the PFI

13 transactions that triggered repeated suspicious activity alerts, but he should not be permitted to

14 undermine Ghiglieri's opposing opinions by informing the jury that there are analyst notes she did not

15 review. And he should not be allowed to opine that nobody can say for certain what Umpqua's analysts

16 saw when they reviewed the suspicious activity alerts because certain notes they took have not been

17 entered into evidence. (*See* Lam Decl., Ex. 6 (Egler Report), ¶¶ 71, 76; Ex. 8 (Rebuttal Report), ¶ 14.)

18 If Umpqua is permitted to solicit testimony regarding its undisclosed analyst notes, it could mislead the

19 jury and prejudice Plaintiffs by suggesting that there is information in those notes that contradicts

20 Ghiglieri's testimony. Umpqua knows what is in its analysts' notes and so the jury may be inclined to

21 credit that negative implication, whereas Plaintiffs have never seen the documents and would be unable

22 to effectively argue otherwise. Plaintiffs accordingly request that the Court preclude all attorneys and

23 witnesses, including Egler, from mentioning the existence of privileged and undisclosed documents.

**MOTION IN LIMINE NO. 8**

24
25 **To preclude Umpqua from calling *Bagatelos* plaintiffs (FRE 401-403, 611(a)(3), FRCP 37(c)(1))**

26        Hours after the Court issued its decision on Umpqua's motion for summary judgment in the

27 *Bagatelos* action, Umpqua wrote to Plaintiffs, "in light of the Court's ruling today, will you be able to

28 accept trial subpoenas for the Bagatelos plaintiffs." (Lam Decl., Ex. 9.) Umpqua never disclosed the

*Bagatelos* plaintiffs as potential witnesses during discovery in *Camenisch*. (*Id.*, Exs. 10-12 (initial and supplemental disclosures).) And while Umpqua did disclose them in *Bagatelos*, it disclosed them only with respect to "their allegations and claims, and the purported damages set forth in their Complaint"— a Complaint that is no longer at issue. (*Id.*, Ex 13; *Bagatelos,* Dkt. 95 (order dismissing case).)

Plaintiffs are the Court-appointed representatives of the certified class in this action and object to Umpqua calling the *Bagatelos* plaintiffs during the class trial. The class consists of persons who invested money with PFI through LLC memberships, deeds of trust, or promissory notes. The *Bagatelos* plaintiffs invested through tenancy-in-common (TIC) interests and did so by depositing money into escrow—not into PFI's bank accounts at Umpqua. The Court found these to be material differences that meant the *Bagatelos* plaintiffs could not prevail on their aiding-and-abetting claims against Umpqua. (*Bagatelos* Dkt. 91 at 8.) If the *Bagatelos* plaintiffs were now called to testify at the *Camenisch* class trial, their testimony would confuse the issues, waste time, and prejudice LLC, DOT, and Note investors—who can still prevail on their aiding-and-abetting claims against Umpqua.

Nine of the eleven *Bagatelos* plaintiffs made other investments with PFI as well, and so they will remain absent class members in this case even after judgment is entered against them in *Bagatelos*. But testimony from absent class members is not warranted in this case, and even if it were, the *Bagatelos* plaintiffs would be poor choices since their experiences with PFI include TIC investments that are not at issue in this case. None of the *Bagatelos* plaintiffs have personal knowledge of Umpqua's dealings with PFI; they therefore cannot shed light on the issue of whether Umpqua knew about PFI's fraud or the issue of whether Umpqua substantially assisted that fraud. Any testimony the *Bagatelos* plaintiffs could offer regarding PFI's fraudulent conduct would be based, at least in part, on irrelevant TIC investments. And since Plaintiffs' claims are not premised on the particularities of PFI's sales pitches, but rather on its uniform failure to disclose that it was essentially stealing investor funds, there is little probative value in hearing about that omission from the *Bagatelos* plaintiffs as well as the four investors appointed by the Court to represent the class's interests at trial.

In a recent fraud case involving uniform misrepresentations in the Southern District of California, the court found that the testimony of absent class members was admissible "only to rebut [plaintiffs'] showing that the material misrepresentations were uniformly made." *Low v. Trump Univ.,*

*LLC*, No. 3:10-cv-00940-GPC-WVG, 2016 WL 6732110, at *3 (S.D. Cal. Nov. 15, 2016); *see also id.*
at 12. The testimony of the *Bagatelos* plaintiffs would not serve even that purpose here, as none of the
*Bagatelos* plaintiffs testified they were told PFI was commingling investor funds and using those funds
to pay prior investors, cover recurring shortages, and benefit PFI's executives. The *Low* court
confirmed that absent class member testimony was otherwise not relevant: when a claim for fraud
involves allegedly uniform misrepresentations or omissions, "absent class member testimony as to the
particularities of specific sales is … irrelevant." *Id.* at 2; *see also In re Loestrin 24 Fe Antitrust Litig.*,
No. 1:13-MD-2472 WES, 2019 WL 13257216, at *1 (D.R.I. Dec. 6, 2019) (excluding evidence of
absent class members to relitigate class certification issues).

