UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al., | Case No. 20-cv-05905-PCP |
| Plaintiffs, | |
| v. | **OMNIBUS ORDER ON MOTIONS TO EXCLUDE EXPERTS' OPINIONS AND TESTIMONY AND MOTIONS IN LIMINE** |
| UMPQUA BANK, | |
| Defendant. | Re: Dkt. Nos. 242, 243, 244, 245, 247 |

Before the Court are defendant Umpqua Bank's motions to exclude the opinions and testimony of plaintiffs' experts Catherine Ghiglieri, Dan Salah, and Micheal Goldberg and both parties' motions in limine.[1] For the reasons set forth herein, the parties' motions in limine and Umqpua's motion to exclude Ghiglieri's opinions and testimony are granted in part. Umpqua's motions to exclude the opinions and testimony of Salah and Goldberg are denied. The parties are further ordered to file a joint sealing motion that consolidates all pending sealing motions regarding material filed in connection with the motions resolved by this order.

I.      **Umpqua's Motions to Exclude Plaintiffs' Experts' Opinions and Testimony**

**LEGAL STANDARD**

Admissibility of expert testimony in a civil proceeding is governed by Fed. R. Evid. 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

---

[1] The facts of this case are set forth in this Court's order denying Umpqua's motion for summary judgment. *See* Dkt. No. 144.

United States District Court
Northern District of California

principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Ninth Circuit has "interpreted Rule 702 to require that expert testimony ... be both relevant and reliable." *Barabin v. AsentJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal citations and quote marks omitted). Relevancy requires "the evidence ... logically advance a material aspect of the party's case." *Id.* (citation omitted). Reliability encompasses "whether an expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (quoting *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)). The role of the court is not to determine the "correctness of the expert's conclusions but the soundness of his methodology." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). The court must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. While testimony on an ultimate issues is not "per se improper[,] ... an expert witness cannot give an opinion as to her legal conclusion, *i.e.,* an opinion on an ultimate issue of law." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002)) (emphasis omitted).

## ANALYSIS

### A.    Umpqua's motion to exclude Ghiglieri's opinions and testimony is granted in part.

Catherine Ghiglieri is a retained expert being offered by plaintiffs to help the jury understand and interpret the banking evidence that will be presented at trial, such as what is typical in the banking industry, which transactions lack business justification, and what kinds of customer behavior are considered red flags. Ghiglieri was formerly Texas Banking Commissioner and has spent her career regulating, training, and advising banks. Umpqua does not challenge

1   Ghiglieri's qualifications as an expert in banking standards generally but argues for several other

2   reasons that Ghiglieri's opinions and testimony should be excluded.

3           **1.    Ghiglieri may not testify as to Umpqua or its employees' knowledge.**

4           Umpqua seeks to exclude Ghiglieri's opinions in their entirety on the ground that her core

5   opinions constitute impermissible state of mind opinions about the knowledge of Umpqua and its

6   employees. "Courts routinely exclude expert testimony as to intent, motive, or state of mind as

7   issues better left to a jury." *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal.

8   2017). Indeed, plaintiffs agree that an expert may not offer such state of mind opinions. Though

9   portions of Ghiglieri's report stray into that territory and such testimony is prohibited, Ghiglieri

10  can properly testify at trial regarding normal banking practices, which will help the jury evaluate

11  whether an inference of actual knowledge may be drawn from how Umpqua and its employees

12  behaved.

13          Umpqua also argues that Ghiglieri's opinions are confusing and should be excluded

14  because she does not differentiate between actual and constructive knowledge. Because the Court

15  will not allow Ghiglieri to testify with respect to the state of mind of Umpqua or its employees,

16  Ghiglieri will not be asserting that Umpqua "knew" anything under either standard. Contrary to

17  Umpqua's contentions, this Court concluded at summary judgment that evidence about red flags

18  and atypical banking practices can in some instances support an inference the bank had actual

19  knowledge, i.e. "must have known." *See* Dkt. No. 144.

20          **2.    Ghiglieri may only reference the facts necessary and helpful to the jury
                    to understand her expert opinions.**

21

22          Umpqua asks the court to exclude any testimony based on Ghiglieri's summaries of the

23  facts of this case in her expert report, arguing that such testimony will simply regurgitate facts and

24  impermissibly comment on the evidence. Expert testimony is "inadmissible if it simply 'presents a

25  narrative of the case which a lay juror is equally capable of constructing.'" *Taylor v. Cnty. of*

26  *Pima*, No. CV-15-00152-TUC-RM, 2023 WL 2652602, at *4 (D. Ariz. Mar. 27, 2023) (quoting

27  *Taylor v. Evans*, No. 94-CV-8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997)).

28  Ghiglieri may not present such factual narratives, divorced from her expert opinions, at trial. She

United States District Court
Northern District of California

3

is entitled, however, to explain the facts on which she bases her opinions that Umpqua did or did not comply with banking standards.

As to Umpqua's contentions that particular opinions in Ghiglieri's expert report constitute impermissible factual narratives, "an objection to the 'narrative' nature of testimony is an objection [that] ... is properly asserted at trial.... [I]t is not a proper objection to an *expert report*, that, itself, will not be placed into evidence, nor to a *Daubert* challenge." *Holley v. Gilead Scis., Inc.*, No. 18-CV-06972-JST, 2023 WL 2469632, at *6 (N.D. Cal. Feb. 27, 2023) (quoting *In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 12-cv-00064, 2014 WL 120973, at *14 (W.D. La. Jan. 10, 2014)). The Court therefore denies Umpqua's request to exclude Ghiglieri's factual summaries without prejudice. Specific objections are best handled at trial and will depend on the particular testimony given.

### 3. Ghiglieri may not testify as to undisclosed opinions, but many of the opinions Umpqua challenges were in fact disclosed.

Federal Rule of Civil Procedure 26 requires a retained export's report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Umpqua argues that Ghiglieri's report is premised on impermissible state-of-mind opinions and impermissible factual narratives and that, to the extent it also reflects her opinions about standard banking practices or Umpqua's departures therefrom, those opinions are so buried in impermissible opinions as to be effectively unintelligible.

Expert disclosures under Rule 26 are intended to provide opposing parties fair notice of an expert's opinions. Here, Ghiglieri's report disclosed her opinions about standard banking practices, even if those opinions were embedded in impermissible subjects of expert testimony. Because the report disclosed those permissible expert opinions, the Court will not preclude Ghiglieri from testifying about them.

Umpqua also contends that plaintiffs intend to have Ghiglieri testify about certain specific opinions that were not disclosed in her report. Umpqua argues, for example, that Ghiglieri's report stated only that it was suspicious for Weaver to remove Casey's name, whereas Ghiglieri now intends to testify that to request such a name removal is inherently suspicious. Rule 26's

1  disclosure requirement does not demand the degree of precision Umpqua suggests. Because

2  Ghiglieri disclosed her opinion that the name removal was suspicious, she is entitled to opine on

3  that issue at trial.

