Keith Ketterling (*pro hac vice*)
Lydia Anderson-Dana (*pro hac vice*)
Madeleine Holmes (*pro hac vice*)
Erin E. Roycroft (*pro hac vice*)
**STOLL BERNE**
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
kketterling@stollberne.com
landersondana@stollberne.com
mholmes@stollberne.com
eroycroft@stollberne.com

Kasey J. Curtis (SBN 268173)
Charles P. Hyun (SBN 307817)
Kathryn Bayes (SBN 334864)
Katherine Goetz (SBN 346205)
kcurtis@reedsmith.com
chyun@reedsmith.com
kbayes@reedsmith.com
kgoetz@reedsmith.com
**REED SMITH LLP**
515 Flower Street, Suite 4300
Los Angeles, CA 90071
Telephone: (213) 457-8089
Facsimile: (213) 457-8080

Attorneys for Defendant Umpqua Bank

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al., | Case No.: 5:20-cv-05905-PCP |
| Plaintiffs, | Judge: P. Casey Pitts |
| vs. | **UMPQUA BANK'S POST-TRIAL MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b)** |
| UMPQUA BANK, | |
| Defendant. | Trial Date:    April 28, 2025 |
| | Date:         April 3, 2025 |
| | Time:         10:00 a.m. |
| | Place:        Courtroom 8 |

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2      PLEASE TAKE NOTICE that on April 3, 2025, at 10:00 a.m., or as soon thereafter as may

3  be heard in Courtroom 8 of the above-entitled Court, located at 280 South First Street, San Jose,

4  CA 95113, Defendant Umpqua Bank ("Umpqua") will and hereby does move, pursuant to Federal

5  Rule of Civil Procedure 50(b) for judgment as a matter of law.

6      As detailed in the attached Memorandum of Points and Authorities, whether styled as a

7  claim for aiding and abetting a "Ponzi scheme" or aiding and abetting "fraudulent concealment,"

8  insufficient evidence was presented at trial to allow Plaintiffs to prevail on their aiding and

9  abetting fraud claim and Umpqua is therefore entitled to judgment as a matter of law.  Irrespective

10  of how the claim is styled, insufficient evidence was presented to allow a reasonable jury to

11  conclude that Umpqua had "actual knowledge" of, or substantially assisted, the alleged fraud that

12  PFI perpetrated.  Further, Plaintiffs have abandoned their aiding and abetting breach of fiduciary

13  duty claim, so that claim should be decertified and dismissed.

14      This motion is based on this Notice of Motion and Motion, the Declaration of Kasey J.

15  Curtis, the testimony and exhibits introduced at trial, the attached Memorandum of Points and

16  Authorities, and all other pleadings, papers, records and documentary materials on file or deemed

17  to be on file in this action and in the two related cases, those matters of which this Court may take

18  judicial notice, and upon the oral arguments of counsel made at the hearing on this motion.

19

20

21  DATED:  March 11, 2025              REED SMITH LLP

22                                      By: /s/ *Kasey J. Curtis*
                                            _____
23                                          Kasey J. Curtis
                                            Attorneys for Defendant
24                                          UMPQUA BANK

25

26

27

28

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION ............................................................................................................1

4   II.    FACTUAL AND PROCEDURAL BACKGROUND ...................................................2

5
        A.     PFI Operates As A Legitimate And Successful Real Estate Business For Decades
6              Before Engaging In Fraud Sometime After 2012 ...........................................2

7       B.     Umpqua's History As PFI's Depository Bank .................................................3

8       C.     Plaintiffs File This Action Seeking To Hold Umpqua Liable For Aiding And
               Abetting PFI's "Ponzi Scheme" ....................................................................3
9
        D.     Plaintiffs' Pivot To A Fraudulent Concealment Theory; The Jury Deadlocks And
10             The Court Declares A Mistrial .......................................................................4

11  III.   LEGAL STANDARD .....................................................................................................5

12  IV.    ARGUMENT ..................................................................................................................6

13
        A.     Plaintiffs' Aiding And Abetting "Fraudulent Concealment" And Aiding And
14             Abetting A "Ponzi Scheme" Theories Implicate Different Primary Wrongs .........6

15      B.     There Is Insufficient Evidence That Umpqua Aided And Abetted PFI's
               "Fraudulent Concealment" ...........................................................................7
16
               1.     No Actual Knowledge Of PFI's Fraudulent Concealment .........................7
17
               2.     Actual Knowledge Of Concealment Cannot Be Inferred From
18                    Circumstantial Evidence On This Record .................................................12

19             3.     No Substantial Assistance Of PFI's Alleged Fraudulent Concealment ....14

20      C.     Plaintiffs Have Abandoned Their "Ponzi Scheme" Theory; There Is Insufficient
               Evidence Umpqua Had Actual Knowledge PFI Was A Ponzi Scheme ...............15
21
        D.     No Evidence Of Umpqua's Aiding And Abetting Prior To June 14, 2012 ...........19
22
        E.     Umpqua Renews Its Summary Judgment Argument That Plaintiffs Cannot
23             Recover Prejudgment Interest .......................................................................20

24      F.     Plaintiffs' Claim For Aiding And Abetting Breach Of Fiduciary Duty Is
               Abandoned And Should Be Decertified And Dismissed .....................................21
25
    V.     CONCLUSION ...............................................................................................................21

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re. Agric. Research & Tech. Grp., Inc.*,
916 F.2d 528 (9th Cir. 1990)..................................................................7, 15, 16

*Boschma v. Home Loan Ctr., Inc.*,
198 Cal. App. 4th 230 (2011)..................................................................7, 8, 14

*Casey v. U.S. Bank Nat'l Ass'n*,
127 Cal. App. 4th 1138 (2005)...................................................... *passim*

*Chance World Trading E.C. v. Heritage Bank of Commerce*,
438 F. Supp. 2d 1081 (N.D. Cal. 2005) ........................................12, 13

*Chazen v. Centennial Bank*,
61 Cal. App. 4th 532 (1998)................................................................1

*EEOC v. Go Daddy Software, Inc.*,
581 F.3d 951 (9th Cir. 2009)..............................................................5

*El-Hakem v. BJY, Inc.*,
415 F.3d 1068 (9th Cir. 2005)............................................................5

*George v. eBay, Inc.*,
71 Cal. App. 5th 620 (2021)................................................................6

*Gerard v. Ross*,
204 Cal. App. 3d 968 (1988)..............................................................6

*Headwaters Forest Def. v. County of Humboldt*,
240 F.3d 1185 (9th Cir. 2000)............................................................5

*Hunt v. City of Los Angeles*,
523 F. App'x 493 (9th Cir. 2013)........................................................15

*Landes Constr. Co. v. Royal Bank of Canada*,
833 F.2d 1365 (9th Cir. 1987)............................................................20

*Maynard v. City of San Jose*,
37 F.3d 1396 (9th Cir. 1994)..............................................................15

