Amy M. Zeman (SBN 273100)
Linda P. Lam (SBN 301461)
E. Wynne Tidwell (SBN 348179)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
amz@classlawgroup.com
lpl@classlawgroup.com
ewt@classlawgroup.com

(Additional counsel on signature page)

*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al. | Case No. 5:20-cv-5905-PCP |
| Plaintiffs, | **MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT** |
| v. | |
| UMPQUA BANK, | Date: May 22, 2025 |
| Defendant. | Time: 10 a.m. |
| | Place: Courtroom 8, 4th Floor (via Zoom) |

# NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on May 22, 2025, at 10:00 a.m., via Zoom, and before the Honorable P. Casey Pits, Plaintiffs will and hereby do move the Court for an order preliminarily approving the parties' class settlement.

Pursuant to Rule 23(e)(1) of the Federal Rules of Civil Procedure, Plaintiffs request that the Court issue an order that (i) preliminarily approves the terms of the parties' settlement as one that could likely merit approval under Rule 23(e)(2); (ii) directs dissemination of class notice consistent with the Notice Program set forth in the parties' settlement, which includes procedures for class members to make any objections they may have to the settlement; (iii) appoints a settlement administrator to disseminate class notice; and (iv) sets a schedule for a final fairness hearing and stays further proceedings pending final approval of the settlement.

# TABLE OF CONTENTS

Page

NOTICE OF MOTION ............................................................................................................. i

I.    INTRODUCTION ....................................................................................................... 1

II.   BACKGROUND .......................................................................................................... 2

    A.  The Class's Aiding-and-Abetting Claims ..................................................... 2

    B.  The Class Definition ...................................................................................... 2

    C.  Trial of the Class Claims ............................................................................... 3

    D.  Settlement Negotiations ................................................................................. 3

III.  THE SETTLEMENT .................................................................................................. 3

    A.  The Settling Class Members .......................................................................... 3

    B.  The Settlement Fund ...................................................................................... 3

    C.  Notice and Administration ............................................................................. 4

    D.  Attorneys' Fees, Costs, and Service Awards ................................................ 5

    E.  Released Claims ............................................................................................. 5

IV.   LEGAL ANALYSIS .................................................................................................. 6

    A.  The settlement should be preliminarily approved and class notice issued if the Court finds it is likely to be able to approve the settlement as fair, reasonable, and adequate. ............ 6

    B.  The settlement is likely to merit final approval under the Rule 23(e) factors. .......................... 6

        1.  Plaintiffs and Class Counsel have adequately represented the Class ................................. 7

        2.  The settlement was negotiated at arm's length. ........................................................... 8

        3.  The settlement provides a significantly higher percentage recovery than is typically achieved in class actions involving similar aiding-and-abetting claims. .......................... 8

            a.  The risk, delay, and other drawbacks associated with further litigation are substantial. ...................................................................................... 10

            b.  Settlement proceeds will be distributed directly to class members using reliable contact information. .................................................... 11

            c.  Attorneys' fees will be limited to 25% of the settlement fund. ............... 11

            d.  There are no side agreements ..................................................................... 12

        4.  The settlement and allocation plan treat class members equitably. .............................. 12

    C.  The settlement's proposed notice program meets all applicable requirements ...................... 13

        1.  The notice program uses the best practicable means to reach class members. ................ 13

2.  The proposed form of notice adequately informs class members of the settlement and their right to object. ...................................................................................... 13

3.  The proposed Settlement Administrator is qualified, experienced, and previously served as the Court-appointed Notice Administrator in this action. ................................ 14

D.  The parties propose setting a schedule for the next steps in the approval process. .................. 14

V.  CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                    Page(s)

*Acosta v. Trans Union, LLC*,
   243 F.R.D. 377 (C.D. Cal. 2007) ................................................................................. 7

*Chang v. Wells Fargo Bank*,
   No. 19-CV-01973-HSG, 2023 WL 6961555 (N.D. Cal. Oct. 19, 2023) ...................... 9, 10

*Charalambous v. Liberty Mut. Ins. Co.*,
   No. 22-cv-00216-EMC, 2024 WL 1586701 (N.D. Cal. Mar. 15, 2024) ........................ 8

*Evans v. ZB, N.A.*,
   No. 2:17-cv-01123 (E.D. Cal.) .............................................................................. 9, 13

*Gonzalez v. Lloyds TSB Bank*,
   No. 06-cv-01433-VBF (C.D. Cal.) .............................................................................. 9

*In re Anthem, Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) .............................................................................. 12

*In re Bluetooth Headsets Product Liability*,
   654 F.3d 935 (9th Cir. 2011) ..................................................................................... 8

*In re Citric Acid Antitrust Litig.*,
   145 F. Supp. 2d 1152 (N.D. Cal. 2001) ..................................................................... 12

