Keith Ketterling (*pro hac vice*)
Lydia Anderson-Dana (*pro hac vice*)
Erin Roycroft (*pro hac vice*)
Madeleine Holmes (*pro hac vice*)
**STOLL BERNE**
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
kketterling@stollberne.com
landersondana@stollberne.com
roycroft@stollberne.com
mholmes@stollberne.com

Kasey J. Curtis (SBN 268173)
Charles P. Hyun (SBN 307817)
Kathryn M. Bayes (SBN 334864)
Katherine Goetz (SBN 346205)
kcurtis@reedsmith.com
chyun@reedsmith.com
kbayes@reedsmith.com
kgoetz@reedsmith.com
**REED SMITH LLP**
515 Flower Street, Suite 4300
Los Angeles, CA  90071-1514
Telephone: +1 213 457 8000
Facsimile: +1 213 457 8080

*Attorneys for Defendant Umpqua Bank*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al.,<br><br>           Plaintiffs,<br><br>     vs.<br><br>UMPQUA BANK,<br><br>           Defendant. | Case No. 5:20-cv-05905-PCP<br><br>Judge P. Casey Pitts<br><br>**DEFENDANT UMPQUA BANK'S RESPONSE TO MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**<br><br>Date:     May 22, 2025<br>Time:    10:00 am<br>Place:    Courtroom 8 |

**RESPONSE TO MOTION FOR PRELIMINARY APPROVAL**

The proposed class action settlement is a fair, reasonable, and adequate compromise that should be preliminarily approved under Federal Rule of Civil Procedure 26(e). As the Court is aware, this is a case in which liability was hotly contested due in part to the "high bar for bank liability" that California law imposes. *Camenisch v. Umpqua Bank*, Case No. 20-cv-05905-RS, 2022 WL 177440285, at *21 (N.D. Cal. Dec. 16, 2022). The fact that the jury deadlocked and was unable to reach a unanimous verdict underscores this point. All that is the reason why any compromise in this case would be fair and reasonable. Nonetheless, Umpqua submits this response to clarify a handful of points to ensure the Court has a fulsome and clear record in ruling on the preliminarily approval motion.

Class members' net losses. The motion for preliminary approval states that the approximately 1,200 class members "collectively lost $149.4 million" as a result of PFI's fraud. Dkt. 472 at 7-8. The $149.4 million net loss figure that was presented at trial was the amount of the class's net losses for which Umpqua bore potential responsibility—not class members' total losses from investing with PFI. The difference between the two figures is the class members' pre-2007 investments. At class certification, Plaintiffs included more than $31 million in pre-2007 investments in their proposed net loss calculation and their damages expert, Mr. Salah, opined that the putative class's total net losses were $264 million.[1] *See* Dkt. 80-16 at 2, 10; Dkt. 97-53 at 19-20 (explaining that Mr. Salah's class certification calculation included 184 proposed class members with starting balances "in excess of $31 million"). Subsequently, after Umpqua moved for partial summary judgment on the pre-2007 investments, Dkt. 223 at 40-42, Plaintiffs dropped any claim related to pre-2007 investments, Dkt. 227 at n.1. Mr. Salah then revised his net loss calculations downwards to account for the exclusion of the pre-2007 investments and his calculation of apportioned distributions from PFI's bankruptcy case, Dkt. 242-1 at 6-8, 15-18.

Comparison to other settlements. The motion for preliminary approval states the proposed settlement compares favorably to other Ponzi scheme aiding and abetting settlements because it

---

[1] Mr. Salah originally mistakenly included TIC investments in his $264 million figure and later issued a corrected report. FTI's "starting balance" column is where investors' pre-2007 investments can be found in the data. *See* Dkt. 99 at 12; Trial Exhibit 1531.

1  results in a 37% recovery of class members' net losses, when other comparable settlements were in
2  the 4 – 25% range. Dkt. 472 at 14-15. This is likely an overstatement, but the settlement is still
3  plainly within the range of reasonableness compared to other Ponzi scheme aiding and abetting
4  settlements.

5  Because of the number of variables that go into how "recoverable damages," "net losses," or
6  "out-of-pocket losses" are calculated, including whether it includes distributions from the primary
7  tortfeasor (i.e., the bankruptcy or receivership case),[2] includes interest, or is temporally limited, it is
8  hard to assess what constitutes a true "apples-to-apples" comparison to prior settlements. For
9  instance, as the motion notes in footnotes 1 and 2, in *Chang v. Wells Fargo Bank*, the percentage
10 recovery varied significantly depending on whether anticipated distributions from the receivership
11 case were considered. *See* Dkt. 472 at 15, n.1 & n.2 (noting that the investors' losses were either $30
12 million or $100 million, depending on whether the $70 million the receiver recovered were
13 considered). Further, in *In re Woodbridge Investments Litigation*, the settlement occurred pre-
14 certification before a fulsome damages analysis was prepared and thus the parties utilized an
15 "estimate" of "recoverable damages" for the entire proposed nationwide class. *See In re Woodbridge*
16 *Investments Litigation*, Central District of California, Case No. 2:18-cv-00103, Dkt. 188 at 22; Dkt.
17 188-5 at 10-11 (supporting declaration describing the estimate of "aggregate recoverable damages").

