Amy M. Zeman (SBN 273100)
Linda P. Lam (SBN 301461)
E. Wynne Tidwell (SBN 348179)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
amz@classlawgroup.com
lpl@classlawgroup.com
ewt@classlawgroup.com

(Additional counsel on signature page)

*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELA CAMENISCH, et al.<br><br>    Plaintiffs,<br><br>v.<br><br>UMPQUA BANK,<br><br>    Defendant. | Case No. 5:20-cv-5905-PCP<br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Date: September 11, 2025<br>Time: 10:00 a.m.<br>Place: Courtroom 8, 4th Floor |

# NOTICE OF MOTION

**PLEASE TAKE NOTICE** that at 10:00 a.m. on September 11, 2025, at the United States District Court for the Northern District of California, San Jose Courthouse, Courtroom 8, 4th Floor, 280 South First Street, San Jose, CA 95113, before the Honorable P. Casey Pitts, Plaintiffs will and hereby do request that the Court approve the parties' class settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and enter a final judgment in this action.

Specifically, Plaintiffs request that the Court (a) find the settlement fair, reasonable, and adequate; (b) find the notice of settlement given to class members satisfied due process; (c) dismiss this action with prejudice and without costs; (d) bar and enjoin Plaintiffs and class members from asserting any of the Released Claims set forth in the class settlement, including during any appeal from the Court's order and judgment; (e) release Umpqua Bank and the Released Parties from the Released Claims set forth in the class settlement; and (f) reserve continuing jurisdiction over the parties and class members to administer, supervise, construe, and enforce the class settlement in accordance with its terms.

# TABLE OF CONTENTS

Page

NOTICE OF MOTION ..........................................................................................................i

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ......................................................................................................1

        A.  The Class's Aiding-and-Abetting Claims ...................................................1

        B.  The Class Definition ...................................................................................1

        C.  Trial of the Class Claims ...........................................................................2

        D.  Settlement Negotiations .............................................................................2

        E.  Preliminary Approval .................................................................................2

III.    THE SETTLEMENT ..............................................................................................3

        A.  The Settling Class Members ......................................................................3

        B.  The Settlement Fund ..................................................................................3

        C.  Settlement Administration .........................................................................4

        D.  Attorneys' Fees, Costs, and Service Awards ..............................................4

        E.  Released Claims .........................................................................................5

IV.     LEGAL ANALYSIS ...............................................................................................5

        A.  Class members have been notified of the settlement and given an opportunity to object. ..........6

        B.  The settlement satisfies Rule 23's requirements for judicial approval. .........................7

                1.  Plaintiffs and Class Counsel have adequately represented the Class. .................7

                2.  The settlement was negotiated at arm's length. .............................................8

                3.  The settlement provides a significantly higher percentage recovery than is typically achieved in class actions involving similar aiding-and-abetting claims. ..............................9

                        a.  The risk, delay, and other drawbacks associated with further litigation are substantial. ....................10

                        b.  Settlement proceeds will be distributed directly to class members using reliable contact information. ...................12

                        c.  Attorneys' fees will be limited to 25% of the settlement fund. ...............................13

                        d.  There are no side agreements. ............................................14

4.  The settlement and allocation plan treat class members equitably.......................................14

C.  The class's reaction to the settlement and lack of objections also weigh in favor of
    approving the settlement. ..........................................................................................15

V.  CONCLUSION ...............................................................................................................16

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>                                                                                                          Page(s)

3

4

*Acosta v. Trans Union, LLC*,
   243 F.R.D. 377 (C.D. Cal. 2007) .................................................................................... 8

5

6

*Chang v. Wells Fargo Bank*,
   No. 19-cv-01973-HSG, 2023 WL 6961555 at *2 (N.D. Cal. Oct. 19, 2023) ................................... 11

7

*Charalambous v. Liberty Mut. Ins. Co.*,
   No. 22-cv-00216-EMC, 2024 WL 1586701 (N.D. Cal. Mar. 15, 2024) ............................................ 9

8

9

*Churchill Vill., L.L.C. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ................................................................................................. 5, 6

10

*Evans v. ZB, N.A.*,
   No. 2:17-cv-01123 (E.D. Cal.) ............................................................................................. 10

11

12

*Fatnani v. JPMorgan Chase Bank, et al.*,
   No. 3:23-cv-00712-SI (D. Or. July 24, 2025) ......................................................................... 11

13

*Gonzalez v. Lloyds TSB Bank*,
   No. 06-cv-01433-VBF (C.D. Cal.) ......................................................................................... 10

14

15

*In re Anthem, Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) .......................................................................................... 14

16

17

*In re Bluetooth Headsets Product Liability*,
   654 F.3d 935 (9th Cir. 2011) ................................................................................................. 9

18

*In re Citric Acid Antitrust Litig.*,
   145 F. Supp. 2d 1152 (N.D. Cal. 2001) ................................................................................ 14

19

20

*In re Woodbridge Investments Litigation*,
   No. 18-cv-00103-DMG (C.D. Cal.) ........................................................................................ 10

21

22

*Jenson v. First Tr. Corp.*,
   No. CV 05–3124 ABC (CTX), 2008 WL 11338161 (C.D. Cal. June 9, 2008) ................... 9, 10, 11, 13