Plaintiffs were appointed as class representatives because their claims are typical of the class's
legal claims. Umpqua will have a full and fair opportunity to question each class representative
regarding their investments with PFI. Additional testimony from the *Bagatelos* plaintiffs is neither
necessary nor appropriate. Any probative value to be gained from also calling the *Bagatelos* plaintiffs
at trial is outweighed by the danger that jurors will be confused by hearing about investments that are
not part of this case, that Plaintiffs will be unfairly prejudiced if the jury learns that Umpqua is
decidedly not liable for some or all of the *Bagatelos* plaintiffs' losses, and that additional testimony
from PFI investors will only waste time and prove needlessly cumulative. If it were truly important for
Umpqua to present testimony from absent class members in this case, it would have sought absent-
class-member discovery before fact discovery closed in February 2022. But as matters lie, it appears
that Umpqua only wants the *Bagatelos* plaintiffs to testify at trial because, unlike other absent class
members, they were involved in separate TIC investments that have the potential to confuse matters
and distract the jury from the central issue of whether Umpqua knowingly assisted PFI's
misappropriation of investor funds.

## MOTION IN LIMINE NO. 9

**To preclude live testimony from witnesses Umpqua controls if it does not make
the witnesses available to testify in person during Plaintiffs' case-in-chief (FRE 611(a))**

Many of the Umpqua employees and former employees that Plaintiffs expect to call at trial
reside within the Court's subpoena power and so can be compelled to testify in person. Fed. R. Civ. P.

45(c). Several key witnesses reside out-of-state, however, and so will only be available to testify personally if Umpqua voluntarily makes them available. These witnesses include:

- o  Crystle Fielder (Oregon) – Umpqua's Director of Transaction Monitoring

- o  Babette Lou Bilger (Oregon) – Umpqua's Deputy Bank Secrecy Act Officer who manages its enhanced due diligence team

- o  Theresa Becker (Oregon) – former Umpqua alert analyst and enhanced due diligence analyst

- o  Patrick McCarty (Texas) – former Commercial Relationship Manager at Umpqua and Senior Vice President at Circle Bank

Each of these witnesses provided important deposition testimony in this case, and each was represented by Umpqua's counsel at their deposition.

"In general, there is a strong preference for live testimony," which is typically far more engaging and useful to jurors than deposition testimony. *Weiner v. Ocwen Fin. Corp*., No. 2:14-CV-02597-DJC-DB, 2023 WL 6519292, at *2 (E.D. Cal. Oct. 5, 2023). But since some Umpqua witnesses reside beyond the Court's subpoena power, the Court can only encourage that option and prevent Umpqua from engaging in gamesmanship. *Id.* When faced with similar scenarios, "numerous courts have held that a party may not limit a witness that the party intends to call at trial from testifying only during its own case in chief. Instead, the party must either permit its opponent to directly examine the witness, so that both parties may elicit the witness's live testimony during their cases in chief, or rely itself on the witness's deposition testimony, so that neither party may elicit the witness's live testimony during its case in chief." *Buchwald v. Renco Grp., Inc.*, No. 13-CV-7948 AJN, 2014 WL 4207113, at *1 (S.D.N.Y. Aug. 25, 2014) (citing cases, including *R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 273 (9th Cir. 1991)).

Plaintiffs respectfully request that the Court do the same here and order that for any witness that Umpqua may call at trial by live testimony, it must also make that witness available to Plaintiffs for their case-in-chief. *Weinger*, 2023 WL 6519292 at *2. If Umpqua chooses not to make witnesses available to Plaintiffs, it could still call them but would be limited to the use of deposition testimony. *Id.*; *see also Iorio v. Allianz Life Ins. Co. of N. Am.*, No. 05CV633 JLS (CAB), 2009 WL 3415689, at

1   *6 (S.D. Cal. Oct. 21, 2009) (precluding defendants from producing employees or former employees in

2   person if they are not made available for the plaintiffs' case-in-chief).

3                                             Respectfully submitted,

4   Dated: July 19, 2024                       By: */s/ Amy M. Zeman*

5                                           Amy M. Zeman (SBN 273100)
                                        Linda P. Lam (SBN 301461)

6                                         E. Wynne Tidwell (SBN 348179)

7                                         **GIBBS LAW GROUP LLP**
                                        1111 Broadway, Suite 2100

8                                         Oakland, California 94607
                                        Telephone: (510) 350-9700

9                                         amz@classlawgroup.com
                                        lpl@classlawgroup.com

10                                         ewt@classlawgroup.com

11                                         Scott L. Silver (*pro hac vice*)

12                                         Peter M. Spett (*pro hac vice*)
                                        Ryan A. Schwamm (*pro hac vice*)

13                                         **SILVER LAW GROUP**

14                                         11780 W. Sample Road
                                        Coral Springs, FL 33065

15                                         Telephone: 954-755-4799
                                        ssilver@silverlaw.com

16                                         pspett@silverlaw.com
                                        rschwamm@silverlaw.com

17

18                                         Geoffrey A. Munroe (SBN 228590)

19                                         **LAW OFFICE OF**
                                        **GEOFFREY A. MUNROE**

20                                         1435 Broad Street
                                        San Luis Obispo, CA 93401

21                                         Telephone: 925-788-8493
                                        gam@munroe-law.com

22                                         *Counsel for Plaintiffs and the Class*

23

24

25

26

27

28