4  The same reasoning applies with equal force to all but one of Umpqua's challenges to

5  specific opinions it contends were not properly disclosed. The only opinion to which this

6  reasoning does not apply is Ghiglieri's opinion that "Umpqua's retention of only about two years

7  of alert data regarding PFI is unusual in the banking industry." Plaintiffs have conceded that

8  Ghiglieri had not disclosed this opinion in her report. Because this opinion was not disclosed,

9  Ghiglieri may not offer it at trial.

10  To the extent Ghiglieri offers any other opinions at trial that were not properly disclosed,

11  Umpqua may object to her testimony on that basis at trial. As noted at the pretrial conference,

12  should a party object to an expert witness's testimony on the ground that it was not properly

13  disclosed, the Court expects counsel for the party offering that expert witness to immediately

14  identify, by page and paragraph number of the expert report, where the opinion at issue was

15  disclosed. All parties should annotate their expert witness examination outlines with those page

16  and paragraph numbers to enable immediate responses to such objections.

17       **4.    Ghiglieri may testify as to whether Umpqua's conduct was outside the
18            bounds of banking standards, but may not testify that Umpqua violated
             any law.**

19  "Instructing the jury as to the applicable law is the distinct and exclusive province of the

20  court." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008)

21  (quoting *Hangarter*, 373 F.3d at 1016). "Although expert testimony about industry practice or

22  standards often may be relevant and admissible, expert opinion about whether federal law was

23  contravened is simply inadmissible." *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*,

24  No. 19-CV-1756 (WMW), 2022 WL 4547022, at *16 (D. Minn. Sept. 29, 2022) (quotations

25  omitted). For that reason, Ghiglieri may testify about industry standards, including those

26  influenced by the Bank Secrecy Act, but Ghiglieri may not opine that Umpqua violated the Bank

27  Secrecy Act. Similarly, Ghiglieri may not opine about whether Umpqua had a duty under

28

United States District Court
Northern District of California

1    California law to monitor its accounts.[2]

2                    **5.     Ghiglieri's testimony regarding Umpqua's Sales Incentive Program is**
                    **appropriately based on her analysis of branch employees' testimony**
3                    **and internal correspondence.**

4           Umqpua argues that Ghiglieri's opinion about Umpqua's deposit sale incentives is flawed

5    and lacks sufficient facts or data under Rule 702. The opinion is sufficiently well founded,

6    however, because Ghiglieri appropriately based her analysis on branch employees' testimony and

7    internal correspondence and her familiarity with banking from her decades regulating and advising

8    banks. "Weakness in the factual basis of an expert witness' opinion generally 'bear on the weight

9    of the evidence rather than the admissibility.'" *Quality Packaging, Inc. v. Snak Club*, No. C 03-

10   5240 SI, 2005 WL 8177597, at *5 (N.D. Cal. Apr. 26, 2005) (quoting *McLean v. 988011 Ontario,*

11   *Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)).

12                   **6.     Ghiglieri's opinion about what transactions may have triggered the**
                    **anti-money laundering alerts is reliable.**
13

14          Umpqua changed its anti-money laundering alert system in June 2018 and lost all pre-

15   transition data. Ghiglieri's report therefore analyzes the types of transactions that triggered

16   Umpqua's anti-money laundering alerts since the transition and extrapolates from those

17   transactions that Umpqua would have received repeated alerts of suspicious activity in PFI's

18   accounts prior to June 2018. Umpqua argues that Ghiglieri's opinions regarding what anti-money

19   laundering alerts Umpqua may have received on PFI's account prior to June 2018 should be

20   excluded because there are no records of the alerts and Ghiglieri's methodology for recreating

21   transactions does not meet *Daubert*'s requirements for scientific or technical opinion testimony.

22          To support her opinion, Ghiglieri provided several examples of pre-2018 PFI transactions

23   that were similar in nature, velocity, and volume to those transactions that alerted in Umpqua's

24

25   _____

26   [2] Contrary to Umpqua's assertion, California Financial Code §§ 1450–51 is not controlling in this
     case and does not make industry standards stemming from the Bank Secrecy Act irrelevant. *See*
27   *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1152, 26 Cal. Rptr. 3d 401, 411 (2005)
     (concluding that if "the bank had actual knowledge of the underlying wrong it purportedly aided
28   and abetted, … [it] is a reasonable exception to the case law limiting bank duties to
     nondepositors") (discussing *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 545 (1998)).

United States District Court
Northern District of California

post-2018 system. Ghiglieri also based her opinion on her general familiarity with the alert

systems that were used and testimony from Umpqua's employees that the type and volume of

suspicious activity alerts that Umpqua received was similar on both systems. Umpqua points out a

series of assumptions that Ghiglieri made about Umpqua's alert system preferences that it argues

are incorrect. The role of the Court, however, is not to determine the "correctness of the expert's

conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564 (9th Cir. 2010).

Here, Ghiglieri has adequately based her analysis off the record and her expertise. Umpqua may

impeach Ghiglieri with respect to the specific issues it raises, but Ghiglieri's methodology is

sufficiently sound to allow her opinion's admission.

### 7.    Ghiglieri may testify about Umpqua's investigation or lack thereof, but may not introduce testimony that would reveal the filing or non-filing of an SAR.

If a bank detects money laundering or other illegal conduct, it typically must file a

suspicious activity report (SAR) with the appropriate federal authorities. *See* 12 C.F.R. § 21.11(a),

(c). "A SAR, and any information that would reveal the existence of a SAR, are confidential, and

shall not be disclosed." *Id.* § 21.11(k) (Office of the Comptroller of the Currency regulation); *see

also* 31 C.F.R. § 1020.320(e) (nearly identical regulation from the Financial Crimes Enforcement

Network). The Court previously concluded after *in camera* review that several documents related

to Umpqua's handling of the PFI accounts are protected by the SAR privilege. *See* Dkt. No. 59.

Umpqua argues that if Ghiglieri is permitted to testify that Umpqua performed no investigation in

response to the anti-money laundering alerts, Umpqua will be in the untenable position of having

to protect the government's privileged information while not being able to respond to her

allegations with evidence of how Umpqua actually investigated PFI.

The SAR privilege only extends to testimony that would reveal the filing or non-filing of

an SAR. It does not encompass the details of an investigation leading to the decision whether to

file an SAR. *See In re JPMorgan Chase Bank*, N.A., 799 F.3d 36, 44 (1st Cir. 2015). Accordingly,

both parties can introduce testimony about Umpqua's investigations (or lack thereof). Before any

such testimony is presented to the jury, the Court will provide the jury with an instruction

explaining that the SAR privilege prohibits Umpqua from revealing whether an SAR was filed in

United States District Court
Northern District of California

1    connection with any investigation of PFI's accounts, and that certain Umpqua documents were

2    withheld from plaintiffs due to this SAR privilege. The parties should prepare a joint instruction

3    regarding the SAR privilege, which the Court will discuss with the parties at the January 27, 2025

4    hearing.

5        **8.    Ghiglieri cannot testify that PFI was a TPPP but may testify that Weaver's behavior violated industry standards or norms.**

6

7        Umpqua argues that Ghiglieri's opinions about June Weaver's interactions with Umpqua's

8    regulatory analysts should be excluded because they rely "on the premise that PFI was a third-

9    party payment processor ('TPPP')," which Umpqua argues it is not. Plaintiffs concede that

10   Ghiglieri concludes PFI is not a TPPP but argue that Ghiglieri's opinion that Weaver ignored red

11   flags and acted inconsistently with standard banking practices when communicating with

12   Umpqua's regulatory analysts still holds. Plaintiffs are correct. Ghiglieri may testify that Weaver's

13   behavior violated industry standards or norms, but cannot testify that PFI was a TPPP or that

14   June Weaver deceived other Umpqua employees by correctly informing them that PFI was not a

15   TPPP.

16       **9.    Ghiglieri may testify about whether commingling was a red flag and whether it is a banking norm to do business with individuals convicted of financial crimes.**

17

18       Umpqua argues that Ghiglieri cannot properly testify about PFI's commingling because

19   she does not know whether PFI was under any obligation to keep the funds separate. This

20   argument misses the mark. Ghiglieri intends to and is permitted to testify that commingling of

21   funds drawn from many separate accounts belonging to separate entities is considered a red flag in

22   the banking industry. As discussed extensively already, Ghiglieri has years of expertise in the

23   banking industry and may testify about standard banking practices and common red flags and

24   typical responses to those red flags. This is but one example.