*Neilson v. Union Bank of Cal., N.A.*,
290 F. Supp. 2d 1101 (C.D. Cal. 2003)..............................................7

*Richard B. LeVine, Inc. v. Higashi*,
131 Cal. App. 4th 566 (2005)..............................................................6

*Rodriguez v. County of Stanislaus*,
    799 F. Supp. 2d 1131 (E.D. Cal. 2011) ....................................................................5

*RSB Vineyards, LLC v. Orsi*,
    15 Cal. App. 5th 1089 (2017) ........................................................................... 12, 13

*Sacramento Mun. Util. Dist. v. Kwan*,
    101 Cal. App. 5th 808 (2024) ................................................................................6

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) .................................................................................5

*Shum v. Intel Corp.*,
    630 F. Supp. 2d 1063 (N.D. Cal. 2009) ..................................................................5

*Torres v. City of Los Angeles.*,
    548 F.3d 1197 (9th Cir. 2008) ...............................................................................5

*York v. United States (In re York)*,
    78 F.4th 1074 (9th Cir. 2023) ...............................................................................20

**Other Authorities**

CACI No. 3610 ................................................................................................................6

I.    **INTRODUCTION**

Under controlling California law, a depository bank cannot be held liable for aiding and abetting the torts of its customer unless the depository bank had *actual knowledge* of the specific tort that its customer was committing and rendered *substantial assistance* to the commission of that tort.  Cases such as *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138 (2005) and *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532 (1998) make that clear.

Now with the benefit of a complete evidentiary record following trial, it is clear Plaintiffs lack sufficient evidence that Umpqua had actual knowledge of PFI's fraud.[1]  No direct evidence of Umpqua's knowledge was adduced.  Aside from Lewis Wallach, every single witness (Umpqua employees, PFI employees, and investors alike) testified that they had no idea that PFI was engaging in fraud until Ken Casey's death.  And the circumstantial evidence that Plaintiffs elicited came nowhere near the type of "must have known" evidence required to infer actual knowledge on the part of Umpqua.  Instead, Plaintiffs were only able to muster the type of non-descript and amorphic circumstantial evidence that *Casey* says is legally insufficient: evidence of supposed "red flags," a handful of emails that Plaintiffs attempted to paint as nefarious, and transfers to personal accounts—all of which were untethered to the primary wrong Plaintiffs accuse Umpqua of aiding and abetting.  Umpqua is therefore entitled to judgment as a matter of law ("JMOL").

Umpqua's entitlement to JMOL is even more plain now that Plaintiffs have pivoted to an aiding and abetting "fraudulent concealment" theory of liability.  The evidence at trial indisputably established that Umpqua had no idea what PFI was (or was not) telling its investors, meaning that, by definition, Umpqua could not know whether PFI was fraudulently concealing information from investors.  And even if Plaintiffs had pursued their original "Ponzi scheme" theory, JMOL would still be warranted.  As multiple witnesses testified, it was impossible to determine that PFI was operating a Ponzi scheme from bank records alone.  Rather, to determine whether PFI was a Ponzi scheme, one would have to perform a forensic accounting utilizing PFI's internal accounting

---

[1] As noted in Section IV.F, *infra*, Plaintiffs have dropped their aiding and abetting breach of fiduciary duty claim.

records to analyze how PFI's net operating income (or "NOI") from its 70 apartment buildings and commercial properties compared to its promised returns (or "debt service") to investors. The evidence at trial was undisputed that Umpqua *did not* have access PFI's internal accounting records, which means that Umpqua had no way of knowing how PFI's revenue from its properties compared to the returns PFI had promised to investors.

In sum, there is simply no evidence that would support an inference that Umpqua knew of PFI's fraud. JMOL is therefore warranted.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    PFI Operates As A Legitimate And Successful Real Estate Business For Decades Before Engaging In Fraud Sometime After 2012

Founded in 1983 by Ken Casey, PFI was an established and successful real estate business that focused on utilizing investor-sourced funds to purchase and operate commercial real estate in Marin County. *See* Dkt. 144 at 1-2. By the time it filed for bankruptcy in 2020, PFI had direct or indirect interests in 70 properties, estimated to be worth $550 million. Tr. 285-86, 2324. Over the course of its history, PFI offered five distinct investment types, three of which are at issue in this class action: (i) Promissory Notes ("PISF Notes"); (ii) Second Deeds of Trust ("DOTs"); and Limited Liability Company interests ("LLCs"). *See* Dkt. 41 ("FAC"), ¶¶ 33-47; Dkt. 181 (Order Directing Class Notice). PISF Notes were a form of investment in which investors made loans to PISF, rather than to specific properties and therefore received higher interest rates than investors in PFI's second deeds of trust. Dkt. 423-1 at 32:22-33:8, 38:21-39:2. DOTs were a form of investment in which investors made secured second mortgages to PFI, behind the mortgages PFI had obtained from commercial lenders, on specific properties. Dkt. 423-1 at 31:18-32:19. LLCs were a form of investment in which investors acquired equity stakes in entities that owned specific properties, receiving returns based on the profits of the property owned by the LLC. Dkt. 423-1 at 33:24-34:8, 34:23-35:6, 38:13-15.

Although PFI began as a legitimate enterprise, at some point its revenues became insufficient to pay its debts. Dkt. 423-1 at 57:12-57:25. When that occurred, PFI began relying on new investor capital (typically provided by investors in PISF Notes) to keep its business

1   afloat.  Dkt. 423-1 at 58:12-25.  For his part, Lewis Wallach (PFI's President) testified that he

2   first became aware that PFI's expenses were exceeding its income sometime in "the mid to late

3   2000s."  Dkt. 423-1 at 58:12-20.  However, in Wallach's view, it was not until "after 2012" that

4   PFI became fraudulent.  Dkt. 423-1 at 149:10-20.

5         On May 6, 2020, Ken Casey passed away and his ex-wife, Charlene Albanese, took over

6   operations.  Ex. 1525, ¶ 29.  Albanese then engaged an attorney, Eric Sternberger, to assist in

7   transitioning PFI's business.  Tr. 1719-20; Ex. 1525, ¶ 10.  Based upon concerns that Wallach had

8   expressed about PFI's investor "debt service" (i.e., the returns PFI had promised investors)

9   Albanese asked Sternberger to focus his review on PFI's investor obligations and overall debt.  Tr.

10  1719-21.  Upon analyzing PFI's schedule of assets and investor obligations, Sternberger became

11  concerned about the structure and validity of PFI's business.  Tr. 1723-27.  On July 26, 2020, PFI

12  filed for bankruptcy.  Ex. 1525, ¶ 16; Ex. 1527, ¶ 1.  Federal authorities began investigating,

13  ultimately leading Wallach to plead guilty to wire fraud, admitting that from 2015 forward he had

14  defrauded investors.  Dkt. 423-1 at 59:22-60:10; Ex. 1565.