*In re Woodbridge Investments Litigation*,
   No. 18-cv-00103-DMG (C.D. Cal.) ............................................................................ 9

*Jenson v. First Tr. Corp.*,
   No. CV 05–3124 ABC (CTX), 2008 WL 11338161 (C.D. Cal. June 9, 2008) ........................... passim

*Low v. Trump Univ., LLC*,
   881 F.3d 1111 (9th Cir. 2018) .................................................................................. 14

*Neilson v. Union Bank*,
   No. 02-cv-06942-MMM (C.D. Cal.) ....................................................................... 9, 13

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) .................................................................................... 13

*Williams v. MGM-Pathe Commc'ns Co.*,
   129 F.3d 1026 (9th Cir. 1997) .................................................................................. 11

1

Statutes

Cal. Civ. Code § 3288 ................................................................................................................ 10

Rules

Fed. R. Civ. P. 23 ..............................................................................................................passim

Other Authorities

4 *Newberg and Rubenstein on Class Actions* § 13 (6th ed.) ................................................ 6, 7

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Preliminary Approval of Class Settlement
Case No. 5:20-cv-5905-PCP

# I.     INTRODUCTION

When Plaintiff Shela Camenisch awoke on June 4, 2020, she was devastated to learn that she and her husband had invested a substantial portion of their life savings with a fraudulent investment company. Professional Financial Investors and Professional Investors Security Fund—known collectively as "PFI"—appeared to be running a successful real estate investment business. PFI was among the largest holders of real estate in Marin County, it offered ordinary investors an opportunity to earn steady returns from the commercial real estate market, and for more than three decades, PFI had never failed to make the monthly payments it had promised its investors. But when PFI's founder suddenly died in May 2020, it was only a matter of weeks before PFI was exposed as a fraud and likely Ponzi scheme. Camenisch and over 1,200 investors like her recovered some of their losses through PFI's bankruptcy, but when the dust had settled, they had still collectively lost $149.4 million.

This class action was filed against Umpqua Bank in an effort to recover investors' remaining losses. Umpqua was not one of the primary perpetrators of the PFI Ponzi scheme, but under California law, a bank can be held secondarily liable if it knows a customer is engaged in wrongful conduct and substantially assists the wrongful conduct. Plaintiffs pursued this aiding-and-abetting theory against Umpqua through nearly five years of litigation. Following a four-week trial that resulted in a deadlocked jury, and with a retrial scheduled for the following month, the parties have agreed to a $55 million settlement that would fully resolve the investor class's aiding-and-abetting claims against Umpqua.

The parties' settlement affects the legal rights of absent class members and so requires judicial approval before it can go into effect. Both the plaintiffs and the attorneys appointed to represent the class believe the settlement to be a fair, reasonable, and adequate compromise of class members' aiding-and-abetting claims. The amount of the settlement represents 37% of the maximum losses that a jury could find class members suffered as a result of the PFI Ponzi scheme. Prior class actions involving similar aiding-and-abetting claims against banks, in contrast, have settled at significantly lower percentages of recovery—ranging from 3% to 25%, with one court characterizing a 9.3% recovery of the class's remaining loss as "a highly-favorable outcome to the Litigation." *Jenson v. First Tr. Corp.*, No. CV 05–3124 ABC (CTX), 2008 WL 11338161, at *12 (C.D. Cal. June 9, 2008).

Plaintiffs accordingly request that the Court take the first step of the judicial approval process by entering an order that: (i) considers whether the parties' settlement is likely to merit final approval; (ii) directs that class members be notified of the settlement and given an opportunity to object; (iii) appoints a settlement administrator to disseminate class notice; and (iv) sets a schedule for a final fairness hearing.

## II.    BACKGROUND

### A.    The Class's Aiding-and-Abetting Claims

Plaintiffs filed this action in August 2020. (Compl. [Dkt. 1].) They asserted two aiding-and-abetting claims against Umpqua: one for aiding and abetting fraud and one for aiding and abetting breach of fiduciary duty. (*Id.*, ¶¶ 48-56.) Both claims are premised on allegations that Umpqua knew PFI was engaged in a fraudulent enterprise and yet continued to provide the company with essential banking services. (*Id.*; *see also* 7/14/22 MSJ Opp. [Dkt. 122-1] at 15.) And both claims sought the same relief—namely, the recovery of the remaining net losses caused by the PFI Ponzi scheme, along with prejudgment interest on those losses. (Compl. at 11; 5/21/24 MSJ Opp. [Dkt. 224] at 10.)