18 Nonetheless, even if Plaintiffs' estimated net losses of $264 million at class certification (the
19 procedural stage at which *In re Woodbridge Investments* settled) or the $368.1 million in total
20 damages Plaintiffs sought at trial (which included prejudgment interest) is used as the comparator for
21 the percentage recovery, the recovery would be 15 – 21% of those figures. That is still in line with
22 other settlements and thus fair and reasonable. Furthermore, it bears emphasis that the nature of
23 aiding and abetting liability under California law and requirement that the defendant have actual
24 knowledge of the underlying tort necessarily means that the strength or weakness of a particular case

---

[2] Underscoring this point, Plaintiffs in this case did not take a consistent position on this issue. They simultaneously took the position that initial distributions should be considered in the damages analysis, but that future distributions from PFI's bankruptcy case were inadmissible and could not be included in any damages analysis presented to the jury. *See* Dkt. 247 at 11-12.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

will be highly individualized—which is a reason why comparisons to other settlements may be of less value in this context than it is for other types of class actions.

<u>Settlement allocation methodology.</u>  The settlement agreement provides for class counsel to propose a methodology for allocating proceeds among class members that will be subject to court approval.  *See* Settlement, § 8.1.  Umpqua has no stake in the allocation methodology ultimately selected, other than to ensure that it is transparently approved by the Court with full awareness of its implications.  Class counsel has proposed allocating the net settlement proceeds based on class members' net loss as presented to the jury by Plaintiffs' damages expert.  Dkt. 472 at 9-10.  Class counsel states that this is the same methodology that was used to allocate distributions in PFI's bankruptcy case and will treat class members equitably in relation to each other.  *Id.* at 18-19.

As noted above, however, in PFI's bankruptcy case investors' pre-2007 investments were taken into consideration when calculating the amount of investors' net claims.  In contrast, Mr. Salah's damages calculation at trial excluded those pre-2007 investments.  Thus, Plaintiffs' proposed distribution methodology is somewhat different from the methodology utilized in PFI's bankruptcy case to distribute funds.  Further, this proposed allocation methodology will favor more recent investors because it does not take into consideration the prejudgment interest that Plaintiffs sought at trial.  That is significant both because (i) the class representatives are more recent investors who stand to benefit from the use of this methodology[3] and (ii) approximately 59.4% of the $368.1 million in total damages Plaintiffs sought at trial was prejudgment interest.

That said, Umpqua disputes the recoverability of interest in this case given how PFI's bankruptcy case was administered.  *See* Dkt. 223 at 35-40 (Umpqua's motion for partial summary judgment on prejudgment interest).  The jury had discretion to award prejudgment interest or not.  *See* Dkt. 412 at 29 (final jury instruction on prejudgment interest).  And earlier investors had weaker evidence of PFI's fraud or Umpqua's purported knowledge of the same.  *See* Tr. 2527 (closing

---

[3] The parties can provide calculations showing how much the class representatives would receive under the proposed methodology compared to one that takes into consideration prejudgment interest. The magnitude of the benefits depends on how late the class representatives invested and, for that reason, Shela Camenisch and Dale Dean in particular (who first invested right before Casey passed away) benefit the most. *See* Tr. 1364 ("Q. So when did you ultimately invest with PFI? A. I believe it was in April of 2020.  It was spring.")

argument about the problems with Plaintiffs' liability dates). Any of these may be reason for the Court to conclude that the proposed allocation methodology remains appropriate. However, given "preferential treatment to class representatives or segments of the class" is a factor for the Court to consider as part of its preliminary approval analysis, *Grady v. RCM Techs, Inc.*, 671 F. Supp. 3d 1065, 1079 (C.D. Cal. 2023), Umpqua wanted to ensure the Court was fully apprised of the implications of class counsel's proposed allocation methodology.

DATED: May 16, 2025

REED SMITH LLP

By: */s/ Kasey J. Curtis*
    Kasey J. Curtis
    Charles P. Hyun
    Kathryn M. Bayes
    Katherine Goetz

STOLL BERNE
    Keith Ketterling (*pro hac vice*)
    Lydia Anderson-Dana (*pro hac vice*)
    Erin Roycroft (*pro hac vice*)
    Madeleine Holmes (*pro hac vice*)

Attorneys for Defendant
UMPQUA BANK