23

*Neilson v. Union Bank*,
   No. 02-cv-06942-MMM (C.D. Cal.) ....................................................................................... 10

24

25

*Williams v. MGM-Pathe Commc'ns Co.*,
   129 F.3d 1026 (9th Cir. 1997) .............................................................................................. 13

26

<u>Statutes</u>

27

Cal. Civ. Code § 3288 .............................................................................................................. 12

28

<u>Rules</u>

Fed. R. Civ. P. 23.................................................................................................................passim

<u>Other Authorities</u>

4 *Newberg and Rubenstein on Class Actions* § 13:14.................................................................8

Motion for Final Approval of Class Settlement
Case No. 5:20-cv-5905-PCP

# I.    INTRODUCTION

In May, the Court preliminarily approved the parties' $55 million class settlement and directed the Settlement Administrator to notify class members so they could voice any objections. (Dkt. 476.) The class has now been notified of the settlement, the deadline for objecting has passed, and none of the 1,219 class members have submitted an objection. So long as the Court remains convinced that the proposed settlement constitutes a fair, reasonable, and adequate compromise of the class's legal claims, it may now formally approve the settlement at the fairness hearing scheduled for September 11, 2025, and enter final judgment.

To assist the Court in its final review of the proposed settlement, Plaintiffs have updated the analysis they provided in connection with their motion for preliminary settlement approval. Little has changed since the Court conducted its initial review and the lack of objections indicate that the Court's preliminary evaluation was correct and that the terms of the proposed settlement are indeed fair, reasonable, and adequate. Class Counsel will be prepared to answer any further questions the Court may have at the upcoming fairness hearing, and otherwise look forward to resolving this litigation and getting settlement payments into class members' hands as soon as reasonably possible.

# II.    BACKGROUND

## A.    The Class's Aiding-and-Abetting Claims

Plaintiffs filed this action in August 2020. (Compl. [Dkt. 1].) They asserted two aiding-and-abetting claims against Umpqua: one for aiding and abetting fraud and one for aiding and abetting breach of fiduciary duty. (*Id.*, ¶¶ 48-56.) Both claims are premised on allegations that Umpqua knew PFI was engaged in a fraudulent enterprise and yet continued to provide the company with essential banking services. (*Id.*; *see also* 7/14/22 MSJ Opp. [Dkt. 122-1] at 15.) And both claims sought the same relief—namely, the recovery of the remaining net losses caused by the PFI Ponzi scheme, along with prejudgment interest on those losses. (Compl. at 11; 5/21/24 MSJ Opp. [Dkt. 224] at 10.)

## B.    The Class Definition

Plaintiffs' aiding-and-abetting claims were certified to be tried on a classwide basis in December 2022. (Dkt. 144.) The class was defined to include the following PFI investors:

All persons who invested money with Professional Financial Investors, Inc. (PFI) or

Professional Investors Security Fund, Inc. (PISF) through secured or unsecured debt instruments or an LLC membership purchase agreement; who did not recover the principal amount of their investment prior to July 14, 2020; and who have a valid, allowed claim in *In re Professional Financial Investors, Inc.*, Case No. 20-bk-30604 (Bankr.N.D. Cal.) or any of its affiliated debtor bankruptcy cases, jointly administered under Case No. 20-bk-30604. Commercial lenders to PFI and PISF are excluded from the class.

(Dkt. 181, ¶ 6.)

Pursuant to Rule 23(c)(2)(B), the Court directed that class members be individually notified of the class action and given the option to either remain in the class, and be bound by the outcome of the litigation, or exclude themselves from the class and retain their ability to sue Umpqua Bank on an individual basis. (*Id.*, ¶ 3, Ex. A.) Two class members elected to exclude themselves; the remainder opted to remain in the class and be bound by the outcome of this action. (Dkt. 198-99.)

**C.    Trial of the Class Claims**

The class's aiding-and-abetting claims against Umpqua were tried before a jury over four weeks in February 2025. After four days of deliberations, the jury reported that it was unable to reach a unanimous verdict and a mistrial was declared. (Dkt. 425.) The case was scheduled to be retried before a new jury beginning on April 28, 2025.

**D.    Settlement Negotiations**

Prior to trial, the parties had engaged in private mediation with two separate neutrals but remained far apart on their valuation of the class claims. Following trial, the parties were given an opportunity to speak with several of the jurors regarding the evidence and were directed to participate in a mandatory settlement conference before Magistrate Judge Cousins. (Dkt. 426, 435.) At the conclusion of the settlement conference, Judge Cousins made a mediator's proposal of $55 million, which both parties accepted. (Zeman Decl., ¶ 3.) The parties subsequently memorialized the classwide settlement in the formal agreement that is now before the Court. (*See id.*, Ex. A ("Settlement").)

**E.    Preliminary Approval**

The Court conducted an initial review of the parties' settlement in May. (*See* 5/22/25 Tr. [Dkt. 478].) The Court observed that, however measured, the amount of the proposed settlement appeared sufficient. (*Id.* at 4.) Similarly, Plaintiffs' proposal for allocating the settlement's proceeds amongst the

class appeared to be fair and reasonable. (*Id.*) By order dated May 22, 2025, the Court preliminarily approved the proposed settlement and directed the Settlement Administrator to notify class members using available contact information. (Dkt. 476.)