25       Similarly, Ghiglieri may testify about whether it is a banking norm to do business with

26   individuals convicted of financial crimes, an opinion that is adequately supported by the record

27   and her decades of experience with the banking industry.

28

**B.    Umpqua's motion to exclude Salah's opinions and testimony is denied.**

Dan Salah is an expert who calculated the damages that each class member suffered. To do so, Salah relied upon an "Access" database that is a direct copy of a portion of a financial transactions database that was created for PFI by forensic accountants at FTI Consulting in preparation for PFI's bankruptcy.[3]

Umpqua does not challenge Salah's qualifications to offer expert opinions on the issue of damages. Instead, Umpqua contends that Salah's calculations are inadmissible because the database upon which they are based is hearsay. Umpqua also takes issue with specific aspects of Salah's calculations.

**1.    The exclusion order poses no bar to Salah's testimony.**

Umpqua first argues that the raw data upon which the financial transactions and Access database was built was ordered excluded by this Court because it was produced after the discovery deadline. *See* Dkt. No. 179. Umpqua contends that it is improper to admit Salah's expert testimony because it is merely a conduit for this excluded evidence. This Court's exclusion order, however, expressly noted that "nothing in this order resolves whether the structured database, records retrieved therefrom, or any other evidence regarding that database or its contents will be admissible at trial." *Id.* at 4. Accordingly, the exclusion order poses no bar to Salah's testimony. Notably, Umpqua has had access to the excluded raw financial data that FTI used to create and verify its database for over two years, so Umpqua has had ample opportunity to independently verify the database. *See* Dkt. No. 261, at 7.

**2.    The Access database is not hearsay.**

Umpqua contends that Salah's testimony is a conduit for impermissible hearsay and should be excluded on that basis. Plaintiffs argue that the documents upon which Salah relied fall within the "business records" exemption to the hearsay rule.

Federal Rule of Evidence 803(6) allows the admission of business records when "two foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge

---

[3] The "Access" database was produced in response to a subpoena in this litigation. It is a direct copy of the financial transactions database but is limited to class member data.

at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity." *United States v. Miller,* 771 F.2d 1219, 1237 (9th Cir. 1985).[4] Because the Access database relied upon by Salah is a direct copy of a portion of the financial transactions database, Salah's reliance on that database is permissible if the financial transactions database itself constitutes a business record. *See U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009) ("[P]rintouts prepared specifically for litigation from databases that were compiled in the ordinary course of business are admissible as business records to the same extent as if the printouts were, themselves, prepared in the ordinary course of business. The important issue is whether the database, not the printout from the database, was compiled in the ordinary course of business.")

Umpqua argues that the financial transactions database was produced years after the relevant financial records were recorded and therefore cannot be considered to have been recorded "at or near" the relevant time as required. But the Ninth Circuit has allowed admission of later-constructed financial records under the business records exception so long as they meet the other elements of the business record test. *See S.E.C. v. Jasper*, 678 F.3d 1116, 1123 (9th Cir. 2012) (holding that a later constructed financial report "made at or near the time *of the accounting review*" was a business record (emphasis in original)). Umpqua argues that the database contains multiple inferential leaps not directly contained in the underlying data, and therefore cannot be fairly characterized as a compilation or pure reconstruction of business records. *See* Dkt. No. 265, at 10-12. It also argues that because the financial transactions database was produced in

---

[4] Fed. R. Evid. 803(6) excludes from the rule against hearsay:

A record of an act, event, condition, opinion, or diagnosis if:
(A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
(C) making the record was a regular practice of that activity;
(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
(E)  the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

10

anticipation of PFI's bankruptcy proceeding, it cannot be considered "kept in the course of a regularly conducted business activity." But the Ninth Circuit has permitted similar forensic accounting records requiring substantial work product and analysis in their construction to be considered business records so long as they were "prepared pursuant to an ongoing duty" of the company. *See United States v. Hussain*, No. 16-CR-00462-CRB, 2018 WL 3619797, at *25 (N.D. Cal. July 30, 2018), *aff'd*, 818 F. App'x 765 (9th Cir. 2020). Here, the "data was compiled into a single integrated database so that PFI's new management could make use of the data and carry out its ongoing duties to investors." Dkt. No. 261, at 17. Therefore, it qualifies as a business record and satisfies both elements.

Umpqua's argument that the financial transactions database is inherently untrustworthy because it was produced in anticipation of the bankruptcy litigation also fails. While "[c]ourts are rightfully wary when parties create self-serving documents and seek to offer them as business records," PFI is not a party to this action and "had no incentive to gather evidence" that would benefit either side in this litigation. *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999). The data used to create the database was already in existence when PFI's bankruptcy proceeding began and was compiled into a single integrated database so that PFI's new management could make use of the data to carry out its ongoing duties to investors. The bankruptcy court relied on the data to approve creditor claims and authorize partial payments to investors. Additionally, Umpqua has not pointed to any class member whose gains or losses have been recorded incorrectly in the Access database. The only issue Umpqua has been able to identify with the Access database is that some rollovers were unmatched, but plaintiffs explain and are prepared to provide testimony that this issue is a product of the slicing done to create the Access database and that, in the broader financial transactions database, all rollovers match and sum to zero. Umpqua thus has not shown that the source of information or the method or circumstances of the database's preparation indicate a lack of trustworthiness.

The foundational requirement in FRE 803(6) dictates that offered records be authenticated by testimony from a custodian or other qualified witness from the business. "The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-

1    keeping system." *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990). Such testimony must

2    be offered for each level of business record: the Access database, the financial transactions

3    database, and the underlying raw financial records.

4          Plaintiffs seek to offer the testimony of Michelle Herman, an FTI consultant who served as

5    an outside financial advisor to PFI and oversaw the creation of the databases. Herman can

6    satisfactorily lay the foundation for the FTI-produced databases of which she had firsthand

7    knowledge, and she presumably has a reliable understanding of PFI's record-keeping system

8    based on that work. It is not clear, however, that she will be able to provide a foundation for PFI's

9    raw financial records because she was not an employee of PFI. *See Latman v. Burdette*, 366 F.3d

10    774, 787, n.10 (9th Cir. 2004) *abrogated on other grounds by L. v. Siegel*, 571 U.S. 415, 134 S.

11    Ct. 1188 (2014) (finding that an attorney lacked personal knowledge to authenticate business

12    records because he was only informed by a bank employee that the documents at issue were the

13    plaintiff's account records). Daniel Goldberg, who oversaw the business and affairs of PFI for

14    more than a year as it wound down its businesses, will likely be able to lay a foundation for the

15    raw financial records if he is able to testify that he understands PFI's financial record-keeping

16    system.