15  **B.      Umpqua's History As PFI's Depository Bank**

16        In July 2004, PFI first opened depository accounts with one of Umpqua's predecessor

17  banks, a small community bank located in Marin County called Novato Community Bank.  Dkt.

18  412 at 10; Dkt. 423-1 at 23:22-24:2.  In the early 2000s, Novato Community Bank became Circle

19  Bank, where PFI continued to maintain its depository accounts.  Dkt. 423-1 at 24:24-25:18.  In

20  November 2012, Umpqua acquired Circle Bank and PFI's accounts became Umpqua accounts.

21  Tr. 975-976; Dkt. 423-1 at 44:6-9.  PFI generally maintained separate bank accounts for each of

22  its 70 properties in addition to various operational accounts.  Dkt. 423-1 at 74:17-19.  As a result,

23  by the time PFI filed for bankruptcy, PFI maintained approximately 75 to 80 deposit accounts at

24  Umpqua.  Dkt. 423-1 at 54:17-55:1.

25  **C.      Plaintiffs File This Action Seeking To Hold Umpqua Liable For Aiding And Abetting
26              PFI's "Ponzi Scheme"**

27        Prior to changing their theory on the eve of trial, Plaintiffs initially sought to hold

28  Umpqua liable for "aiding and abetting" the alleged "Ponzi scheme" carried out by PFI.  Dkt. 41

DEFENDANT UMPQUA BANK'S MOTION FOR JUDGMENT AS A MATTER OF LAW

("FAC"), ¶¶ 57-65.  And over the nearly five years that this case has been litigated, Plaintiffs repeated that refrain that Umpqua is liable for aiding and abetting PFI's alleged Ponzi scheme.

Among other things, Plaintiffs' operative complaint alleges: (i) "Plaintiffs and class members were each victimized by the Ponzi scheme orchestrated by Ken Casey" [FAC, ¶ 58]; (ii) "Defendant Umpqua Bank aided and abetted Casey's Ponzi scheme and is accordingly liable for the damage caused to Plaintiffs and class members" [FAC, ¶ 59]; and (iii) "Umpqua learned of Casey's Ponzi scheme in the course of performing its customer-due-diligence obligations. Yet instead of exposing the Ponzi scheme, Umpqua substantially assisted Casey in operating the scheme" [FAC, ¶ 64].

Plaintiffs also argued that the allegedly "Ponzi scheme" nature of PFI's operations made the class's aiding and abetting claims well suited for class treatment.  Dkt. 80 at 14.  Plaintiffs also retained a Ponzi scheme expert, Michael Goldberg, to help define for the jury what a Ponzi scheme is and how PFI was operating as one.  Tr. 276-78.  And Plaintiffs' damages expert, Dan Salah, proffered a damages model that assumed PFI was a "Ponzi scheme" and calculated damages based upon the date by which Umpqua Bank may have begun aiding and abetting the Ponzi scheme.  Tr. 1547-48, 1585-86.

**D.    Plaintiffs' Pivot To A Fraudulent Concealment Theory; The Jury Deadlocks And The Court Declares A Mistrial**

On the eve of trial, Plaintiffs shifted from their "Ponzi scheme" theory to a "fraudulent concealment" theory.

To that end, Plaintiffs vigorously opposed the inclusion of a Ponzi scheme instruction and any reference to "Ponzi scheme" in the jury instructions at large.  *See e.g.*, Dkt. 317 at 47.  Rather, Plaintiffs' new theory was that PFI "fraudulently concealed" three facts from the class: "that investor funds were being used to personally benefit PFI's executives, pay other investors, and cover recurring shortages in PFI's bank accounts." Dkt. 317 at 2; Tr. 162.  This fraudulent concealment theory is ultimately the theory that Plaintiffs pursued at trial.  Tr. 244, 2470.

On February 21, 2025, Umpqua made its pre-verdict motion for JMOL.  Tr. 1928-32; Dkt. 392.  On February 25, 2025, after the close of evidence, Umpqua renewed its motion for JMOL.

1    Tr. 2433-34.  On March 4, 2025, the Court declared a mistrial after the jury deadlocked.  Tr. 2627-

2    28.

3                              **III.    LEGAL STANDARD**

4              "Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law

5    before a case is submitted to the jury."  *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th

6    Cir. 2009).  "If the judge denies or defers ruling on the motion, and if the jury returns a verdict

7    against the moving party, the party may renew its motion under Rule 50(b)."  *Id.*

8              A party can also renew its motion for judgment as a matter of law after a jury deadlocks

9    and the Court declares a mistrial.  *See Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1072 (N.D. Cal.

10   2009) ("Where the jury has not reached a verdict, the failure to reach a verdict 'does not

11   necessarily preclude a judgment as a matter of law.'" (*quoting Headwaters Forest Def. v. County

12   of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000), *vacated on other grounds by County of

13   Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001))).  "A jury's inability to reach a verdict

14   does not necessarily preclude a judgment as a matter of law."  *Rodriguez v. County of Stanislaus*,

15   799 F. Supp. 2d 1131, 1139 (E.D. Cal. 2011) (citation and internal quotation marks omitted).  "The

16   same standard applies to a motion for judgment as a matter of law made after a mistrial because

17   of jury deadlock."  *Id.*

18             "A motion for a judgment as a matter of law is properly granted only if no reasonable juror

19   could find in the non-moving party's favor."  *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1072 (9th

20   Cir. 2005).  Accordingly, "[j]udgment as a matter of law is appropriate when the evidence

21   presented at trial permits only one reasonable conclusion."  *Santos v. Gates*, 287 F.3d 846, 851

22   (9th Cir. 2002).  In ruling on a motion for judgment as a matter of law, "[t]he evidence must be

23   viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be

24   drawn in favor of that party."  *Torres v. City of Los Angeles.*, 548 F.3d 1197, 1205-06 (9th Cir.

25   2008) (citation and internal quotation marks omitted).  "If conflicting inferences may be drawn

26   from the facts, the case must go to the jury."  *Id.* at 1206 (citation and quotation marks omitted).

27

28

**IV.    ARGUMENT**

**A.    Plaintiffs' Aiding And Abetting "Fraudulent Concealment" And Aiding And Abetting A "Ponzi Scheme" Theories Implicate Different Primary Wrongs**

Under California law, aiding and abetting is a form of derivative liability under which a defendant may become secondarily liable for a tort committed by another.  *Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 579 (2005).  Thus, to prevail on an aiding and abetting claim, a plaintiff must prove both: (i) the underlying tort committed by the primary tortfeasor; and (ii) the defendant's secondary liability for the same (which requires that the defendant had actual knowledge of the tort, rendered substantial assistance to its commission, and that the defendant's conduct was a substantial factor in bringing about the plaintiff's harm).  *See Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1146 (2005); CACI No. 3610 (elements of aiding and abetting).