### B.    The Class Definition

Plaintiffs' aiding-and-abetting claims were certified to be tried on a classwide basis in December 2022. (Dkt. 144.) The class was defined to include the following PFI investors:

> All persons who invested money with Professional Financial Investors, Inc. (PFI) or Professional Investors Security Fund, Inc. (PISF) through secured or unsecured debt instruments or an LLC membership purchase agreement; who did not recover the principal amount of their investment prior to July 14, 2020; and who have a valid, allowed claim in *In re Professional Financial Investors, Inc.*, Case No. 20-bk-30604 (Bankr.N.D. Cal.) or any of its affiliated debtor bankruptcy cases, jointly administered under Case No. 20-bk-30604. Commercial lenders to PFI and PISF are excluded from the class.

(Dkt. 181, ¶ 6.)

Pursuant to Rule 23(c)(2)(B), the Court directed that class members be individually notified of the class action and given the option to either remain in the class, and be bound by the outcome of the litigation, or exclude themselves from the class and retain their ability to sue Umpqua Bank on an individual basis. (*Id.*, ¶ 3, Ex. A.) Two class members elected to exclude themselves; the remainder

1  opted to remain in the class and be bound by the outcome of this action. (Dkt. 198-99.)

2  **C.    Trial of the Class Claims**

3      The class's aiding-and-abetting claims against Umpqua were tried before a jury over four weeks

4  in February 2025. After four days of deliberations, the jury reported that it was unable to reach a

5  unanimous verdict and a mistrial was declared. (Dkt. 425.) The case was scheduled to be retried before

6  a new jury beginning on April 28, 2025.

7  **D.    Settlement Negotiations**

8      Prior to trial, the parties had engaged in private mediation with two separate neutrals but

9  remained far apart on their valuation of the class claims. Following trial, the parties were given an

10  opportunity to speak with several of the jurors regarding the evidence and were directed to participate

11  in a mandatory settlement conference before Magistrate Judge Cousins. (Dkt. 426, 435.) At the

12  conclusion of the settlement conference, Judge Cousins made a mediator's proposal of $55 million,

13  which both parties accepted. (Zeman Decl., ¶ 4.) The parties subsequently memorialized the classwide

14  settlement in the formal agreement that is now before the Court for preliminary review. (*See id.*, Ex. A

15  ("Settlement").)

16                          **III.    THE SETTLEMENT**

17  **A.    The Settling Class Members**

18      If judicially approved, the parties' settlement would bind the same group of class members

19  whose claims were at issue in the recent trial. (*See* Settlement, §§ 2.2, 2.4, 2.19). There is, in other

20  words, no difference between the class the Court previously certified under Rule 23(b)(3) for purposes

21  of litigation, and the class whose claims are being settled pursuant to Rule 23(e). That class consists of

22  1,219 investors who were previously identified as class members and who declined the opportunity to

23  opt-out of all further class proceedings. It does not include the two investors who previously elected to

24  exclude themselves from the certified class. (*Id.*, § 2.4.)

25  **B.    The Settlement Fund**

26      In exchange for a final resolution of the class's claims, the parties' settlement requires Umpqua

27  to establish a settlement fund in the amount of $55 million. (Settlement, §§ 2.23, 3.1.) That fund will be

28  used to (i) make payments to settling class members; (ii) pay Class Counsel's attorney's fees, costs, and

expenses (subject to Court approval); (iii) pay service awards to the class representatives (subject to Court approval); (iv) pay any costs incurred by the Settlement Administrator incurred in connection with its duties; (v) pay any taxes arising from income earned by the fund; and (vi) pay miscellaneous fees, costs, or expenses that might arise (subject to approval by all parties and the Court). (*Id.*, § 3.2.)

After first deducting Court-authorized fees, service awards, costs, and expenses, the net settlement fund will then be allocated to class members. (*Id.*, § 8.1.) The allocation formula that Class Counsel proposes using, subject to the Court's approval, would base each class member's respective share on the ratio between (i) the class member's maximum net loss (as presented to the jury by Plaintiffs' damages expert), and (ii) the entire class's maximum net loss (as presented to the jury by Plaintiffs' damages expert). (*Id.*; *see also* Trial Ex. 1387 [Dkt. 455-36] (maximum of $149.4 million in classwide net losses); Trial Ex. 1388 (maximum net losses presented to jury for each class member).

To use Plaintiff Eva King as an example: The damages spreadsheet submitted to the jury at trial calculated Ms. King's maximum net losses at $106,890. (Trial Ex. 1388, Tab 2.1, line 247.) The maximum net losses calculated for the class as a whole was $149,435,961. (Trial Ex. 1388, Tab 1.1, line 8.) Ms. King's pro rata share of the net settlement fund would therefore be 106,890 / 149,435,961, or 0.071529%. If the net settlement fund consists of $38 million, for example, Ms. King's pro rata share would then be $27,181.