## III.    THE SETTLEMENT

### A.    The Settling Class Members

If judicially approved, the parties' settlement would bind the same group of class members whose claims were at issue in the trial held earlier this year. (*See* Settlement, §§ 2.2, 2.4, 2.19). There is, in other words, no difference between the class the Court previously certified under Rule 23(b)(3) for purposes of litigation, and the class whose claims are being settled pursuant to Rule 23(e). That class consists of 1,219 investors who were previously identified as class members and who declined the opportunity to opt-out of all further class proceedings. It does not include the two investors who previously elected to exclude themselves from the certified class. (*Id.*, § 2.4.)

### B.    The Settlement Fund

In exchange for a final resolution of the class's claims, the parties' settlement requires Umpqua to establish a settlement fund in the amount of $55 million. (Settlement, §§ 2.23, 3.1.) That fund will be used to (i) make payments to settling class members; (ii) pay Class Counsel's attorneys' fees, costs, and expenses (subject to Court approval); (iii) pay service awards to the class representatives (subject to Court approval); (iv) pay any costs incurred by the Settlement Administrator incurred in connection with its duties; (v) pay any taxes arising from income earned by the fund; and (vi) pay miscellaneous fees, costs, or expenses that might arise (subject to approval by all parties and the Court). (*Id.*, § 3.2.)

After first deducting Court-authorized fees, service awards, costs, and expenses, the net settlement fund will then be allocated to class members. (*Id.*, § 8.1.) The allocation formula that Class Counsel proposes using, subject to the Court's approval, bases each class member's respective share on the ratio between (i) the class member's maximum net loss (as presented to the jury by Plaintiffs' damages expert), and (ii) the entire class's maximum net loss (as presented to the jury by Plaintiffs' damages expert). (*Id.*; *see also* Trial Ex. 1387 [Dkt. 455-36] (maximum of $149.4 million in classwide net losses); Trial Ex. 1388 (maximum net losses presented to jury for each class member).)

To use Plaintiff Eva King as an example: The damages spreadsheet submitted to the jury at trial

1  calculated Ms. King's maximum net losses at $106,890. (Trial Ex. 1388, Tab 2.1, line 247.) The

2  maximum net losses calculated for the class as a whole was $149,435,961. (Trial Ex. 1388, Tab 1.1,

3  line 8.) Ms. King's pro rata share of the net settlement fund would therefore be 106,890 / 149,435,961,

4  or 0.071529%. As the net settlement fund is expected to amount to around $39.9 million, Ms. King's

5  pro rata share would then be approximately $28,540.

6  **C.    Settlement Administration**

7          The Court's preliminary approval order appointed Epiq Class Action and Claims Solutions to

8  act as the Settlement Administrator. (Dkt. 476, ¶ 10.) The Settlement Administrator was responsible for

9  disseminating notice of the proposed settlement to class members. (*See id.*, ¶¶ 10-11; Settlement, §§

10  6.1-6.8.) If the Court finally approves the settlement, the Settlement Administrator will also be charged

11  with distributing the net settlement fund to class members. (*Id.*, § 9.1.) Class members will not need to

12  file a claim to receive a settlement payment. The Settlement Administrator will automatically mail

13  settlement checks to Class Members within 14 days of the settlement's effective date, which is defined

14  as the fifth business day after the settlement is finally approved and any appeals are exhausted. (*Id.*, §§

15  2.6, 9.1-9.2.) Class Counsel and the Settlement Administrator will make reasonable efforts to contact

16  any class members who do not timely cash their settlement checks and ensure that each class member

17  receives their portion of the settlement funds. (*Id.*, § 9.2) Settlement checks will remain valid for 180

18  days, and any funds that remain unclaimed 60 days after the latest issued settlement check is no longer

19  valid will be disposed of by the Settlement Administrator in a manner consistent with applicable

20  unclaimed property laws. (*Id.*, §§ 9.2, 10.1.) The Settlement Administrator will cap the total charges for

21  all of its settlement notice and distribution administrative services at $26,344, the amount it had

22  previously estimated for the project. (Zeman Decl., ¶ 7.)

23  **D.    Attorneys' Fees, Costs, and Service Awards**

24          The parties' settlement provides that any award of attorneys' fees, costs, and expenses to Class

25  Counsel, as well as any service awards to the class representatives, will be paid from the $55 million

26  settlement fund. (Settlement, §§ 13.1-13.4.) The benchmark for attorneys' fees in the Ninth Circuit is

27  25% of the entire settlement fund and that is what Class Counsel has requested here. (*See* Dkt. 479.)

28  Class Counsel has also requested a $5,000 service award for each of the four class representatives,

1  reimbursement of $1,261,622 in litigation expenses they previously incurred for the benefit of the class,

2  and reimbursement for approximately $30,000 in additional expenses that Class Counsel expects to

3  incur in connection with the settlement. (*Id.* at 8-9.) When the Settlement Administrator's expected

4  final fee of $26,344 is also taken into account, Class Counsel expects that the net settlement fund

5  distributed directly to class members will amount to approximately $39.9 million.

6  **E.    Released Claims**

7        In exchange for Umpqua's $55 million settlement payment, class members will release Umpqua

8  from any and all claims that were or could have been alleged in this action, including any claims that

9  relate in any way to fraud and/or breaches of fiduciary duty committed by PFI, PISF, and/or their

10  affiliates. (Settlement, § 12.1.)