17          Because the Access database may be admissible as a business record if the appropriate

18    witnesses provide the needed foundation, Umpqua's request to exclude Salah's opinion as

19    premised on inadmissible hearsay is denied.[5]

20              **3.    Salah's proration methodology is reliable.**

21          Umpqua argues that Salah's proration methodology is speculative and not sufficiently tied

22    to the facts of the case. Salah's pro rata approach to computing which of PFI's payments were

23    made on account of harms for which PFI is solely liable and which were made on account of

24    harms for which PFI and Umpqua are jointly liable is reasonable, reliable, and sufficiently tied to

25    the facts of the case. Indeed, Umpqua offers no alternative approach Salah could have used, and its

26

27    ――――――――――――
      [5] Should plaintiffs fail to provide an adequate foundation for the Access database's admission as a
28    business record, the Court will consider plaintiffs' argument that the Access database should
      nonetheless be admitted under the hearsay rule's residual exception. *See* Fed. R. Ev. 807.

United States District Court
Northern District of California

own damages expert uses the same pro rata approach for payments made by PFI following its bankruptcy. Umpqua's request to exclude Salah's opinions based on his proration methodology is therefore denied.

### 4. Salah is permitted to testify about his opinions based on the mid-year convention.

Umpqua argues that permitting Salah to utilize the midyear convention would be unduly prejudicial under Rule 403 because approximation is unnecessary as Salah had access to the data that would have allowed him to make a more precise calculation. The midyear convention is a common and widely accepted technique. The probative value of Salah's testimony is not substantially outweighed by a danger of unfair prejudice or confusion simply because Salah bases his opinion on a common accounting method. "The court's role is to determine 'the scientific validity' of an expert's 'principles and methodology,' not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record. That is for the litigants to argue, and for the jury to decide." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022).

### 5. Salah is permitted to calculate compound interest.

"In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." *Michelson v. Hamada*, 29 Cal. App. 4th 1575, 1586 (1994) (quoting Cal. Civ. Code § 3288). Umpqua's arguments to the contrary are unavailing. Accordingly, Umpqua's request to preclude Salah from calculating compound interest is denied.

### 6. The Court reserves ruling on undisclosed opinions until specific objections are presented at trial.

Umpqua requests that Salah be precluded from testifying about several speculative categories of undisclosed opinions. The Court denies this request without prejudice and will rule on specific objections as necessary at trial.

### C. Umpqua's motion to exclude Goldberg's opinions and testimony is denied.

Daniel Goldberg is an attorney whose practice, for the past 30 years, has focused on unwinding Ponzi schemes. Goldberg served as the court-approved sole director of PFI and its

13

United States District Court
Northern District of California

related entity PFI Fund, Inc. during their bankruptcy, and as trustee of the PFI Trust that was formed to liquidate and distribute the assets of the debtors. Umpqua does not dispute that Goldberg is qualified to testify generally about Ponzi schemes but contests whether Goldberg is able to offer reliable case-specific opinions about whether and to what extent PFI was a Ponzi scheme.

### 1.    Goldberg may testify as a lay witness about his firsthand experience with PFI.

Umpqua argues that Goldberg's opinions are based on specialized knowledge and do not qualify as lay witness testimony.

"[T]he line between lay and expert opinion depends on the basis of the opinion, not its subject matter." *United States v. Barragan*, 871 F.3d 689, 704 (9th Cir. 2017). "The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge[.]" *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014) (quoting *Nationwide Transp. Fin.*, 523 F.3d at 1058).

Lay opinion testimony must be "helpful to the jury in acquiring a clear understanding of the witness's testimony or the determination of a fact in issue." *United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007) (quoting Fed. R. Evid. 701) (internal quotation marks omitted). In contrast, expert testimony must be based on the witness's "scientific, technical, or other specialized knowledge," and the Court serves as a gatekeeper for this testimony. Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 589-91; *Kumho Tire Co.*, 526 U.S. at 147-48. "The fact that [a witness] has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004).

> If the witness with specialized knowledge was a percipient witness, that does not mean that his testimony automatically qualifies as lay testimony. *See United States v. Figueroa–Lopez,* 125 F.3d 1241, 1246 (9th Cir. 1997) (noting that "[t]he mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule

702" because, "[o]therwise, a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death"). But where a witness with specialized knowledge provides percipient testimony about "'common enough' [matters that] require ... a limited amount of expertise," then the testimony constitutes lay testimony and not expert. *Id.* at 1245; *see also* Fed. R. Evid. 701, 2000 advisory committee notes (citing *State v. Brown,* 836 S.W.2d 530 (Tenn.1992), in support of the statement that "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'").

*Sec. & Exch. Comm'n v. Sabhlok*, No. C-08-4238 EMC, 2010 WL 2944255, at *4 (N.D. Cal. July 23, 2010).

Goldberg may testify as a lay witness as to "'common enough' [matters that] require ... a limited amount of expertise." *Id.* In this case, testimony about what Goldberg did in his role at PFI and in response to the FTI investigation could constitute lay testimony. Technical opinions Goldberg formed about the extent of the Ponzi scheme, however, would not constitute lay testimony.

> ### 2. Goldberg may testify as a nonretained expert for further percipient testimony.

To the extent that Goldberg intends to testify about technical opinions he formed during his work with PFI, Goldberg may testify as a nonretained/percipient expert witness. *See Masimo Corp. v. Apple Inc.*, No. SACV2000048JVSJDEX, 2022 WL 18285029, at *3 (C.D. Cal. Nov. 22, 2022).[6] Any opinions formed for the purpose of this litigation must be offered as a retained expert and subject to the disclosure requirements for such experts.

---

[6] Umpqua argues that Goldberg has not provided the requisite percipient expert disclosure under Fed. R. Civ. P. 26(a)(2)(C), which requires "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Goldberg's disclosure meets both prongs but the Court will allow specific objections based on the testimony given at trial as appropriate. Umpqua also argues that plaintiffs have maintained that Goldberg is a retained expert and benefited from special privileges under it such that it is unfair for plaintiffs to now claim But hybrid percipient/non-retained and retained experts are fairly common, and Umpqua cites no precedents forcing parties to cabin experts into one box or the other. *See, e.g.*, *Masimo Corp. v. Apple Inc.*, No. SACV2000048JVSJDEX, 2022 WL 18285029, at *3 (C.D. Cal. Nov. 22, 2022).

United States District Court
Northern District of California

### 3.    Goldberg has personal knowledge as to the conclusions he reached as a result of his and FTI's investigation.

When Goldberg is testifying as either a nonretained/percipient witness or lay witness, it is important that Goldberg have personal knowledge of the facts regarding PFI to which he is testifying. Though Goldberg may not have specific personal knowledge of all of FTI's investigatory steps and accountancy, once that foundation is laid by an FTI employee, Goldberg may testify about the conclusions he reached based on FTI's investigatory findings and the steps he took as a result of the investigation.