"Knowledge is the crucial element."  *Casey*, 127 Cal. App. 4th at 1145.  In California, "liability for aiding and abetting depends on proof the defendant had actual knowledge of the *specific primary wrong* the defendant substantially assisted."  *Id.* (emphasis added).  "Courts have phrased this as a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act or an alleged aider and abettor must have acted with the intent of facilitating the commission of that tort."  *Sacramento Mun. Util. Dist. v. Kwan*, 101 Cal. App. 5th 808, 813 (2024) (citing *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 641-42 (2021)) (internal quotation marks omitted).  Knowledge is of paramount importance because "a defendant can only aid and abet another's tort if the defendant knows what 'that tort' is."  *Casey*, 127 Cal. App. 4th at 1146; *Gerard v. Ross*, 204 Cal. App. 3d 968, 983 (1988) (absent such particularized knowledge of the specific tort at issue, the defendant cannot be said to have "acted with the intent of facilitating the commission of that tort").

Here, Plaintiffs' aiding and abetting "fraudulent concealment" and aiding and abetting a "Ponzi scheme" theories implicate distinct frauds and thus require proof that Umpqua had actual knowledge of different primary wrongs.  The "fraudulent concealment" theory asserts that PFI was concealing from investors how "investor funds were being used to personally benefit PFI's

executives, pay other investors, and cover recurring shortages in PFI's bank accounts."  Dkt. 317 at 2.  The "Ponzi scheme" theory, on the other hand, asserts that PFI's fraud "consist[ed] of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists."[2]  *In re. Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 531 (9th Cir. 1990); *accord Casey*, 127 Cal. App. 4th at 1147-48 (discussing *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003) and how the primary wrong in that case was the depositor's perpetration of "a class Ponzi scheme").

Irrespective of which theory Plaintiffs are pursuing, Umpqua is entitled to JMOL.

## B.    There Is Insufficient Evidence That Umpqua Aided And Abetted PFI's "Fraudulent Concealment"

The "fraudulent concealment" theory that Plaintiffs pursued at trial alleges that Umpqua aided and abetted PFI's fraudulent concealment of three specific facts: that PFI was using investor money to enrich its executives, pay other investors, and cover recurring shortages [Dkt. 317 at 2], irrespective of PFI's profitability or ability to repay investors.  There is insufficient evidence for a jury to find Umpqua liable for aiding and abetting this alleged fraudulent concealment by PFI.

### 1.    No Actual Knowledge Of PFI's Fraudulent Concealment

To prove that PFI engaged in fraudulent concealment, Plaintiffs must prove that (1) PFI "concealed or suppressed a material fact," (2) PFI was "under a duty to disclose the fact to the plaintiff[s]," (3) PFI "intentionally concealed or suppressed the fact with the intent to defraud the plaintiff[s]," (4) Plaintiffs were "unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact," and (5) Plaintiffs were damaged "as a result of the concealment or suppression of the fact[.]"  *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th

---

[2]  Plaintiffs' "Ponzi scheme" expert agreed that in a Ponzi scheme the fraud consists of the use of new investor funds to pay existing investors to create the appearance "that the underlying business is profitable."  Tr. 273-74; *accord* Tr. 312 (PFI was a Ponzi scheme because "it was concluded that distributions to the investors could not have been made from the businesses themselves and absolutely relied on raising of funds from investors"); Tr. 327 (a Ponzi scheme involves "misrepresentations or omissions … about the underlying profitability of the business and things related to that").

230, 248 (2011).

Given that Plaintiffs are pursuing an aiding abetting claim against Umpqua, Plaintiffs' theory that PFI fraudulently concealed "that investor funds were being used to personally benefit PFI's executives, pay other investors, and cover recurring shortages in PFI's bank accounts" [Dkt. 403 at 2; Tr. 2470 (Plaintiffs' closing argument arguing these three facts as being fraudulently concealed)], necessitates proof that PFI had a duty to disclose this information [*Boschma*, 198 Cal. App. 4th at 248] and Umpqua knew about PFI's fraudulent non-disclosure of this information [*Casey*, 127 Cal. App. 4th at 1146]. There is insufficient evidence of either.

**No evidence PFI had a duty to disclose or that Umpqua knew of the duty.** Plaintiffs have not presented any evidence that PFI had a duty to disclose these facts to the entire class. These three identified facts are not, by themselves, inherently wrongful.

As to the first fact Plaintiffs identified—PFI using investor funds "to personally benefit PFI's executives"—this vague phrasing encompasses using funds to pay executives' salaries and bonuses, which is not necessarily improper. Plaintiffs did not present any evidence that PFI had a duty to disclose this information as to all investors[3]; let alone evidence that Umpqua had actual knowledge of any duty by PFI to disclose it. Instead, in closing arguments when discussing this first concealed fact, Plaintiffs' counsel incorrectly argued that *Wallach's* failure to disclose to investors that he was embezzling money from PFI was a fact *PFI* fraudulently concealed. Tr. 2470-71 (arguing Wallach "admitted that he did not disclose any of these transactions to investors in which he embezzled over $26 million through PFI's bank accounts at Umpqua"). But PFI was the victim of Wallach's embezzlement—i.e., Wallach embezzled money *from* PFI; PFI did not conceal Wallach's embezzlement. *See* Ex. 1565 (Wallach Plea Agreement: "I engaged in a scheme to *embezzle money from PFI* and PISF. . . . I made numerous payments and transfers for my personal benefit *without authority of the company* and *without disclosing the transfers to*

---

[3] PFI might arguably have a duty to disclose this fact only if these actions were taken within the context of a fraudulent Ponzi scheme. But because Plaintiffs have abandoned their Ponzi scheme theory and refused to allow the jury to be instructed on it, there is no evidence that would support that PFI had a duty to disclose the vague fact that it was using investor money to "enrich" PFI's executives.

DEFENDANT UMPQUA BANK'S MOTION FOR JUDGMENT AS A MATTER OF LAW

1  *anyone else at the company* or to investors. . . . I knew that I was not entitled to the money I

2  misappropriated from PFI.") (emphasis added).

3      Next, there is no evidence that PFI had a duty to keep all investor funds in specific accounts

4  or that PFI had a duty to disclose to the entire class how it was using the capital PFI raised (whether

5  to pay existing investors or cover shortages).  The majority of the class invested in PISF Notes

6  and DOTs, which operated as loans from an investor to PFI for which investors would receive a

7  fixed return.  Ex. 1527, ¶ 19; Exs. 176, 183; Tr. 319-20.  These loan funds were not specific to

8  any property[4] and there is no evidence that the money was intended to be kept in any one account

9  or used for any specific purpose.[5]  Exs. 176, 177, 183; Tr. 1374-75 ("Q. Do you see any language

10  in this note that restricts the use of your investment funds? A. No. Q. So this note, it doesn't say

11  anything about how your money would be used, does it? A. No, it does not."); Tr. 1383 ("Q. So

12  as a note holder, you weren't investing in any specific building; correct? A. That is correct."); Tr.