## C.    Notice and Administration

After obtaining multiple bids, Plaintiffs – with input from Umpqua – selected Epiq to act as the Settlement Administrator, subject to Court approval, for purposes of notifying class members about the settlement and distributing the settlement fund. (Settlement, § 5.1, Zeman Decl., ¶ 5.) Epiq was previously appointed to serve as the Notice Administrator in this action. (Dkt. 181, ¶ 1.) If the Court preliminarily approves the parties' settlement, the Settlement Administrator will disseminate both Mailed Notice and Emailed Notice to the class using contact information provided by Class Counsel. (*Id.*, §§ 5.2(a), 6.4-6.8, Ex. 1.) The notices will inform class members of the settlement, describe the settlement's terms, and provide class members with an opportunity to object to any portion of the settlement that they do not like. (*Id.*, §§ 6.1-6.3, Ex. 1 (proposed notice).) In addition, Umpqua will notify government officials of the proposed settlement and afford them an opportunity to object, as

required by the Class Action Fairness Act. (*Id.*, § 4.3.)

    If the Court finally approves the settlement, the Settlement Administrator will be charged with distributing the net settlement fund to class members. (*Id.*, § 9.1.) Class members will not need to file a claim to receive a settlement payment. They will automatically be mailed a settlement check within 14 days of the settlement's effective date, which is defined as the fifth business day after the settlement is finally approved and any appeals are exhausted. (*Id.*, §§ 2.6, 9.1-9.2.) The Settlement Administrator will make reasonable efforts to contact any class members who do not timely cash their settlement checks and ensure that each class member receives their portion of the settlement funds. (*Id.*, § 9.2) Settlement checks will remain valid for 180 days, and any funds that remain unclaimed 60 days after the latest issued settlement check is no longer valid will be disposed of by the Settlement Administrator in a manner consistent with applicable unclaimed property laws. (*Id.*, §§ 9.2, 10.1.) Epiq estimates it will charge a total of about $25,000 for performing these functions. (Zeman Decl., ¶ 12.)

**D.    Attorneys' Fees, Costs, and Service Awards**

    The parties' settlement provides that any award of attorneys' fees, costs, and expenses to Class Counsel, as well as any service awards to the class representatives, will be paid from the $55 million settlement fund. (Settlement, §§ 13.1-13.4.) The benchmark for attorneys' fees in the Ninth Circuit is 25% of the entire settlement fund and that is what Class Counsel intends to request here. To prosecute the class claims through trial and post-trial motions required Class Counsel to spend more than 22,500 hours and almost $1.5 million in litigation expenses. (Zeman Decl., ¶ 13.) The approximate lodestar value of Class Counsel's professional time is $16,500,000. (*Id.*)

    Class Counsel also intends to request service awards for each of the four class representatives, each of whom have devoted considerable time over the past several years to respond to written discovery, produce private communications with other investors, sit for lengthy depositions, and testify at trial. (*Id.*, ¶ 15.) In this district, a service award of $5,000 is presumptively reasonable, and that is what Class Counsel intends to request here. (*Id.*)

**E.    Released Claims**

    In exchange for Umpqua's $55 million settlement payment, class members would release Umpqua from any and all claims that were or could have been alleged in this action, including any

1    claims that relate in any way to fraud and/or breaches of fiduciary duty committed by PFI, PISF, and/or

2    their affiliates. (Settlement, § 12.1.)

3                    **IV.    LEGAL ANALYSIS**

4    **A.    The settlement should be preliminarily approved and class notice issued if the Court finds**

5    **it is likely to be able to approve the settlement as fair, reasonable, and adequate.**

6            Judicial approval of class action settlements like this one typically proceeds through three

7    stages: (i) preliminary approval, where the court conducts an initial fairness review and decides

8    whether to notify the class; (ii) a notice period, where class members are given an opportunity to

9    review the settlement and raise objections; and (iii) a final fairness hearing, where the court considers

10   the overall class reaction and makes its final determination. 4 *Newberg and Rubenstein on Class*

11   *Actions* § 13:1 (6th ed.).

12           This case is at the preliminary approval stage, which is now governed by Rule 23(e)(1). If the

13   Court's initial review indicates that it will "likely" be able to approve the parties' settlement as fair,

14   reasonable, and adequate, then the Court is required to direct notice in a reasonable manner to all class

15   members who would be bound by the settlement. Fed. R. Civ. P. 23(e)(1)(B). The text of Rule 23(e)(1)

16   also requires the Court to find it will likely be able to certify the settling class for purposes of

17   judgment, but because the Court has already certified the settling class in this case, that requirement is

18   met and no further analysis is required. *See* 4 *Newberg and Rubenstein on Class Actions* § 13:18 ("The

19   preliminary analysis of class certification referenced in Rule 23(e)(1) pertains only in cases in which

20   the court has not certified a class at the time of settlement and does so solely for purposes of

21   settlement."); Fed. R. Civ. P. 23(e)(1), Adv. Comm. Note to 2018 amendment (standard that the court

22   will likely be able to certify a class applies only "if it has not previously certified a class").