11                          **IV.    LEGAL ANALYSIS**

12        The class's aiding-and-abetting claims against Umpqua may be settled only with the Court's

13  approval and only after class members are notified of the proposed settlement and given an opportunity

14  to object. Fed. R. Civ. P. 23(e). In assessing whether a proposed settlement is fair, reasonable, and

15  adequate, the Court is required to consider the following factors:

16        (1) whether the class representatives and class counsel adequately represented the Class;

17        (2) whether the settlement was negotiated at arm's length;

18        (3) whether the amount of the settlement is adequate, taking into account:

19            (i) the costs, risks, and delay of trial and appeal;

20            (ii) the effectiveness of any proposed method of distributing relief to the class, including

21            the method of processing class-member claims;

22            (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

23            (iv) any agreement required to be identified under Rule 23(e)(3); and

24        (4) whether the settlement treats class members equitably relative to each other.

25  Fed. R. Civ. P. 23(e)(2).

26        Courts in this district also sometimes consider the "*Churchill* factors"—an expansive set of

27  considerations established by the Ninth Circuit before Rule 23(e)(2) and its "shorter list of core

28  concerns" was adopted in 2018. *Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004);

Fed. R. Civ. P. 23(e)(2), Adv. Comm. Note to 2018 amendment. The *Churchill* factors called upon courts to balance:

> (1) the strength of the plaintiffs' case;

> (2) the risk, expense, complexity, and likely duration of further litigation;

> (3) the risk of maintaining class action status throughout the trial;

> (4) the amount offered in settlement;

> (5) the extent of discovery completed and the stage of the proceedings;

> (6) the experience and views of counsel;

> (7) the presence of a governmental participant; and

> (8) the reaction of the class members to the proposed settlement.

*Churchill Vill.*, 361 F.3d at 575.

The Court considered many, if not all, of these same factors when it preliminarily approved the settlement. Now that class members have been afforded an opportunity to review the settlement's terms as well, and having received no objections, it is appropriate for the Court to revisit the Rule 23 and *Churchill* factors. If it remains convinced that the parties' settlement constitutes a fair, reasonable, and adequate compromise of the class's legal claims against Umpqua, it may now formally approve the settlement and enter a final judgment consistent with its terms.

**A.    Class members have been notified of the settlement and given an opportunity to object.**

In accordance with Rule 23(e)(1), the Court previously ordered that notice be disseminated in a reasonable manner to all class members who would be bound by the proposed settlement. (5/22/25 Order [Dkt. 476].) Specifically, the Court directed the Settlement Administrator to send notice to all class members via U.S. mail and to supplement the mailed notice with email notice to each of the 1,069 class members for whom Class Counsel has an email address. (*Id.*, ¶ 9.) The Settlement Administrator has executed the notice program approved by the Court and succeeded in notifying over 99% of the class. (*See* Kimball Decl, ¶ 12.) Of the 1,219 notices initially sent via U.S. mail, only 35 have been returned as undeliverable. (*Id.*, ¶ 6.) Of those, the Settlement Administrator re-sent mail notice to an updated address for 15 class members and successfully delivered e-mail notice for another 13. (*Id.*) Of the remaining seven class members, Class Counsel was able to contact six by phone and emailed each a

link to the settlement website where the full class notice was available. (Zeman Decl., ¶ 5.) Class

Counsel has not yet received a response from the one remaining class member but has a probable new

mailing address and contact information to a close relative. (*Id.*, ¶ 6.) Class Counsel anticipates that, if

the proposed settlement is ultimately approved, they will be able to deliver settlement checks to all

class members or their heirs, with very few, if any, exceptions. (*Id.*)

Class members were given 45 days to lodge any objections they might have to the proposed

settlement. (Dkt. 476, ¶ 12.) That deadline passed on July 20, 2025, without any objections being

submitted. And to Plaintiffs' knowledge, no late objections have been submitted, either. To the contrary,

the class's reaction to the settlement has been quite positive. Class Counsel has spoken with around 200

class members about the settlement over the past few months—including class members who called

with questions, class members who reached out to make sure their contact information or IRA details

were correct, class members we sought out to update their addresses when notice was undeliverable,

and class members that Class Counsel happened to speak with as part of their normal outreach. (Zeman

Decl., ¶ 8.) Some have been following the litigation quite closely. They understand the challenges the

class claims would face in a second trial, and while some were hoping for more money, the vast

majority are pleased with the final amount and happy that the litigation and its attendant uncertainty is

finally over. "A bird in the hand is worth two in the bush," is a sentiment that Class Counsel has heard

from these class members more than a few times. (*Id.*, ¶ 9.) Class Counsel also heard from many class

members who had not been following the litigation all that closely at all. They had largely lost hope of

recovering more of their PFI Ponzi losses and were quite pleasantly surprised to hear that they would

be receiving a substantial sum of money from this lawsuit. (*Id.*, ¶ 10.)

Pursuant to the Class Action Fairness Act, Umpqua has provided notice of the settlement to the

Attorneys General of all states, territories, and the District of Columbia in which class members reside,

in addition to relevant regulatory authorities, and has not received any objections. (*See* Anderson-Dana

Decl..)