### 4.    Goldberg may testify about the existence of a Ponzi scheme as a historical fact.

The Ninth Circuit court has "repeatedly affirmed that an expert witness cannot give … an opinion on an ultimate issue of law. … This prohibition of opinion testimony on an ultimate issue of law recognizes that, when an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quotations and citations omitted). Umpqua contends that it is improper for Goldberg to testify about the existence of a "Ponzi scheme" because this is an improper legal conclusion on an ultimate issue of law. *See Hafen v. Howell*, No. 2:19-CV-00813-TC-DAO, 2023 WL 2188566, at *3 (D. Utah Feb. 23, 2023) (prohibiting expert from testifying as to the "legal conclusion" of whether a business operated a Ponzi scheme). Plaintiffs rebut that it is not a legal conclusion but a historical fact. PFI (through Goldberg) stipulated to the bankruptcy court "that its businesses were all part of an overarching Ponzi scheme that began no later than January 1, 2007." Dkt. No. 243-1, at 16.

Umpqua does not dispute that at least some class members' investments were part of a Ponzi scheme orchestrated by PFI. Its primary challenge is instead to the extent of that scheme, in particular whether it encompasses all or only some of the class members' investments. Ultimately, whether PFI operated as a "Ponzi scheme" in all respects goes not to the ultimate legal issue presented—which is whether Umpqua had actual knowledge of PFI's fraud or a fiduciary breach, whether Umpqua provided substantial assistance to PFI in connection therewith, and whether class members were harmed thereby—but to the scope of the class. As Umpqua notes, plaintiffs relied

to a significant degree on their characterization of PFI as a uniform Ponzi scheme in moving for class certification.

Under these circumstances, the Court will not categorically prohibit Goldberg from opining that PFI was a Ponzi scheme. He must, however, explain the precise scope of that scheme and, to the extent he contends it encompassed all PFI investments, identify the basis for that opinion. Rather than relying on magic words like "Ponzi scheme," the parties and their witnesses should focus on the factual issues underlying that characterization—namely, whether and how PFI operated in a manner that was fraudulent or constituted a breach of fiduciary duty, and whether and how that conduct affected the class, including any identifiable subsets therein.

## II.    Umpqua's Motions in Limine

### 1.    Umpqua's motion to exclude any references to the bankruptcy court stipulations, orders, and filings regarding whether PFI was a Ponzi scheme is denied.

Umpqua asks the Court to exclude any evidence at trial regarding any bankruptcy court stipulations, orders, and filings containing any determinations or allegations that PFI was a Ponzi scheme. Umpqua argues that these statements and filings are hearsay and that no exceptions apply. Umpqua also argues that the statements are irrelevant and would be unduly prejudicial.

Plaintiffs agree that the judgment is hearsay, but argue that it remains admissible because it has independent legal significance if not offered to establish the truth of its contents. *See United States v. Boulware*, 384 F.3d 794, 806–07 (9th Cir. 2004) (prior judgment admissible when offered "not for the truth of the matters asserted in the judgment, but rather to establish the judgment's legal effect"). Umpqua's request is too broad because excluding any reference to PFI's stipulation to operating a Ponzi scheme or any bankruptcy filings related to that stipulation would preclude the introduction of permissible non-hearsay evidence. The probative value of such testimony is not substantially outweighed by its prejudice This motion in limine is therefore denied.

### 2.    Umpqua's motion to exclude the Alfaro declaration is granted.

Umpqua asks this Court to preclude plaintiffs from offering the Alfaro Declaration into evidence. The Alfaro declaration is a summary of the findings of FTI's investigation conducted

before PFI went into bankruptcy. The Alfaro declaration itself is hearsay. Umpqua's motion is therefore granted. This order does not exclude testimony by Wallach adopting portions of the declaration.

**3.   Umpqua's motion to preclude David Alfaro from offering any expert opinion testimony is granted, but Alfaro may testify as a lay witness about FTI's investigation.**

David Alfaro is an FTI financial advisor who worked on the forensic accountancy review of PFI's financial records and created the financial transactions database in advance of PFI's bankruptcy. Plaintiffs have not disclosed Alfaro as an expert witness. Umpqua therefore moves the Court for an order excluding Alfaro from offering any expert opinions or analysis.

Plaintiffs assert they are not intending to elicit expert testimony from Alfaro, but it appears that the parties disagree about the proper subjects of Alfaro's testimony as a fact witness. "A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'" *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (quoting *Bank of China*, 359 F.3d at 181). The *Rigas* court allowed an outside consultant accountant very similar to Alfaro to testify as a lay witness about his investigation and findings. *Id.* This Court finds the Second Circuit's reasoning persuasive and will allow Alfaro to testify as a lay witness as to his investigation into PFI and its findings independent from this litigation.

**4.   Umpqua's motion to exclude any evidence, argument, or comment on documents withheld pursuant to SAR privilege is denied without prejudice.**

Umpqua seeks an in limine ruling excluding evidence, theories, and argument about materials covered by the suspicious activity report ("SAR") privilege. 12 C.F.R. § 353. Because the specific documents withheld pursuant to the SAR privilege were never provided to plaintiffs in discovery, no witness for any party should reference those specific documents, and the Court will instruct the jury with respect to the SAR privilege. As noted above, however, the SAR privilege does not preclude Umpqua's witnesses from providing testimony about details of any investigations described in the SAR-privileged materials, so long as that testimony does not

disclose whether an SAR was or was not filed in connection therewith. To the extent Umpqua contends that plaintiffs' witnesses may nonetheless be asked other questions to which Umpqua cannot fairly respond without divulging SAR privileged information, the Court will review the privileged materials in camera and disallow such questions.

### 5. Umpqua's motion to preclude evidence or argument re transfers to personal accounts is denied.

Umpqua asks the Court to exclude any argument or evidence about the allegedly suspicious nature of transfers from PFI's business accounts to the personal accounts of Ken Casey and Lewis Wallach as contrary to California Financial Code § 1451. California Financial Code § 1451 provides no safe harbor if plaintiffs prove the elements of aiding and abetting liability, which they aim to do at trial. *See Casey*, 127 Cal. App. 4th at 1152. The evidence is directly relevant and probative as to Umpqua's aiding and abetting liability, and Umpqua's motion is therefore denied.

### 6. Umpqua's motion to preclude evidence or argument relying upon allegedly suspicious account transactions to establish Umpqua's knowledge is denied.

Umpqua asks that the Court preclude plaintiffs from introducing evidence or argument regarding allegedly suspicious account activity to establish Umpqua's alleged knowledge. Umpqua's argument focuses again on its view that "[t]he California Financial Code and settled California case law makes clear that depository banks have no duty to police activity on customer accounts and instead directs that they ignore adverse claims to a depositor's funds and presume that transactions initiated by authorized signers are duly authorized and drawn for a proper purpose." Dkt. No. 245, at 34. For the same reasons explained with respect to Umpqua's fifth motion in limine, this motion is denied.

### 7. Umpqua's motion to preclude any evidence, argument, or comment on other disputes and litigation involving Umpqua Bank and related entities is denied without prejudice.

Pursuant to Federal Rules of Evidence 401, 402, and 403, Umpqua asks the Court to order the exclusion of any evidence, argument, or comment at trial regarding other disputes or litigation involving Umpqua Bank, Columbia Banking System, Circle Bank, their predecessors, or any other

United States District Court
Northern District of California

related entities. "The Court will bar use of the evidence in question only if the moving party establishes that the evidence clearly is not admissible for any valid purpose." *Ochoa v. Cnty. of Kern*, 628 F. Supp. 3d 1006, 1010 (E.D. Cal. 2022). Here, plaintiffs reasonably argue that Umpqua's request is overbroad and is best handled in response to particular objections at trial because such evidence may be probative and not overly prejudicial in specific contexts on cross-examination. *See Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12–cv–525, 2015 WL 1518099, at *13 (E.D. Va., Mar. 31, 2015) (holding that "whether evidence should be admissible will depend upon the factual context in which it is placed" and that "[a]t this juncture, the Court cannot say that all evidence regarding the Defendants' other legal proceedings is irrelevant and therefore should not be admitted"). Umpqua's motion is therefore denied without prejudice.