13  1389 ("Q. Did you expect PFI to hold your funds in a bank account related to any specific

14  building? A. No."); Tr. 1390 ("Q. But PFI did not have a specific bank account for note funds; is

15  that right? A. I—I don't know.").  Further, as to LLC investments, while those were property-

16  specific investments, intercompany loans can be a legitimate business practice.  Tr. 645.  At best,

17  there may be some evidence that money related to LLC investments was meant to be kept in each

18  specific LLC account and used in relation to that LLC.  *See, e.g.*, Tr. 494-95, 1520; Ex. 91 at 27;

19  Ex. 280 at 23; Ex. 436 at 22.  So perhaps, at most, PFI should have told LLC investors it was going

20  to engage in intercompany borrowing (and obtained their approval), but that is certainly not proof

21  of a uniform concealment of this fact from the entire class.  Further, there is no evidence that

22

23  [4]  DOT investments created a lien against specific property, but the investment documents did not
    require PFI to use the DOT money for any specific purpose or for any specific property.  *See* Tr.

24  320, 1495-96; Exs. 181-82

25  [5]  There is also evidence that some PISF Note investors were told their investments would be used
    to pay off existing investors.  At trial, the evidence demonstrated that Michael Hogan (PFI's Chief

26  Restructuring Officer) told the bankruptcy court that PISF Note investors "appear to have been
    told their loaned funds would be used to make improvements to properties owned by PISF, pay

27  off existing investors in PISF, purchase new properties to be held by PISF, and to fund a reserve

28  to cover PISF's debt service on investors' loans."  Ex. 1527, ¶ 19; Tr. 2024-25.

1  Umpqua knew that PFI had a duty to tell investors about PFI's intercompany borrowing and had

2  failed to do so.

3          **No evidence Umpqua knew what PFI was and was not telling investors.**  In addition

4  to Plaintiffs failing to establish that PFI was required to disclose these facts to the entire class,

5  Plaintiffs have failed to provide any evidence that Umpqua had actual knowledge that PFI was

6  fraudulently concealing this information from investors.

7          As Plaintiffs' very first witness, Michael Goldberg, testified, to know whether PFI

8  concealed a particular fact from investors, one would need to know what was being told to

9  investors in the first place.  Tr. 329 ("Q. Would you agree with me that to know whether something

10 is a Ponzi scheme, you have to know what is being told to investors?  A. No, because it could be

11 an omission as well.  Q. You have to know what's being told to investors to know whether

12 something has been omitted; right?  A. I guess in the general sense, you're correct.").  Though

13 Goldberg's testimony confirmed this, it is also a matter of common sense.  Umpqua could not

14 possibly know that PFI failed to disclose to investors that "investor funds were being used to

15 personally benefit PFI's executives, pay other investors, and cover recurring shortages in PFI's

16 bank accounts" unless Umpqua knew what was being communicated to investors and could see

17 that those facts were omitted from such communications.  There is no evidence in the record that

18 Umpqua knew what was being communicated to investors—which precludes a finding that

19 Umpqua had actual knowledge that PFI was concealing anything from investors.

20          Instead, the evidence affirmatively showed that Umpqua had no knowledge of what PFI

21 was telling to or concealing from its investors.  During their case-in-chief, Plaintiffs called one

22 former PFI employee (Lewis Wallach) and several Umpqua employees to testify.  None of these

23 witnesses testified that Umpqua knew what PFI was telling its investors.  In fact, the testimony

24 was to the contrary.

25          June Weaver testified that she had no knowledge of what PFI was telling its investors about

26 its investment offerings.  Tr. 957 ("Q. Describe your knowledge of what you knew PFI was telling

27 its investors about their investment.  A. I don't know what they were telling their investors.").  Nor

28 could she.  Weaver also testified that she had no understanding at the time of whether investors in

PFI owned specific properties or the different types of investment vehicles PFI offered.  Tr. 926 ("Q. Do you have any understanding of whether or not the investors were owners of any of the PFI properties?  A. I know that now.  But I didn't know that then."); Tr. 957 ("Q. Do you know whether or not PFI offered different types of investment vehicles?  A. I don't know how they broke down their business down, no.").

A.J. Vazquez similarly testified that she had no understanding of what PFI told its investors.  Tr. 1025 ("Q. Can you tell me whether or not you had any understanding of what PFI told its investors?  A. No.").  Furthermore, Vazquez testified that she had never even spoken to any investors, never reviewed any investment documents, and had no understanding of PFI's different investment types.  Tr. 1024-25.

The testimony of these Umpqua witnesses (and the absence of any evidence that anyone at Umpqua knew what was being communicated to investors) is consistent with and buttressed by the testimony of Wallach.  Wallach's testimony was that Umpqua was not involved with the investor side of PFI's business.  Dkt. 423-1 at 149:3-4 ("Q. Did Umpqua help you in finding investors?  A. No.").  But more importantly, Wallach testified that he actively hid PFI's fraudulent scheme from Umpqua because he believed that Umpqua would cease banking PFI if it learned that PFI was engaging in fraud.  Dkt. 423-1 at 149:18-150:5 ("Q. Did anyone at Umpqua know about the scheme? . . . .  A. Not that I know of.  Q. Did you try to prevent Umpqua from knowing about the scheme?  A. Yes.  Q. If Umpqua had found out about the scheme, what do you think would have happened? . . . .  A. I think it would be -- I think, I don't know what they would have done, but I think they would have -- if that information became public, that they would cease doing business with us.").

Indeed, based on the evidence in the record, it would have been impossible for Umpqua to know what was being told to investors.  Plaintiff Shela Camenisch testified that prior to investing, she contacted Wallach to discuss her investment options and the viability of PFI's business.  Tr. 1361-62.  Ms. Camenisch testified that she specifically discussed topics with Wallach, including PFI's succession plan in the event Wallach retired, the effect of the COVID-19 pandemic on rental income, and how investor funds would be used to acquire or improve existing properties.  Tr.

DEFENDANT UMPQUA BANK'S MOTION FOR JUDGMENT AS A MATTER OF LAW

1361:25-1362:24.  The absent class members called to testify at trial each testified that they spoke to Ken Casey before investing.  Dkt. 411-1 at 32:12-25, 36:18-22 (Michael Bagatelos); Tr. 1776-78 (Liana Forest); Tr. 1786 (Mary Roy Michaels); Tr. 1792-93 (Ian Tuller); 1807-08 (Syd Weiss).  Umpqua had no knowledge of Ms. Camenisch's conversation with Wallach nor the countless others that Wallach and Casey had with the 1,200 class members in this action.  Ms. Camenisch also testified that she relied on PFI's website in making her investment decision.  Tr. 1363.  There is no evidence in the record that anyone at Umpqua knew or understood what was being communicated to investors through PFI's website.

As to LLC investors, the evidence is that they received lengthy memorandums detailing the purchase price, cash flow potential and other characteristics of the specific properties they were investing in.  Tr. 373-380; Exs. 91, 94, 195, 280, 436, 555, 690-98, 795-96, 802, 830, 879, 906.  There was also evidence that an absent class member (Tamara Shearer) received a prospectus prior to making a PISF Note investment in 2014.  Ex. 788.  There is no evidence in the record, however, that Umpqua had access to these investment memorandums or prospectuses prior to taking discovery in this action.