23   **B.    The settlement is likely to merit final approval under the Rule 23(e) factors.**

24           Under Rule 23(e)(2), the Court may approve the parties' settlement only upon finding that it is

25   fair, reasonable, and adequate after considering four overarching questions:

26           (1) whether the class representatives and class counsel adequately represented the Class;

27           (2) whether the settlement was negotiated at arm's length;

28           (3) whether the amount of the settlement is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);

(4) whether the settlement treats class members equitably relative to each other.

A preliminary analysis of each of these factors indicates that, after class members are notified and given an opportunity to be heard, the Court is likely to be able to finally approve the parties' settlement as fair, reasonable, and adequate.

### 1.    Plaintiffs and Class Counsel have adequately represented the Class.

Before evaluating the substantive terms of a classwide settlement, it is important to ensure that the parties who negotiated on behalf of the class were adequately informed and capable of intelligently representing the class's interests. *See* Fed. R. Civ. P. 23(e)(2)(A), Adv. Comm. Note to 2018 amendment. A settlement that is negotiated with the benefit of an extensive record and by counsel who have demonstrated the willingness and ability to litigate zealously on the class's behalf is more likely to be fair and reasonable than a settlement that is reached quickly, without thoroughly investigating and testing the merits of the class claims being compromised. *See* 4 *Newberg and Rubenstein on Class Actions* § 13:14; *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007).

Here, Plaintiffs and their counsel have vigorously represented the class for nearly five years. They successfully defended the class's aiding-and-abetting claims against two motions to dismiss and two motions for summary judgment; obtained and evaluated more than 1.5 million pages of documents, and took or defended approximately 40 depositions, concerning the class claims; successfully moved for a class certification order permitting the class claims to be tried on a collective basis and resisted multiple efforts to partially or fully decertify those claims; opposed three *Daubert* motions and numerous motions seeking to exclude key evidence supporting the class's claims; and presented the class's claims to the jury over the course of a four-week trial featuring more than thirty witnesses. (Zeman Decl., ¶¶ 2-3.) Plaintiffs and their counsel were, in other words, armed with a great deal of information about the strengths and weaknesses of the class's claims when they negotiated the

settlement now before the Court. They were ideally positioned to value those claims appropriately and had demonstrated a strong commitment to maximizing the class's ultimate recovery.

### 2. The settlement was negotiated at arm's length.

The parties' settlement was reached during a mandatory settlement conference with Magistrate Judge Cousins that took place only after the parties had engaged in over four years of adversarial litigation—including a four-week jury trial. (Zeman Decl., ¶ 4.) That is strong evidence that the parties' compromise was the product of arm's-length, non-collusive negotiations. *See Charalambous v. Liberty Mut. Ins. Co.*, No. 22-cv-00216-EMC, 2024 WL 1586701, at *2 (N.D. Cal. Mar. 15, 2024) ("the presence of an experienced mediator evidences a non-collusive settlement"). None of the subtle signs of collusion that the Ninth Circuit has cautioned courts to guard against are present here either: there is no "clear sailing" agreement providing for the payment of fees separate and apart from class funds; there is no possibility that any of the $55 million settlement fund will revert to Umpqua; and Class Counsel has agreed to limit their fee request to 25% of the settlement fund—even though the extraordinary amount of time and effort that Class Counsel devoted to this case could readily support a higher fee award. *See In re Bluetooth Headsets Product Liability*, 654 F.3d 935, 947 (9th Cir. 2011).

### 3. The settlement provides a significantly higher percentage recovery than is typically achieved in class actions involving similar aiding-and-abetting claims.

At trial, Plaintiffs sought to recover up to $149.4 million in net losses that class members suffered as a result of investing in the PFI Ponzi scheme. If a jury were to award maximum damages to the class, it would also have discretion to award prejudgment interest on those damages, which in the best case scenario could reach as high as $218.7 million. The parties' settlement calls for Umpqua to pay $55 million, which represents 37% of the class's maximum damages and 15% of the total amount of damages and prejudgment interest that a jury could potentially award at a second trial.