**B.     The settlement satisfies Rule 23's requirements for judicial approval.**

**1.     Plaintiffs and Class Counsel has adequately represented the Class.**

The four core factors that Rule 23(e) requires the Court to consider before approving a class

settlement consist of two factors primarily concerned with procedural fairness and two primarily concerned with substantive fairness. *See* Fed. R. Civ. P. 23(e)(2)(A)-(B), (C)-(D), Adv. Comm. Note to 2018 amendment.

The first procedural factor asks whether Plaintiffs and Class Counsel has adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). Before the substantive terms of the settlement are considered, it is important to ensure that the parties who negotiated on behalf of the class were well-informed and capable of intelligently representing the class's interests in the first place. *See* Fed. R. Civ. P. 23(e)(2)(A), Adv. Comm. Note to 2018 amendment. A settlement that is negotiated with the benefit of an extensive record and by counsel who have demonstrated the willingness and ability to litigate zealously on the class's behalf is more likely to be fair and reasonable than a settlement that is reached quickly, without thoroughly investigating and testing the merits of the class claims being compromised. *See* 4 *Newberg and Rubenstein on Class Actions* § 13:14; *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007).

Here, Plaintiffs and their counsel have vigorously represented the class for nearly five years. They successfully defended the class's aiding-and-abetting claims against two motions to dismiss and two motions for summary judgment; obtained and evaluated more than 1.5 million pages of documents, and took or defended approximately 40 depositions, concerning the class claims; successfully moved for a class certification order permitting the class claims to be tried on a collective basis and resisted multiple efforts to partially or fully decertify those claims; opposed three *Daubert* motions and numerous motions seeking to exclude key evidence supporting the class's claims; and presented the class's claims to the jury over the course of a four-week trial featuring more than thirty witnesses. (Zeman Decl., ¶ 2.) Plaintiffs and their counsel were, in other words, armed with a great deal of information about the strengths and weaknesses of the class's claims when they negotiated the settlement now before the Court. They were ideally positioned to value those claims appropriately and had demonstrated a strong commitment to maximizing the class's ultimate recovery.

### 2. The settlement was negotiated at arm's length.

The second procedural factor seeks to eliminate the possibility that otherwise well-informed counsel may have colluded with the defendant to enrich themselves at the expense of the class. *See*

Fed. R. Civ. P. 23(e)(2)(B). Here, the parties' settlement was reached during a mandatory settlement conference with Magistrate Judge Cousins that took place only after the parties had engaged in over four years of adversarial litigation—including a four-week jury trial. (Zeman Decl., ¶¶ 2-3.) That is strong evidence that the parties' compromise was the product of arm's-length, non-collusive negotiations. *See Charalambous v. Liberty Mut. Ins. Co.*, No. 22-cv-00216-EMC, 2024 WL 1586701, at *2 (N.D. Cal. Mar. 15, 2024) ("the presence of an experienced mediator evidences a non-collusive settlement"). None of the subtle signs of collusion that the Ninth Circuit has cautioned courts to guard against are present here either: there is no "clear sailing" agreement providing for the payment of fees separate and apart from class funds; there is no possibility that any of the $55 million settlement fund will revert to Umpqua; and Class Counsel has limited their fee request to 25% of the settlement fund— even though the extraordinary amount of time and effort that Class Counsel devoted to this case could readily support a higher fee award. *See In re Bluetooth Headsets Product Liability*, 654 F.3d 935, 947 (9th Cir. 2011).

### 3. The settlement provides a significantly higher percentage recovery than is typically achieved in class actions involving similar aiding-and-abetting claims.

At trial, Plaintiffs sought to recover up to $149.4 million in net losses that class members suffered as a result of investing in the PFI Ponzi scheme. If a jury were to award maximum damages to the class, it would also have discretion to award prejudgment interest on those damages, which in the best case scenario could reach as high as $218.7 million. The parties' settlement calls for Umpqua to pay $55 million, which represents 37% of the class's maximum damages and 15% of the total amount of damages and prejudgment interest that a jury could potentially award at a second trial.

Prior cases involving similar aiding-and-abetting claims have typically settled, with judicial approval, for significantly lower percentages. For example, in *Jenson v. First Trust*, a certified class of Ponzi scheme victims settled their aiding-and-abetting claims for 9.3% of the class's remaining net losses. *Jenson v. First Tr. Corp.*, No. CV 05–3124 ABC (CTX), 2008 WL 11338161, at *10 (C.D. Cal. June 9, 2008). The court characterized the class's recovery as a "highly-favorable outcome to the Litigation," and an "excellent result, especially when compared to gross settlement figures achieved in recent years." *Id.* at 12. Other cases involving aiding-and-abetting claims by Ponzi scheme victims

have yielded settlements in that same range, as shown in the table below. Particularly when considered alongside these historical recoveries, the percentage recovery Plaintiffs and their counsel were able to secure for PFI Ponzi victims is quite favorable:

| | Investor Net Loss | Settlement | % Recovery |
|---|---|---|---|
| Proposed Settlement | $149.4 million | $55 million | 37% |
| *Chang v. Wells Fargo Bank*, No. 19-CV-01973-HSG (N.D. Cal.) | $30 – $100 million[1] | $3.75 million[2] | 4 – 13%[2] |
| *In re Woodbridge Investments Litigation*, No. 18-cv-00103-DMG (C.D. Cal.) | ~$500 million[3] | $54.2 million[4] | 11% |
| *Gonzalez v. Lloyds TSB Bank*, No. 06-cv-01433-VBF (C.D. Cal.) | $90 million[5] | $17.04 million[5] | 19% |
| *Jenson v. First Trust Corp.*, No. 05-cv-03124-ABC (C.D. Cal.) | $91.5 million[6] | $8.5 million[7] | 9% |
| *Evans v. ZB, N.A.*, No. 2:17-cv-01123 (E.D. Cal.) | $55 million[8] | $14 million | 25% |
| *Neilson v. Union Bank*, No. 02-cv-06942-MMM (C.D. Cal.) | $200+ million[9] | $26.5 million[10] | 13%[11] |

Umpqua has pointed out that there are other comparators that could be used to value the

---

[1] Dkt. 129 at 10-11 (estimating out-of-pocket losses at just over $100 million but noting that up to $70 million being held by the receivership estate could ultimately be returned to investors as well).
[2] *Chang*, 2023 WL 6961555 at *2 (N.D. Cal. Oct. 19, 2023) (if the funds held by receivership estate are disregarded, "the total settlement amount of $3.75 million represents approximately 3.75% of total estimated losses").
[3] Dkt. 188 at 10 ("preliminary estimates suggest damages as high as $500 million or more").
[4] Dkt. 207, ¶ 14.
[5] Dkt. 189 at 5-6, *adopted by* Dkt. 197.
[6] *Jenson*, 2008 WL 11338161 at *1, n.2 (C.D. Cal. June 9, 2008) ("the net-loss suffered by the Class is approximately $91.5 million").
[7] *Id.* at 6.
[8] Dkt. 105 at 10.
[9] Dkt. 308 at 2 ("Plaintiffs allege that more than $200,000,000 of [$600,000,000 received from investors] has never been returned").
[10] *Id.* at 5-6 ($26.5 million settlement fund to compensate both class and non-class investors for all claims, including aiding-and-abetting claims).
[11] *Id.* at 26 ("The proposed settlement amount thus represents approximately 13% of the damages the class sought to recover on the aiding and abetting claims").

settlement as well. (*See* 5/16/25 Resp. [Dkt. 473] at 2.) The $55 million Umpqua has agreed to pay is approximately 21% of the $264 million net losses that were outstanding when Plaintiffs moved for class certification in February 2021; and it is roughly 15% of the $368 million that a jury theoretically could have awarded at trial (if it assigned the earliest possible liability date, awarded maximum damages, and awarded compound prejudgment interest of 7% on all of those damages). Plaintiffs have previously explained why they believe it is more useful to analyze this settlement using the same comparators used in prior settlements. (*See* 5/19/25 Reply [Dkt. 474] at 2-3.) But as the Court noted at the preliminary approval hearing, "under either approach," it would likely "still find the amount that is offered sufficient and … reasonable, fair under the standard." (5/22/25 Tr. [Dkt. 478] at 4.) Umpqua likewise agrees that the proposed settlement is "plainly within the range of reasonableness compared to other Ponzi scheme aiding and abetting settlements." (5/16/25 Resp. at 2.).[12]

> **a.    The risk, delay, and other drawbacks associated with further litigation are substantial.**

Aiding-and-abetting claims against financial institutions are acknowledged to be highly risky affairs—primarily because, under California law, a financial institution cannot be held secondarily liable unless they had "actual knowledge" of the fraud. *See Jenson*, 2008 WL 11338161 at *5 ("Particularly important—and risky—in this case is a requirement for aiding and abetting liability that Plaintiffs prove that Fiserv had actual knowledge of the Heath Fraud."); *Chang*, 2023 WL 6961555 at *4 ("Plaintiffs recognize that with just circumstantial evidence, they face an uphill battle proving that Wells Fargo had actual knowledge of the Equitybuild Scheme perpetrators' fraud and breach of duty.").

That risk is not merely theoretical here. Plaintiffs presented extensive evidence of Umpqua's alleged knowledge to a jury over the course of four weeks and were unable to convince the entire jury of Umpqua's liability. The evidence was compelling enough that at least one juror believed Umpqua

---

[12] Plaintiffs previously noted that Umpqua was likely downplaying the relative value of this settlement to aid in other lawsuits, where it would be looking to settle at significantly lower percentages. (5/19/25 Reply at 3-4.) It was recently disclosed, for instance, that only a few weeks before filing its response, Umpqua had agreed to pay $1 million to settle claims it aided and abetted a Ponzi scheme that caused over $37 million in net losses (a 3% recovery from Umpqua and a 10% recovery after factoring in the other defendants' contributions). *See Fatnani v. JPMorgan Chase Bank, et al.*, No. 3:23-cv-00712-SI, Dkt. 174 at 33 (D. Or. July 24, 2025).

1    should be held secondarily liable for PFI's fraud. But at least one juror also believed that Plaintiffs'

2    evidence was insufficient. Such is the nature of a case that requires Plaintiffs to prove a corporation's

3    mental state and, by necessity, depends on circumstantial evidence that can reasonably be viewed in

4    different ways by different jurors.