### 8. Umpqua's motion to prohibit lay witnesses from testifying about Umpqua's or PFI's actions in this matter unless they have the requisite personal knowledge is denied without prejudice.

Federal Rule of Evidence 602 precludes testimony within this category. But "[m]otions in limine that seek exclusion of broad and unspecific categories of evidence [ ] are generally disfavored." *Fitzpatrick v. Ford Motor Co.*, No. 2:22-cv-01924-FWS-JPR, 2024 WL 2331843, at *1 (C.D. Cal. Jan. 5, 2024) (quoting *Jackson v. Cnty. of San Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. 2016)). Rather than grant such a motion, the Court will rule on individual objections to specific testimony at trial.

### 9. Umpqua's motion to preclude lay witness testimony regarding standard of care is denied without prejudice.

Similarly, the Court denies this motion in limine as overly broad and defers ruling on whether particular testimony meets the requirements of Rule 701 to trial.

### 10. Umpqua's motion to exclude any evidence, argument, or comment regarding any SEC or criminal complaints or allegations made in the same is granted in part.

Umpqua moves this Court for an order in limine excluding any evidence, argument, or comment on any SEC complaints or criminal informations related to PFI. Umpqua's motion "includes but is not limited to":

- the information in *United States v. Wallach*, 3:20-cr-00365 (N.D. Cal.), Dkt. 1, see Holmes Decl., Ex. 15 ("Wallach Information");
- the complaint in *SEC v. Wallach*, 3:20-cv-06756 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 16 ("Wallach Complaint");
- the complaint in *SEC v. The Estate of Kenneth J. Casey*, 3:21-cv-04164 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 17 ("Casey Complaint");
- the complaint in *SEC v. Romero*, 3:22-cv-02067 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 18 ("Romero Complaint"); and
- the complaint in *SEC v. Dow Rockwell LLC et al.*, 3:22-cv-02069 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 19 ("Rockwell Complaint").

Plaintiffs do not intend to offer any of these civil complaints or informations into evidence but do intend to refer to the Wallach criminal information in at least one admissible respect.

The motion is therefore granted as to

- the complaint in *SEC v. Wallach*, 3:20-cv-06756 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 16 ("Wallach Complaint") except to the extent Wallach adopted it in his deposition testimony;
- the complaint in *SEC v. The Estate of Kenneth J. Casey*, 3:21-cv-04164 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 17 ("Casey Complaint");
- the complaint in *SEC v. Romero*, 3:22-cv-02067 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 18 ("Romero Complaint"); and
- the complaint in *SEC v. Dow Rockwell LLC et al.*, 3:22-cv-02069 (N.D. Cal.), Dkt. 1, *see* Holmes Decl., Ex. 19 ("Rockwell Complaint").

The motion is denied as to the Wallach information and denied without prejudice to any other complaints or criminal informations.

**11.    Umpqua's motion to exclude any evidence, argument, or comment on any consent decrees, judgments, or pleas in which guilt is not admitted is granted in part.**

Umpqua seeks to exclude specific consent decrees and judgments (Wallach Judgments, Casey Final Judgment and Consent Decree, Romero Final Judgment and Consent Decree, and Rockwell Final Judgments and Consent Decrees) resulting from several complaints and informations that the SEC filed against individuals and entities related to PFI's Ponzi scheme. Umpqua additionally asks this Court to preclude any evidence, argument, or comment on any consent decrees, judgments, or pleas in which guilt is not admitted, arguing that any such evidence would be hearsay, not subject to any exception, and overly prejudicial to Umpqua. Umpqua's specific request to exclude Wallach Judgments, Casey Final Judgment and Consent Decree,

United States District Court
Northern District of California

21

1    Romero Final Judgment and Consent Decree, and Rockwell Final Judgments and Consent Decrees

2    is not opposed by plaintiffs and is granted. Umpqua's further request to preclude any evidence,

3    argument, or comment on any consent decrees, judgments, or pleas in which guilt is not admitted

4    is denied without prejudice to any specific objections Umpqua might raise at trial.

5              **12.    Umpqua's motion to exclude any evidence, argument, or comment on**

6                      **unpleaded theories is denied without prejudice.**

7          Umpqua's categorical and nonspecific request for an exclusion as to any evidence,

8    argument, or comment on unpleaded theories is denied without prejudice. Such a request is an

9    inappropriate use of a motion in limine.

10          To the extent that this motion is aimed at what Umpqua calls plaintiffs' "newly alleged

11    fraudulent concealment theory," it also fails. Since the advent of this case, plaintiffs have alleged

12    two claims for aiding-and-abetting two torts: (1) fraud and (2) breach of fiduciary duty. Despite

13    Umpqua's repeated assertion that plaintiffs' fraud claim is cabined to aiding-and-abetting PFI's

14    "Ponzi scheme," no such "claim" exists under California law. A claim for aiding-and-abetting a

15    tort under California law necessarily requires a California tort. There is no "Ponzi scheme" tort

16    under California law. In fact, California recognizes a limited universe of tortious fraud claims,

17    each of which is a subspecies and none which is an all-encompassing "fraud" claim. *See Lazar v.*

18    *Superior Ct.*, 12 Cal. 4th 631, 638 (1996) ("The elements of fraud, which give rise to the tort

19    action for deceit, are (a) misrepresentation (*false representation, concealment, or nondisclosure*);

20    (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable

21    reliance; and (e) resulting damage." (emphasis added)); *Graham v. Bank of Am., N.A.*, 226 Cal.

22    App. 4th 594, 605–06 (2014); *see also* CACI series 1900; 5 WITKIN, SUMMARY 11TH TORTS, Ch.

23    IX (2024). Plaintiffs have alleged facts to suggest PFI committed fraudulent concealment—one of

24    the few subspecies of "fraud"—since their complaint, and explicitly raised the "fraudulent

25    concealment" theory when they sought to certify their class. The fraudulent concealment theory

26    was therefore pleaded and is properly at issue in this trial.[7]

27          ————————————————

28    [7] Of course, if plaintiffs pursue theories at trial that are inconsistent with class treatment, that might provide support for Umpqua's motion to decertify the class after trial.

United States District Court
Northern District of California

**13. Umpqua's motion to exclude evidence of plaintiffs' financial hardships is denied without prejudice.**

Umpqua moves this Court for an order in limine precluding plaintiffs from introducing evidence, argument, or comment at trial regarding the past, present, or future financial hardships suffered by the class or individual class members. "The Court will bar use of the evidence in question only if the moving party establishes that the evidence clearly is not admissible for any valid purpose." *Ochoa v. Cnty. of Kern*, 628 F. Supp. 3d 1006, 1010 (E.D. Cal. 2022). Here, plaintiffs explain that they will necessarily need to discuss their finances while testifying to establish that PFI defrauded them and to assist the jury in determining whether to exercise their discretion to award prejudgment interest to compensate them for the loss of use of their investment capital. The probative value of such testimony outweighs the prejudicial effect such that the court cannot categorically exclude the testimony.