Given that the absence of any evidence that Umpqua knew what PFI was communicating to its investors, judgment as a matter of law should be entered in Umpqua's favor on Plaintiffs' fraudulent concealment claim.

### 2. Actual Knowledge Of Concealment Cannot Be Inferred From Circumstantial Evidence On This Record

Actual knowledge cannot be inferred from circumstantial evidence that only supports speculative or conjectural inferences.  *RSB Vineyards, LLC v. Orsi*, 15 Cal. App. 5th 1089, 1098 (2017).  Rather, "[o]nly where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted."  *Id.* (citation and internal quotations marks omitted).

At best, Plaintiffs have presented only evidence of "red flags" and/or allegedly "atypical banking practices" by Umpqua.  This evidence cannot support a finding of "actual knowledge" of fraudulent concealment on this record.  *See Casey*, 127 Cal. App. 4th at 1142, 1151-52 (allegations

1   banks violated their "own internal policies and procedures" were insufficient to show actual

2   knowledge of customer's wrongdoing); *Chance World Trading E.C. v. Heritage Bank of*

3   *Commerce*, 438 F. Supp. 2d 1081, 1085 (N.D. Cal. 2005) ("Even if the transfers out of

4   Construction Navigator's accounts did not comport with Heritage Bank rules or California

5   corporate law, that alone is insufficient to show that Heritage Bank was aware of Ms. Yadav-

6   Ranjan's misuse of funds").

7           That is because Plaintiffs' theory is that PFI fraudulently concealed certain facts from its

8   investors and there is no reason that circumstantial evidence of "atypical" banking practices could

9   show actual knowledge of what PFI was telling and not telling its investors.  As discussed above,

10  there is nothing *inherently wrongful* about the three things that Plaintiffs contend were concealed.

11  It therefore follows that any allegedly "atypical" banking procedures that would have facilitated

12  these three things could not provide an inference that Umpqua had actual knowledge of PFI's

13  fraudulent concealment.  Plaintiffs' reliance on "atypical" banking procedures and "red flags"

14  therefore fails as a matter of law to satisfy their burden of proof.

15          Moreover, the evidence of "red flags" and "atypical" banking practices that Plaintiffs

16  pointed to cannot, as a matter of law, support an inference that Umpqua had actual knowledge of

17  PFI's fraudulent concealment of the three facts Plaintiffs identified.  For example, Catherine

18  Ghiglieri testified that it was "atypical" for Umpqua to continue to bank with PFI even though

19  Casey had a criminal conviction for bank fraud.  Tr. 1193.  But that testimony, even if credited, is

20  simply not evidence that Umpqua "must have known" about the *specific tort* that PFI was

21  allegedly committing (its fraudulent concealment of information from investors).  *Cf. RSB*

22  *Vineyards*, 15 Cal. App. 5th at 1098.  It is instead the same type of generalized evidence that

23  "*something* fishy was going on with the accounts" that California law says is legally insufficient

24  to support an aiding and abetting claim.  *See Casey*, 127 Cal. App. 4th at 1149 (emphasis in

25  original).

26          The primary piece of evidence that Plaintiffs relied on and labeled as a "red flag" was

27  Exhibit 1044.  This exhibit is an email from Weaver to PFI explaining that a person called Umpqua

28  stating that he was an attorney of an investor, that his client had not received "paperwork as to

what services PFI would be providing," that the attorney "wanted to freeze the PFI account and get the money back," and Weaver explained she could not give any information or do anything without a court order. Ex. 1044. In closing, Plaintiffs argued that this email, by itself, reflected "how a banker behaves who knows their star customer is mishandling investor money and who wants to protect that star customer from consequences." Tr. 2466-67. This not only stretches the evidence far beyond its reasonable limits, but underscores Umpqua's lack of knowledge of the *specific tort* being committed. The email referenced a person not receiving paperwork from PFI—it says nothing about fraudulent concealment. Further, Plaintiffs' aiding and abetting claims do not charge Umpqua with generalized knowledge that PFI was "mishandling investor money"—they charge Umpqua with having *actual knowledge* of *fraudulent concealment* of *three specific facts*. Even in arguing that this email was evidence of Umpqua's "knowledge," Plaintiffs' counsel could not point to the required knowledge Plaintiffs must prove to establish liability.

### 3. No Substantial Assistance Of PFI's Alleged Fraudulent Concealment

Under *Casey*, ordinary banking transactions "can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *Casey*, 127 Cal. App. 4th at 1145. As such, if Plaintiffs' theory of liability had been that Umpqua aided and abetted PFI's status as a Ponzi scheme, Umpqua's processing of ordinary banking transactions could arguably satisfy the substantial assistance element because in that scenario, the banking transactions were necessary for the operation of the Ponzi scheme. However, Plaintiffs have abandoned their Ponzi scheme theory. And, as explained below, ordinary banking transaction cannot substantially assist general fraudulent concealment.

Plaintiffs' theory of liability is that Umpqua aided and abetted PFI's fraudulent concealment that investor funds were being used to enrich PFI executives, pay other investors, and cover recurring shortages. Dkt. 317 at 2. Fraudulent concealment requires a duty to disclose certain material facts, and the concealment only becomes fraudulent when the speaker fails to disclose those facts despite the duty to disclose them. *See Boschma*, 198 Cal. App. 4th at 248. Thus, the fraud is not the *transactions*, but instead the *concealment* of specific facts. Umpqua, in

1    its position as PFI's depository bank, was not involved in what PFI did and did not tell its investors.

2    As discussed above, there is no evidence that Umpqua was involved in any way in the investor

3    facing side of PFI's business.  *See* Tr. 2169, 2234 (Weaver and Vazquez confirming no knowledge

4    of what PFI told investors); Tr. 1403-04, 1418; Tr. 1474, 1539-40 (named Plaintiffs confirming

5    they did not speak with Umpqua and Umpqua did not impact their investment decision).  There is

6    also no evidence that Umpqua even knew what PFI was telling investors.  *See* Tr. 2169, 2234.

7    Umpqua's processing of PFI's transactions did not impact what PFI did and did not tell its

8    investors.  Put another way, the fraud in a fraudulent concealment is the withholding of

9    information, it is not the banking transactions themselves.[6]

10        Umpqua's processing of banking transactions therefore could not be substantial assistance

11   of PFI's fraudulent concealment.  That is because, as Plaintiffs now frame it, their fraudulent

12   concealment claim is based exclusively on what PFI did and did not tell its investors; it is *not*

13   based on how the investors' money was used by PFI.  A banking transaction (which is all Umpqua

14   did) has no bearing on what PFI chose to communicate to or conceal from its investors.