Prior cases involving similar aiding-and-abetting claims have typically settled, with judicial approval, for significantly lower percentages. For example, in *Jenson v. First Trust*, a certified class of Ponzi scheme victims settled their aiding-and-abetting claims for 9.3% of the class's remaining net losses. *Jenson v. First Tr. Corp.*, No. CV 05–3124 ABC (CTX), 2008 WL 11338161, at *10 (C.D. Cal. June 9, 2008). The court characterized the class's recovery as a "highly-favorable outcome to the

Litigation," and an "excellent result, especially when compared to gross settlement figures achieved in recent years." *Id.* at 12. Other cases involving aiding-and-abetting claims by Ponzi scheme victims have yielded settlements in that same range, as shown in the table below. Particularly when considered alongside these historical recoveries, the percentage recovery Plaintiffs and their counsel were able to secure for PFI Ponzi victims is quite favorable:

| | Investor Net Loss | Settlement | % Recovery |
|---|---|---|---|
| Proposed Settlement | $149.4 million | $55 million | 37% |
| *Chang v. Wells Fargo Bank*, No. 19-CV-01973-HSG (N.D. Cal.) | $30 – $100 million[1] | $3.75 million[2] | 4 – 13%[2] |
| *In re Woodbridge Investments Litigation*, No. 18-cv-00103-DMG (C.D. Cal.) | ~$500 million[3] | $54.2 million[4] | 11% |
| *Gonzalez v. Lloyds TSB Bank*, No. 06-cv-01433-VBF (C.D. Cal.) | $90 million[5] | $17.04 million[5] | 19% |
| *Jenson v. First Trust Corp.*, No. 05-cv-03124-ABC (C.D. Cal.) | $91.5 million[6] | $8.5 million[7] | 9% |
| *Evans v. ZB, N.A.*, No. 2:17-cv-01123 (E.D. Cal.) | $55 million[8] | $14 million | 25% |
| *Neilson v. Union Bank*, No. 02-cv-06942-MMM (C.D. Cal.) | $200+ million[9] | $26.5 million[10] | 13%[11] |

---

[1] Dkt. 129 at 10-11 (estimating out-of-pocket losses at just over $100 million but noting that up to $70 million being held by the receivership estate could ultimately be returned to investors as well).

[2] *Chang*, 2023 WL 6961555 at *2 (N.D. Cal. Oct. 19, 2023) (disregarding funds held by receivership estate, "the total settlement amount of $3.75 million represents approximately 3.75% of total estimated losses").

[3] Dkt. 188 at 10 ("preliminary estimates suggest damages as high as $500 million or more").

[4] Dkt. 207, ¶ 14.

[5] Dkt. 189 at 5-6, *adopted by* Dkt. 197.

[6] *Jenson*, 2008 WL 11338161 at *1, n.2 (C.D. Cal. June 9, 2008) ("the net-loss suffered by the Class is approximately $91.5 million").

[7] *Id.* at 6.

[8] Dkt. 105 at 10.

[9] Dkt. 308 at 2 ("Plaintiffs allege that more than $200,000,000 of [$600,000,000 received from investors] has never been returned").

[10] *Id.* at 5-6 ($26.5 million settlement fund to compensate both class and non-class investors for all claims, including aiding-and-abetting claims).

[11] *Id.* at 26 ("The proposed settlement amount thus represents approximately 13% of the damages the class sought to recover on the aiding and abetting claims").

      **a.**      **The risk, delay, and other drawbacks associated with further litigation are substantial.**

Aiding-and-abetting claims against financial institutions are acknowledged to be highly risky affairs—primarily because, under California law, a financial institution cannot be held secondarily liable unless they had "actual knowledge" of the fraud. *See Jenson*, 2008 WL 11338161 at *5 ("Particularly important—and risky—in this case is a requirement for aiding and abetting liability that Plaintiffs prove that Fiserv had actual knowledge of the Heath Fraud."); *Chang*, 2023 WL 6961555 at *4 ("Plaintiffs recognize that with just circumstantial evidence, they face an uphill battle proving that Wells Fargo had actual knowledge of the Equitybuild Scheme perpetrators' fraud and breach of duty.").

That risk is not merely theoretical here. Plaintiffs presented extensive evidence of Umpqua's alleged knowledge to a jury over the course of four weeks and were unable to convince the entire jury of Umpqua's liability. The evidence was compelling enough that at least one juror believed Umpqua should be held secondarily liable for PFI's fraud. But at least one juror also believed that Plaintiffs' evidence was insufficient. Such is the nature of a case that requires Plaintiffs to prove a corporation's mental state and, by necessity, depends on circumstantial evidence that can reasonably be viewed in different ways by different jurors.

There is no guarantee that a second trial would yield a better result. And even if all jurors saw the evidence the same way and found Umpqua liable, there is a wide range of damages that the jury could ultimately award. The maximum net losses for which Umpqua could be held responsible is $149.4 million, but to award that amount, all jurors would have to agree that Umpqua possessed actual knowledge of PFI's fraud by January 1, 2007; if some jurors decided that Umpqua did not learn of the fraud until a later date, the amount of Umpqua's liability would be lower. (*See* Trial Ex. 1387 [Dkt. 455-36] (summarizing classwide net losses by liability date). The prejudgment interest that could be added to any jury award of classwide net losses is substantial, but whether to award prejudgment interest at all is wholly discretionary and thus far from guaranteed. *See* Cal. Civ. Code § 3288. Accordingly, when prior cases involving similar aiding-and-abetting claims have analyzed classwide settlements, they have measured the settlement as a percentage of the class's remaining net losses only, and disregarded the potential for prejudgment interest to be awarded on that amount as well.