5         There is no guarantee that a second trial would yield a better result. And even if all jurors saw

6    the evidence the same way and found Umpqua liable, there is a wide range of damages that the jury

7    could ultimately award. The maximum net losses for which Umpqua could be held responsible is

8    $149.4 million, but to award that amount, all jurors would have to agree that Umpqua possessed actual

9    knowledge of PFI's fraud by January 1, 2007; if some jurors decided that Umpqua did not learn of the

10   fraud until a later date, the amount of Umpqua's liability would be lower. (*See* Trial Ex. 1387 [Dkt.

11   455-36] (summarizing classwide net losses by liability date).) The prejudgment interest that could be

12   added to any jury award of classwide net losses is substantial, but whether to award prejudgment

13   interest at all is wholly discretionary and thus far from guaranteed. *See* Cal. Civ. Code § 3288.

14   Accordingly, when prior cases involving similar aiding-and-abetting claims have analyzed classwide

15   settlements, they have measured the settlement as a percentage of the class's remaining net losses only,

16   and disregarded the potential for prejudgment interest to be awarded on that amount as well.

17        In addition to the risks posed by conducting a second trial, Umpqua has raised a large number of

18   class certification issues, evidentiary issues, and legal issues that would pose at least some risk on

19   appeal. So even if a second or third trial eventually yielded a favorable result for the class, it would

20   likely be several years before all appeals were exhausted and funds could be collected and disseminated

21   to class members. One of the primary benefits of settling now is that PFI Ponzi scheme victims will

22   receive a substantial portion of their potential recovery much sooner than they otherwise could.

         **b.    Settlement proceeds will be distributed directly to class members using
               reliable contact information.**

25        Just as the risk of further trials is not theoretical, neither is the benefit to class members of

26   settlement. Settlement proceeds can be disseminated directly to class members without the need for a

27   claims process. Plaintiffs have comprehensive contact information for the class that will be used to

28   ensure class members receive and have every opportunity to cash their settlement checks. The same

1   contact information, which was also used to disseminate checks in the PFI bankruptcy, has twice been

2   used to successfully reach over 99% of class members via U.S. mail or electronic mail. (*See* Kimball

3   Decl., ¶ 12 (settlement notice); Dkt. 198-1, ¶ 15 (notice of class certification). In fact, Class Counsel is

4   hopeful that they will be able to deliver settlement checks to 100% of the class and will make every

5   effort to do so. As discussed above, the contact information that Class Counsel provided to the

6   Settlement Administrator succeeded in reaching 1,212 of the 1,219 class members, and Class Counsel

7   has since located six of the remaining class members while continuing making efforts to contact the

8   final class member. (Zeman Decl., ¶¶ 5-6.) Many of the class members have also kept in touch with

9   each other through PFI-related Facebook groups and personal communications, offering further

10  opportunities to locate any class members with outdated contact information.

11                    **c.     Attorneys' fees will be limited to 25% of the settlement fund.**

12          The terms and timing of any attorneys' fees provided for in a class settlement warrant scrutiny

13  to ensure that class claims are not being compromised for the benefit of the class's attorneys rather than

14  for the benefit of class members. Here, the settlement leaves Class Counsel's attorneys' fees to the

15  Court's discretion. (Settlement, § 13.1.) Nor is Class Counsel receiving preferential treatment with

16  regard to the timing of payment. The parties' settlement provides for both class members and Class

17  Counsel to be paid within 14 days of the settlement's effective date. (Settlement, §§ 9.1, 13.2.)

18          In addition, Class Counsel has agreed to limit their fee request to the well-established

19  benchmark for an attorneys' fee award in a successful class action: twenty-five percent of the

20  settlement fund generated by their efforts. *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027

21  (9th Cir. 1997). This is no ordinary case, however, and there are several factors that would otherwise

22  weigh in favor of awarding Class Counsel a higher percentage of the settlement fund, including the

23  extraordinary risk they assumed to prosecute aiding-and-abetting claims through a four-week trial; the

24  $16,500,000 lodestar value of the professional time and effort they devoted to this case over the past

25  five years; and the favorable result they were ultimately able to obtain for class members. *See Jenson*,

26  2008 WL 11338161 at *11-15 (awarding class counsel 33% of settlement fund). Class Counsel's

27  decision to limit their request to 25% of the settlement fund thus represents a valuable concession and a

28  further indication that the proposed settlement is a favorable one for class members.

1             **d.     There are no side agreements.**

2        Rule 23(e)(3) requires that parties seeking approval of a class settlement file a statement

3 identifying any agreement made in connection with the proposal. Here, the only such agreement is the

4 formal settlement agreement now before the Court; there are no side agreements. (Zeman Decl., ¶ 14.)

5        **4.     The settlement and allocation plan treat class members equitably.**

6        The settlement requires Class Counsel to propose a method for allocating proceeds among class

7 members; that allocation plan will then be subject to Court approval. (Settlement, § 8.1) Class Counsel

8 has proposed that the net settlement fund be allocated to class members based on the following pro rata

9 formula: (net settlement fund) x (class member's remaining net loss) / (all class members' remaining

10 net loss). (*See* Section III.B, *supra*.) Court approval of this allocation plan is governed by the same

11 standard as the settlement itself: the allocation plan must be "fair, reasonable, and adequate." *In re*

12 *Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001). "A plan of allocation that

13 reimburses class members based on the type and extent of their injuries is generally reasonable." *In re*

14 *Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 332 (N.D. Cal. 2018). Accordingly, an allocation

15 formula like the one proposed by Class Counsel "need only have a reasonable, rational basis,

16 particularly if recommended by experienced and competent counsel." *In re Anthem, Inc. Data Breach*

17 *Litig.*, 327 F.R.D. 299, 332 (N.D. Cal. 2018).