**14. Umpqua's motion to exclude evidence of Umpqua's financial condition is denied without prejudice.**

Umpqua asks the Court to preclude plaintiffs from introducing evidence, argument, or comment at trial regarding Umpqua's or its predecessors' financial condition, including financial size, revenue, and market capitalization, as irrelevant and unfairly prejudicial to Umpqua pursuant to Federal Rules of Evidence 401, 402, and 403. Plaintiffs rebut that Umpqua put its financial status at issue in its own expert's opinion, which relies in part on Umpqua's financial status to conclude that it had no incentive to aid and abet PFI's conduct. As "at least some evidence of the parties' profits will be relevant [and probative] at trial, and Defendant[ ] ha[s] not specified what evidence will fall under an order concerning 'financial condition,'" the Court denies Umpqua's motion without prejudice. *Classical Silk, Inc. v. Dolan Grp., Inc.*, No. CV 14-09224-AB, 2016 WL 7638112, at *12 (C.D. Cal. Mar. 21, 2016).

**15. Umpqua's motion to exclude the FTI database is denied.**

Umpqua seeks to exclude from evidence the Access database, raising the same arguments it raised in its motion to exclude Salah's expert opinion. For the reasons discussed therein, this motion is denied.

United States District Court
Northern District of California

### 16.    Umpqua's motion to preclude Michelle Herman from testifying as an expert or lay witness is denied.

Michelle Herman worked as one of PFI's financial advisors for over a year. Umpqua seeks to preclude Michelle Herman from testifying as either an expert or lay witness. Herman may properly testify as a lay witness to authenticate the Access database, as plaintiffs intend.[8] Umpqua's motion is therefore denied.

### 17.    Umpqua's motion to preclude plaintiffs from eliciting testimony or presenting argument that PFI or its entities commingled funds is denied.

Umpqua moves to preclude plaintiffs from introducing evidence and argument purporting to show that PFI improperly "commingled" funds between and among its various investment accounts. Umpqua argues that such evidence and argument should be precluded because plaintiffs lack the necessary evidentiary foundation to support such a contention and plaintiffs' claim that PFI "commingled" funds requires plaintiffs to show that PFI was, in fact, obligated to keep funds separate—a showing that requires expert testimony—and plaintiffs have failed to offer sufficient expert testimony establishing how and why PFI would be obligated to segregate funds from different investors or investments. Without admissible expert testimony to lay that foundation, Umpqua argues that Plaintiffs should not be permitted to present argument or evidence of "commingling" because it is irrelevant and would be unfairly prejudicial.

An expert witness is not required to establish the commingling of funds. See *Allgoewer v. City of Tracy*, 207 Cal. App. 4th 755, 764 (2012) ("[R]equiring expert testimony rather than simply permitting it represents an extraordinary step, one to be taken only when 'unusually complex or esoteric issues are before the jury.'") Commingling is an accessible concept, not a nuanced professional standard beyond a lay person's understanding. Umpqua's contention that plaintiffs must establish that Umpqua had a legal duty not to commingle funds is misplaced. Plaintiffs plan to present testimony that it is considered a "red flag" in the banking industry, not that it was unlawful. For this reason, Umpqua's motion is denied.

---

[8] Plaintiffs state they do not intend to utilize Herman as an expert witness if she is permitted to testify as a lay witness in this capacity. Accordingly, the Court does not reach the question of whether Herman may testify as an expert witness.

24

### III.  Plaintiffs' Motions in Limine

> **1.  Plaintiffs' motion to exclude argument or evidence suggesting class members could have recovered more from PFI through the bankruptcy settlement is denied without prejudice.**

Plaintiffs state that evidence of the amount that class members received from PFI should be admitted for the limited purpose of facilitating the jury's calculation of the prejudgment interest per California state law. Plaintiffs ask the court to exclude any argument or evidence by Umpqua suggesting class members could or should have recovered more from PFI through the bankruptcy settlement if they had litigated their claims differently. Umpqua replies that it "does not intend to dispute the appropriate amount of the setoff that should be credited." Dkt. No. 258, at 6. Instead, Umpqua intends to demonstrate that plaintiffs' class wide theory of liability and damages is flawed because there was no uniform Ponzi scheme and many of the DOT and LLC investments were profitable. Umpqua's purported use of this evidence is permissible, and its probative value outweighs any prejudicial effect. Plaintiffs' motion is therefore denied without prejudice should further specific objections arise at trial.

> **2.  Plaintiffs' motion to exclude expert testimony that PFI properties would have returned a net gain for investors if bankruptcy sale proceeds were distributed differently is denied.**

Plaintiffs' second motion in limine mimics the first but focuses on specific expert testimony of Jennifer Marietta-Westberg. Umpqua clarifies that it intends to use Marietta-Westberg's analysis to show that LLC and DOT investors are fundamentally unlike PFI's noteholders because, like TIC investors, they invested in specific properties with real values and there was no "Ponzi scheme" as to those investments. This use is permissible and probative, and for the same reasons discussed in the previous motion, this motion is denied without prejudice.

> **3.  Plaintiffs' motion to exclude testimony and argument that Plaintiffs' damages calculations do not account for bankruptcy distributions that may be made in the future is granted.**

Plaintiffs ask the Court to exclude any testimony and argument that its damages calculations conducted are flawed because they do not include an offset for a third round of bankruptcy payments that may be distributed to class members at some point in the future. Umpqua does not oppose this motion. The motion is granted.

1

### 4.    Plaintiffs' motion to exclude expert testimony on state of mind and standard of care is granted.

2

Plaintiffs ask that experts be ordered to refrain from invading the province of the jury by

3

directly opining on whether Umpqua acted with a knowing, conscious, or deliberate state of mind

4

and that experts be directed to avoid using the term "standard of care," which could confuse the

5

issues before the jury by suggesting that Umpqua's conduct is to be judged under a negligence

6

standard. Umpqua agrees that expert opinion testimony on state of mind is inappropriate and that

7

it is not wedded to the term "standard of care." Plaintiffs' motion is therefore granted. Testimony

8

concerning how PFI should have acted as an alleged fiduciary is not precluded by this order.

9

10

### 5.    Plaintiffs' motion to exclude testimony and argument regarding Cal. Fin. Code §§ 1450-1451 or hypothetical claims against Umpqua for dishonoring authorized transfers is granted in part.

11

Plaintiffs request that the Court exclude testimony and argument regarding Cal. Fin. Code

12

§§ 1450–51 or hypothetical claims against Umpqua for dishonoring authorized transfers because

13

they argue that Umpqua's expert Frederick Egler misstates the law and will mislead the jury.

14

While it is true that §§ 1450–51 are irrelevant if plaintiffs establish that Umpqua aided and abetted

15

PFI's unlawful conduct, Umpqua's expert may permissibly opine about the banking standards and

16

practices in California that are informed by §§ 1450–51 and may attempt to establish, based on

17

those standards and practices, that Umpqua's activities were not suspicious and that Umpqua's

18

processing of PFI transactions did not involve atypical banking practices supportive of Umpqua's

19

knowledge. Umpqua, however, is precluded from introducing testimony or argument about

20

Umpqua's hypothetical liability under §§ 1450–51 or any other theory of liability. *See Kelley as*

21

*Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, No. 19-CV-1756 (WMW), 2022 WL 4547022, at

22

*16 (D. Minn. Sept. 29, 2022) (quotations omitted) ("Although expert testimony about industry

23

practice or standards often may be relevant and admissible, expert opinion about whether [a] law

24

was contravened is simply inadmissible.")