15
16   **C.    Plaintiffs Have Abandoned Their "Ponzi Scheme" Theory; There Is Insufficient
             Evidence Umpqua Had Actual Knowledge PFI Was A Ponzi Scheme**

17        Plaintiffs have made abundantly clear that they are not pursuing a theory that Umpqua

18   aided and abetting a Ponzi scheme.  As such, Plaintiffs have abandoned this claim.  *See Maynard*

19   *v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (Plaintiff waived Section 1983 claims

20   based on First Amendment "by failing to object to their exclusion from the instructions," even if

21

---

22   [6] This is contrasted with a Ponzi scheme (Plaintiffs' original claim and the claim that Umpqua
23   maintains was certified for class treatment), where part of the fraud includes the *transactions*,
     because the transactions are what are used to create the appearance there is a legitimate money-
24   making business opportunity.  *See In re Agric.*, 916 F.2d at 531 ("The fraud [in a Ponzi scheme]
     consists of transferring proceeds received from the new investors to previous investors, thereby
25   giving other investors the impression that a legitimate profit-making business opportunity exists,
     where in fact no such opportunity exists.").  Thus, in the Ponzi scheme scenario, banking
26   transactions can arguably substantially assist the fraud because it is used in the mechanics of the
     fraud.  But here, Plaintiffs claim the fraud was PFI's concealment of specific facts regarding how
27   PFI was going to use investor money—without regard to the mechanics or finances of PFI's
28   business.

DEFENDANT UMPQUA BANK'S MOTION FOR JUDGMENT AS A MATTER OF LAW

1  other Section 1983 claims were included in jury instructions and verdict form); *Hunt v. City of*

2  *Los Angeles*, 523 F. App'x 493, 495 (9th Cir. 2013) ("Hunt's failure to present this claim at trial

3  constitutes an abandonment of this claim").   Even if Plaintiffs could resurrect the claim, it fails

4  as a matter of law because there is insufficient evidence to show Umpqua had actual knowledge

5  of PFI's status as a Ponzi scheme.

6        Goldberg testified that "[a] Ponzi scheme is a type of financial fraud" in which "the money

7  comes in from the investors either through an omission or misrepresentation as to the profitability

8  of the underlying business, the investors give their money based on that; and then the returns to

9  the investors are actually paid with their own money or other investors' money back to them so

10  they think that the underlying business is profitable, but it's not." Tr. 273.  Goldberg testified that

11  he determined PFI was a Ponzi scheme based on (1) conversations he had with investors—which

12  included a conversation with an investor who told Goldberg that her returns had been paused and

13  the SEC was investigating PFI's legitimacy; (2) FTI's forensic accounting analysis of PFI; and (3)

14  Wallach's guilty plea to wire fraud.  Tr. 312.  And, critically, Goldberg confirmed that FTI's

15  forensic accounting was required before he could say for certain whether PFI was operating as a

16  Ponzi scheme.  Tr. 330.  All of this dooms any claim that Umpqua had actual knowledge that PFI

17  was a Ponzi scheme to failure.

18        **No evidence that Umpqua knew that PFI was insolvent.**  Goldberg testified that the

19  fraud in a Ponzi scheme is the portrayal of the business as profitable when the business, in fact,

20  presents no money-making opportunity.  Tr. 273, 327.  This is consistent with case law.  *See In re*

21  *Agric.*, 916 F.2d at 531.   In other words, the fraud concerns misrepresentations about how the

22  business's revenue (i.e., net operating income or "NOI") is sufficient to pay the promised investor

23  returns (i.e., investor "debt service").  There is no evidence that Umpqua understood that PFI's

24  revenues were insufficient to pay its promised returns to investors or, more basically, that PFI was

25  insolvent while portraying itself as profitable to investors.

26        Goldberg testified that whether something is a Ponzi scheme depends on the

27  representations or omissions regarding the profitability of the business.  Tr. 327 ("Q. Would you

28  agree with me that a Ponzi scheme – that in a Ponzi scheme, the fraud consists of

misrepresentations about the profitability, viability, or existence of the business?    A. Misrepresentations or omissions.  Q.  But about those things?  A.  Yes, about the underlying profitability of the business and things related to that.").  David Alfaro of FTI Consulting likewise testified that a significant part of his forensic accounting involved analyzing PFI's finances and whether PFI's revenue from operations were sufficient to pay its promised returns to investors. Tr. 435.  Alfaro further testified that to know whether PFI was reliant upon new investor money to pay promised returns to investors, one would need to know the company's "debt service" (which he defined to include both PFI's bank debt and promised returns to investors).  *See* Tr. 446 ("Q. Would you agree with me that you need to know the debt service number to know whether there's a net deficit or not?  A. In order to [] calculate the $11.4 million, you would need to know the debt service, yes.").  In fact, Alfaro went even further, testifying that because PFI's operations were so complex, to know whether PFI was insolvent, one would need to know "the workings of the entire enterprise."  Tr. 465.

But there is no evidence that Umpqua had any insight into the details of what revenues PFI's properties were generating or what returns PFI had promised to investors and, therefore, there is no evidence that Umpqua could have had knowledge of PFI's status as a "Ponzi scheme." *Cf.* Tr. 465 ("Q. Yeah.  And all I'm trying to establish is that in order to know whether it's under water, you have to know what had been promised to investors.  Would you agree with me?  A. You would have to know the entire – the workings of the entire enterprise."); *accord* Tr. 2334 ("Q.  Mr. Sickler, if the amount of the investor obligations over this five-year period were less than $44.8 million, would PFI be a Ponzi scheme?  A.  If it was less than the $44 million that was owed to investor, it would not be a Ponzi scheme.  Q.  To understand whether it's a Ponzi scheme, do you need to know the amount of the obligations to the investors over that period of time?  A. Yes.").  Plaintiffs did not present any evidence that Umpqua knew that PFI had promised its investors far greater returns than its properties were generating.  For this reason alone, Plaintiffs' aiding and abetting a Ponzi scheme theory would fail.

Moreover, Plaintiffs cannot present any evidence that Umpqua knew that PFI was insolvent.  Umpqua, as PFI's depository bank, only had access to a limited amount of information

1    about PFI; namely bank records showing the ins and outs of its various bank accounts.  Umpqua

2    did not have access to PFI's communications with investors and thus could not have known what

3    returns PFI was promising.  *See, e.g.*, Tr. 2169, 2234; *see also* Tr. 1403-04, 1418; Tr. 1474, 1539-

4    40.  Nor is there any evidence that Umpqua had access to PFI's internal accounting records.  The

5    evidence shows that PFI kept records of what it owed to investors in an unstructured format,

6    mostly in paper documents and in unstructured Excel spreadsheets.  Tr. 407-09.  There is no

7    evidence Umpqua had access to any of PFI's documents that would have shown PFI's obligations

8    to investors.  As Goldberg testified, without PFI's internal accounting records *and* underlying

9    financial records, it would have been impossible to discover PFI's fraud.  *See* Tr. 314 ("Q.  As

10   part of your determination, did you assess whether investors could have discovered that PFI was

11   using investor money in the ways that you described?  A.  I don't know how they would have been

12   able to do that without having access to the banking records and the underlying records.  Q.  Did

13   any investors have access to PFI's bank records or internal accounting records?  A.  Not that I'm

14   aware of.").