In addition to the risks posed by conducting a second trial, Umpqua has raised a large number of class certification issues, evidentiary issues, and legal issues that would pose at least some risk on appeal. So even if a second or third trial eventually yielded a favorable result for the class, it would likely be several years before all appeals were exhausted and funds could be collected and disseminated to class members. One of the primary benefits of settling now is that PFI Ponzi scheme victims will receive a substantial portion of their potential recovery much sooner than they otherwise could.

### b. Settlement proceeds will be distributed directly to class members using reliable contact information.

Just as the risk of further trials is not theoretical, neither is the benefit to class members of settlement. Settlement proceeds can be disseminated directly to class members without the need for a claims process. Plaintiffs have comprehensive contact information for the class that will be used to ensure class members receive and have every opportunity to cash their settlement checks. The same contact information, which was also used to disseminate checks in the PFI bankruptcy, has already been used to successfully reach over 99.5% of class members via U.S. mail or electronic mail. (Dkt. 198-1, ¶ 15.) Many of the class members have also kept in touch with each other through PFI-related Facebook groups and personal communications, offering further opportunities to locate any class members with outdated contact information.

### c. Attorneys' fees will be limited to 25% of the settlement fund.

The terms and timing of any attorneys' fees provided for in a class settlement warrant scrutiny to ensure that class claims are not being compromised for the benefit of the class's attorneys rather than for the benefit of class members. Here, the settlement leaves Class Counsel's attorneys' fees to the Court's discretion. (Settlement, § 13.1.) Nor is class counsel receiving preferential treatment with regard to the timing of payment. The parties' settlement provides for both class members and Class Counsel to be paid within 14 days of the settlement's effective date. (Settlement, §§ 9.1, 13.2.)

In addition, Class Counsel has agreed to limit their fee request to the well-established benchmark for an attorneys' fee award in a successful class action: twenty-five percent of the settlement fund generated by their efforts. *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997). This is no ordinary case, however, and there are several factors that would otherwise

weigh in favor of awarding Class Counsel a higher percentage of the settlement fund, including the extraordinary risk they assumed to prosecute aiding-and-abetting claims through a four-week trial; the $16,500,000 lodestar value of the professional time and effort they devoted to this case over the past five years; and the favorable result they were ultimately able to obtain for class members. *See Jenson*, 2008 WL 11338161 at 11-15 (awarding class counsel 33% of settlement fund). Class Counsel's agreement to limit their request to 25% of the settlement fund thus represents a valuable concession and a further indication that the proposed settlement is a favorable one for class members.

### d. There are no side agreements.

Rule 23(e)(3) requires that parties seeking approval of a class settlement file a statement identifying any agreement made in connection with the proposal. Here, the only such agreement is the formal settlement agreement now before the Court; there are no side agreements. (Zeman Decl., ¶ 16.)

### 4. The settlement and allocation plan treat class members equitably.

The settlement requires Class Counsel to propose a method for allocating proceeds among class members; that allocation plan will then be subject to Court approval. (Settlement, § 8.1) Class Counsel has proposed that the net settlement fund be allocated to class members based on the following pro rata formula: (net settlement fund) x (class member's remaining net loss) / (all class members' remaining net loss). (*See* Section III.B, *supra*.) Court approval of this allocation plan is governed by the same standard as the settlement itself: the allocation plan must be "fair, reasonable, and adequate." *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001). "A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 332 (N.D. Cal. 2018). Accordingly, an allocation formula like the one proposed by Class Counsel "need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 332 (N.D. Cal. 2018).

The proposed allocation plan meets the standard for Court approval. It treats class members equitably with respect to one another by basing class members' share on their net loss of principal. If, for example, the net settlement fund amounts to $38 million after the payment of all Court-authorized fees and expenses, each class member would receive 25.43% of their remaining lost principal. This is

the same pro rata approach that was employed in each of the six comparative class settlements cited above. *See, e.g.*, *Neilson*, Dkt. 308 at 6 (approving allocation under which aiding-and-abetting plaintiffs would receive approximately 5.52% of their lost principal); *Evans*, Dkt. 105 at 12 (approving allocation plan as fair and equitable where "all class members are entitled to pro rata monetary relief based on their respective net loss"). This is also the same approach that was used to allocate proceeds among class members in the PFI bankruptcy, where class members agreed to settle their fraud claims against PFI. (Zeman Decl., ¶ 17.) The proposed allocation formula is also consistent with what class members expect and consider fair. (*Id.*) Based on their extensive communications with the class over the years, Class Counsel anticipate that class members would strenuously object if some class members were to receive settlement compensation for prejudgment interest before all class members have fully recovered the full amount of their principal investments. (*Id.*)