18        The proposed allocation plan meets the standard for judicial approval and was preliminarily

19 approved by the Court in May. (5/22/25 Order [Dkt. 476], ¶ 6; *see also* 5/22/25 Tr. [Dkt. 478] at 4 ("I

20 do think that the proposed allocation formula is fair and reasonable").) It treats class members

21 equitably with respect to one another by basing class members' shares on their net loss of principal. If,

22 as expected, the net settlement fund amounts to $39.9 million after the payment of all Court-authorized

23 fees and expenses, each class member would receive 26.7% of their remaining lost principal. This is

24 the same pro rata approach that was employed in each of the six comparative class settlements cited

25 above. *See, e.g.*, *Neilson*, Dkt. 308 at 6 (approving allocation under which aiding-and-abetting plaintiffs

26 would receive approximately 5.52% of their lost principal); *Evans*, Dkt. 105 at 12 (approving allocation

27 plan as fair and equitable where "all class members are entitled to pro rata monetary relief based on

28 their respective net loss"). This is also the same approach that was used to allocate proceeds among

1  class members in the PFI bankruptcy, where class members agreed to settle their fraud claims against

2  PFI. (Zeman Decl., ¶ 13.) The proposed allocation formula is also consistent with what class members

3  expect and consider fair. (*Id.*) Based on their extensive communications with the class over the years,

4  Class Counsel anticipates that class members would strenuously object if some class members were to

5  receive settlement compensation for prejudgment interest before all class members have fully

6  recovered the full amount of their principal investments. (*Id.*)

7  **C.    The class's reaction to the settlement and lack of objections also weigh in favor of
8  approving the settlement.**

9        The majority of the *Churchill* factors are covered above in conjunction with Rule 23(e)(2)'s

10  prescribed analysis, including the strength of Plaintiffs' case (*see* Section IV.B.3(a), *supra*); the risk,

11  expense, complexity, and likely duration of further litigation (*id.*); the risk of maintaining class status

12  through trial (*id.*); the amount offered in settlement (*see* Section IV.B.3, *supra*); and the extent of

13  discovery completed and the stage of proceedings (*see* Section IV.B.1, *supra*).

14       The remaining *Churchill* factors inquire into (i) the experience and views of counsel, (ii) the

15  presence of a governmental participant, and (iii) the reaction of the class members to the proposed

16  settlement. There is no governmental participant in this litigation, but the U.S. Attorney General and

17  appropriate state attorneys general have all been notified (as required by the Class Action Fairness Act),

18  and none have lodged an objection or otherwise expressed concerns about the fairness of the

19  settlement. Class Counsel likewise does not have any concerns regarding the fairness or adequacy of

20  the settlement. They have considerable experience litigating complex class actions like this one, have

21  had the benefit of trying this particular case to a jury, and consider the ultimate resolution to be a

22  favorable one—particularly when compared to prior class settlements involving similar claims. (*See*

23  Zeman Decl., ¶ 12.) But more important than Class Counsel's views are those of class members, who

24  have a great deal of money at stake, who have demonstrated a high level of engagement in both this

25  lawsuit and in the PFI bankruptcy, and who have not hesitated to share their views at various stages of

26  the five-year odyssey of legal proceedings that ensued following Ken Casey's death. If class members

27  considered this settlement to be unfair, unreasonable, or inadequate, they would not have hesitated to

28  lodge objections en masse. The fact that no objections have been submitted speaks volumes. As does

the general reaction and many thanks that Class Counsel has received in their interactions with class members over the past several months. (*See* Zeman Decl., ¶¶ 9-11.)

## V.    CONCLUSION

In light of the lack of objections and the favorable percentage of recovery offered by the proposed settlement, Plaintiffs respectfully request that the Court affirm the findings it made at the preliminary approval stage, formally approve the settlement as a fair, reasonable, and adequate compromise of the class's aiding-and-abetting claims against Umpqua, and enter final judgment consistent with the settlement's terms.

Dated: August 4, 2025                                   Respectfully submitted,

By: */s/ Amy M. Zeman*

Amy M. Zeman (SBN 273100)
Linda P. Lam (SBN 301461)
E. Wynne Tidwell (SBN 348179)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
amz@classlawgroup.com
lpl@classlawgroup.com
ewt@classlawgroup.com

Scott L. Silver (*pro hac vice*)
Peter M. Spett (*pro hac vice*)
Ryan A. Schwamm (*pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: 954-755-4799
ssilver@silverlaw.com
pspett@silverlaw.com
rschwamm@silverlaw.com

Geoffrey A. Munroe (SBN 228590)
**LAW OFFICE OF**
**GEOFFREY A. MUNROE**
1435 Broad Street
San Luis Obispo, CA 93401
Telephone: 925-788-8493
gam@munroe-law.com

*Counsel for Plaintiffs and the Class*