25

### 6.    Plaintiffs' motion to preclude testimony and argument referring to employees as "lower-level" is granted.

26

27

Plaintiffs move to exclude argument and testimony using the term "lower-level" to

28

describe certain Umpqua employees. The motion is unopposed and therefore granted. This order

United States District Court
Northern District of California

does not preclude testimony and evidence concerning the nature and scope of employees' work, job duties, and roles.

### 7. Plaintiffs' motion to exclude any reference to documents withheld by Umpqua Bank pursuant to the SAR privilege is granted.

Plaintiffs' case against Umpqua relies in part on anti-money laundering alerts. Umpqua's banking expert, Frederick Egler, has expressed the opinion that it is not possible to determine what Umpqua learned from those alerts without reviewing analyst notes that have been withheld due to the SAR privilege. Plaintiffs believe it is improper for Umpqua to refer to the existence of documents that have not been produced to it and that the jury will not be permitted to review.

As explained above, Umpqua may introduce testimony about the investigatory steps taken as a result of the anti-money laundering alerts because the SAR privilege extends only to testimony that would reveal the filing or non-filing of an SAR. Egler has no need to testify about the withheld analyst notes themselves because he can describe the investigation without referencing the notes. Accordingly, as noted already, the Court will prohibit witnesses from referencing the specific documents that were withheld pursuant to the SAR privilege, and will instruct the jury with respect to that privilege before any testimony about Umpqua's responses to anti-money laundering alerts.

### 8. Plaintiffs' motion to preclude Umpqua from calling *Bagatelos* plaintiffs is denied, but Umpqua is precluded from referencing the *Bagatelos* case.

The class here consists of persons who invested money with PFI through LLC memberships, deeds of trust, or promissory notes. The *Bagatelos* plaintiffs invested through tenancy-in-common (TIC) interests and did so by depositing money into escrow rather than into PFI's bank accounts at Umpqua. The Court previously dismissed the *Bagatelos* plaintiffs' case, concluding that they could not prevail on their aiding-and-abetting claims against Umpqua because their money was not deposited into PFI's Umpqua accounts. *See Bagatelos v. Umpqua Bank*, No. 23-CV-02759-RS, 2024 WL 3186555, at *4 (N.D. Cal. June 25, 2024). Nine of the eleven *Bagatelos* plaintiffs made other investments with PFI as well, however, and remain absent class members in this case.

1    Plaintiffs seek to preclude Umpqua from calling the *Bagatelos* plaintiffs to testify, arguing

2    that their testimony will confuse the issues, waste time, and prejudice LLC, DOT, and Note

3    investors. Plaintiffs also argue there are no special circumstances which warrant allowing Umpqua

4    to call absent class members.

5    Umpqua argues that the *Bagatelos* plaintiffs' testimony is necessary to help the jury

6    understand all of PFI's investments, which Umpqua believes to be critical to determining whether

7    PFI operated a uniformly fraudulent scheme. Lewis Wallach described the *Bagatelos* plaintiffs'

8    TIC investments as essentially the same as the LLC investments at issue here. Umpqua seeks to

9    offer the *Bagatelos* plaintiffs' testimony about their TIC investments to help the jury understand

10   the LLC investments. Umpqua also intends to utilize the *Bagatelos* plaintiffs to introduce evidence

11   that some class members were aware of Casey's prior conviction, which it argues is necessary

12   because none of the named plaintiffs were.

13   To the extent one or more of the *Bagatelos* plaintiffs offers testimony about their

14   investments with PFI or their knowledge of Casey's prior conviction, that testimony is relevant

15   and could be helpful to the jury. The Court will therefore allow Umpqua to call the *Bagatelos*

16   plaintiffs for that purpose. If the jury is informed of the *Bagatelos* litigation or its result, however,

17   there is a risk that the jury will conclude that the dismissal of the *Bagatelos* lawsuit bears upon the

18   merits of this case. This would be both incorrect and unduly prejudicial. The Court will therefore

19   prohibit any testimony from the *Bagatelos* plaintiffs or others regarding the litigation or its result.

20   **9.    Plaintiffs' motion to preclude live testimony from witnesses Umpqua
         controls if it does not make the witnesses available to testify in person
21        during Plaintiffs' case-in-chief is granted.**

22   Plaintiffs request that the Court order that, for any witness that Umpqua may call at trial by

23   live testimony, it must also make that witness available for plaintiffs' case-in-chief. Umpqua does

24   not oppose this motion but requests (1) that the order be reciprocal; (2) that if certain witnesses

25   require remote appearance and the Court allows it per Federal Rule of Civil Procedure 43(a), they

26   be omitted from this order; and (3) that Umpqua reserves its right to call unforeseen witnesses on

27   rebuttal. This motion is granted, subject to Umpqua's limitations. Should plaintiffs intend to

28   present during their case-in-chief a witness whom Umpqua intends to have testify remotely in

United States District Court
Northern District of California

1   accordance with the second limitation, plaintiffs should inform Umpqua of their intention to do so

2   and the parties should determine whether they can reach an agreeable solution. If they cannot do

3   so, the parties shall present their dispute to the Court for resolution.

4   **IV.    The parties are ordered to file a joint consolidated sealing motion.**

5           Currently pending before the Court are several motions to seal material filed in connection

6   with the motions resolved by this order. *See* Dkt. Nos. 246, 250, 254, 263, 267. To assist the Court

7   in resolving these motions, the parties are ordered to prepare and submit, by January 24, 2025, a

8   joint sealing motion that consolidates all pending sealing motions. The joint motion shall include a

9   table organizing all pending sealing requests by document. One consolidated copy of every

10  document that contains material any party seeks to sealed shall be attached, as an individual

11  exhibit, with a consistent highlighting scheme that indicates which party (or parties) seeks to seal

12  which material. Each attached document shall also be listed as one row in the table in the

13  consolidated motion with the following information in columns:

14      •   Name and exhibit number of the document

15      •   Material proposed to be sealed in the document (e.g., by highlight color/location)

16      •   Legal standard that applies (i.e., good cause or compelling reasons)

17      •   Party or parties seeking to seal the material

18      •   If the Court has previously ruled on any request to seal the material, the Court's ruling

19          (with a citation). If the Court has not, a brief summary of the rationale for sealing.

20      •   The docket citation to the original sealing motion for the document.

21  The motion should not include any requests to seal another party's material if the party whose

22  material is at issue has not timely filed a declaration in support of its sealing on the public docket.

23  The joint motion shall identify by docket number all pending motions that will be rendered moot

24  by its filing, as well as any material that was provisionally filed under seal as to which no party or

25  third-party has submitted a declaration to support its continued sealing.

26                                      **CONCLUSION**

27          For the foregoing reasons, the parties' motions in limine and Umpqua's motion to exclude

28  Ghiglieri's opinions and testimony are granted in part. Umpqua's motions to exclude the opinions

United States District Court
Northern District of California

and testimony of Salah and Goldberg are denied. The parties are ordered to file a joint sealing motion that consolidates all pending sealing motions regarding material filed in connection with the motions resolved by this order.

**IT IS SO ORDERED.**

Dated: January 20, 2025

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

30