15          **No evidence investors expressed concern to Umpqua that PFI was a Ponzi scheme.**

16   Goldberg testified that he became merely suspicious that PFI could have been a Ponzi scheme

17   after an investor told Goldberg that Casey had died, the SEC was investigating PFI, and that

18   payments on her returns had been stopped.  Tr. 281-82.  There is certainly no evidence that anyone

19   at Umpqua had a similarly detailed conversation with an investor, and even if there was, it would

20   be insufficient to show actual knowledge as Goldberg confirmed that even after this conversation,

21   he could not be certain PFI was a Ponzi scheme.  Tr. 282, 330.  Rather, Goldberg needed the

22   forensic accounting that PFI paid FTI Consulting millions of dollars to conduct before he knew

23   for certain whether PFI was operating as a Ponzi scheme.  *See* Tr. 330 ("Q.  In this case, you

24   needed FTI to confirm – to know for certain whether PFI was operating as a Ponzi scheme; is that

25   right?  A.  Yes, I needed FTI to go do the analysis and look at the bank records and everything.

26   Q.  I think your testimony at deposition was upon talking to investors, you had suspicions, but you

27   didn't know for certain until FTI did its work.  Is that fair?  A.  And that's what I testified earlier

28   today, yes.  I had my very strong suspicion, but I would not swear on a bible until FTI did the

1    analysis and showed me the flow of funds and all the necessary analysis that was – that needed to

2    be done.  Q.  How much was FTI paid for its work?  A.  I think – I don't have the exact number,

3    but somewhere between 15 and 20 million maybe.").

4              **No evidence Umpqua knew of Wallach's guilty plea.**  Goldberg testified that Wallach's

5    guilty plea to fraud was one of the three things that Goldberg used to determine that PFI operated

6    as a fraudulent scheme.  Tr. 312.  Of course, Umpqua could not have had knowledge of Wallach's

7    guilty plea because it did not occur until after the fraud was exposed in 2020.  Ex. 1565.  Indeed,

8    Wallach explicitly testified that he concealed the fraud from Umpqua.  Dkt. 423-1 at 149:18-150:5.

9    **D.    No Evidence Of Umpqua's Aiding And Abetting Prior To June 14, 2012**

10              In the event the Court is disinclined to grant JMOL so as to dispose of Plaintiffs' entire

11   case, at the very least, the Court should find that Umpqua's liability (if any) could not have accrued

12   until June 14, 2012 at the earliest.  In their closing argument, Plaintiffs presented a timeline of the

13   alleged "red flags" they claim reflected Umpqua's actual knowledge of PFI's fraudulent

14   concealment.  Dkt. 422-4 at 99.  The earliest date that Plaintiffs included on that timeline that

15   related to Umpqua's alleged knowledge was June 14, 2012, which reflected the earliest date that

16   Wallach transferred money from PFI bank accounts to another investment company called Green

17   Swan:



DEFENDANT UMPQUA BANK'S MOTION FOR JUDGMENT AS A MATTER OF LAW

1    Dkt. 422-4 at 99.  Because the earliest date that Plaintiff contends it has evidence of Umpqua's

2    knowledge of PFI's fraudulent concealment is June 14, 2012, it follows that Umpqua cannot be

3    liable for aiding and abetting for the period prior to that date.

4

5    **E.    Umpqua Renews Its Summary Judgment Argument That Plaintiffs Cannot Recover Prejudgment Interest**

6           Umpqua previously moved for summary judgment on Plaintiffs' entitlement to

7    prejudgment interest on the grounds that Plaintiffs were collaterally and judicially estopped from

8    claiming prejudgment interest in this action.  More specifically, Umpqua argued that Plaintiffs

9    claim for interest on the principal on their investments was disallowed in PFI bankruptcy case and

10   were therefore collaterally estopped from claiming prejudgment interest in this case.  Dkt. 223 at

11   24-26.  Alternatively, Umpqua argued that Plaintiffs were judicially estopped from claiming

12   prejudgment interest because they successfully convinced the bankruptcy court to adopt its

13   position that "netting" or fraudulent avoidance claims brought against investors who obtained

14   gains in excess of their principal investment were not subject to prejudgment interest.  Dkt. 223 at

15   26-28.  Finally, Umpqua also argued that, at the very least, Plaintiffs were collaterally estopped

16   from seeking prejudgment interest that accrued after the PFI bankruptcy was filed on July 26,

17   2020.  Dkt. 223 at 29.

18          Umpqua believes that its arguments as to Plaintiffs' entitlement to prejudgment interest

19   represent pure questions of law that need not be renewed at trial to preserve them on appeal.  *See*

20   *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1370 (9th Cir. 1987) ("As long as a

21   party properly raises an issue of law before the case goes to the jury, it need not include the issue

22   in a motion for a directed verdict in order to preserve the question on appeal.").  Nevertheless, to

23   ensure that this argument is properly preserved, Umpqua renews them here.  *York v. United States*

24   *(In re York)*, 78 F.4th 1074, 1084 (9th Cir. 2023) ("[q]uestions going to the sufficiency of the

25   evidence are not preserved for appellate review by a summary judgment motion alone. . . .

26   challenges of that order must be renewed post-trial by invoking the procedures set forth in Federal

27   Rule of Civil Procedure 50") (citation and internal quotation marks omitted).

28

**F.      Plaintiffs' Claim For Aiding And Abetting Breach Of Fiduciary Duty Is Abandoned And Should Be Decertified And Dismissed**

At trial, Plaintiffs declined to present their aiding and abetting breach of fiduciary duty claim to the jury, rendering it abandoned.  Tr. 2356.  Following trial, counsel for Plaintiffs confirmed that Plaintiffs do not intend to pursue this claim at the retrial.  Declaration of Kasey J. Curtis, Ex. B.  Accordingly, the Court should enter an order decertifying Plaintiffs' cause of action for aiding and abetting breach of fiduciary duty and dismissing that claim as to the named Plaintiffs.

**V.      CONCLUSION**

For these reasons, Umpqua respectfully requests that the Court enter judgment as a matter of law in Umpqua's favor.


DATED:  March 11, 2025

REED SMITH LLP


By:  */s/ Kasey J. Curtis*
        Kasey J. Curtis
        Charles P. Hyun
        Kathryn M. Bayes
        Katherine Goetz

        STOLL BERNE
        Keith Ketterling (*pro hac vice*)
        Lydia Anderson-Dana (*pro hac vice*)
        Erin Roycroft (*pro hac vice*)
        Madeleine Holmes (*pro hac vice*)

        Attorneys for Defendant
        UMPQUA BANK