## C. The settlement's proposed notice program meets all applicable requirements.

### 1. The notice program uses the best practicable means to reach class members.

If the Court concludes that it is likely to be able to approve the parties' settlement, Rule 23(e)(1)(B) requires that it direct notice "in a reasonable manner" to all class members who would be bound by the settlement. Those class members were previously notified of the pendency of this action through a combination of direct mail and email notice, which the Court found to be the best notice practicable under the circumstances, and which succeeded in reaching at least 99.5% of the class. (Dkt. 181; Dkt. 198-1, ¶ 15.) The parties propose that the same methods used to notify class members of the pendency of this action now be used to notify class members of the settlement of this action.

### 2. The proposed form of notice adequately informs class members of the settlement and their right to object.

When notifying class members of a settlement that could affect their rights, the form of the notice should present information about the settlement "neutrally, simply, and understandably," and should generally describe the terms of the settlement in "sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009). The mail and email notices that the parties propose sending to class members satisfy this standard. They are based on the illustrative forms of class-action notices published by the

Federal Judicial Center and incorporate language suggested by this district's Procedural Guidance for Class Action Settlements. Class members were previously given an opportunity to exclude themselves from this action, and so the proposed forms of notice do not include instructions for opting out of the settlement, but they do include the language and information suggested by the Guidelines with respect to notice and objections. *See Low v. Trump Univ., LLC*, 881 F.3d 1111, 1121 (9th Cir. 2018) ("[there is] no authority of any kind suggesting that due process requires that members of a Rule 23(b)(3) class be given a second chance to opt out") (quoting and affirming *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982)).

### 3.   The proposed Settlement Administrator is qualified, experienced, and previously served as the Court-appointed Notice Administrator in this action.

The Court previously appointed Epiq Class Action and Claims Solutions to serve as the Notice Administrator for purposes of notifying the class about the pendency of this action. (Dkt. 181, ¶ 1.) The parties now propose that the Court appoint Epiq to serve as the Settlement Administrator for purposes of notifying the class about the settlement, and if the settlement is ultimately approved, for distributing the settlement fund to class members. Epiq has extensive experience administering notice programs and classwide settlements, maintains robust data privacy and security procedures, and performed admirably in its capacity as Notice Administrator. (Zeman Decl., ¶¶ 6-7, 11; *see also* 4/19/23 Azari Decl. [Dkt. 170-2].) Epiq estimates that it will charge about $25,000 for all administration expenses, which includes the costs of notifying the class of the settlement funds and distributing settlement funds. (Zeman Decl., ¶ 12.)

### D.   The parties propose setting a schedule for the next steps in the approval process.

The next steps in the settlement approval process are to schedule a final fairness hearing, notify the class of the settlement and hearing, and allow class members an opportunity to submit any objections they may have to the settlement. The parties also request that the Court stay all further proceedings pending the outcome of the final fairness hearing. Toward these ends, the parties propose the following schedule:

| Event | Date |
|-------|------|
| Deadline to send Initial Mailed Notice and Initial Email Notice | **June 5, 2025** (14 days after Preliminary Approval Order) |
| Deadline for Class Counsel to File Motion for Attorneys' Fees and Costs | **June 15, 2025** (10 days after Notice Begins) |
| Deadline for Class Members to Submit Objections | **July 20, 2025** (45 days after Notice Begins) |
| Deadline for Class Counsel to File Motion for Final Approval | **August 3, 2025** (14 days after Deadline for Class Members to Submit Objections) |
| Final Approval Hearing | **September 11, 2025** at 10:00 a.m. |

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for preliminary approval of the parties' class settlement.

Dated: May 2, 2025

Respectfully submitted,

By: */s/ Amy M. Zeman*

Amy M. Zeman (SBN 273100)
Linda P. Lam (SBN 301461)
E. Wynne Tidwell (SBN 348179)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
amz@classlawgroup.com
lpl@classlawgroup.com
ewt@classlawgroup.com

Scott L. Silver (*pro hac vice*)
Peter M. Spett (*pro hac vice*)
Ryan A. Schwamm (*pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: 954-755-4799
ssilver@silverlaw.com
pspett@silverlaw.com
rschwamm@silverlaw.com

Geoffrey A. Munroe (SBN 228590)
**LAW OFFICE OF**
**GEOFFREY A. MUNROE**
1435 Broad Street

San Luis Obispo, CA 93401
Telephone: 925-788-8493
gam@munroe-law.com

*Counsel for Plaintiffs and the Class*